WHITE AND WHITE, INC., Bluefield Supply Company, Crocker-Fels Co., and Ransdell Surgical Inc., Plaintiffs,

v.

AMERICAN HOSPITAL SUPPLY CORPORATION, Defendant.

No. G79–633 CA1.

United States District Court, W. D. Michigan, S. D.

April 22, 1982.

Lawrence G. Meyer, Patton, Boggs & Blow, Washington, D. C., Robert D. VanderLaan, Grand Rapids, Mich., George E. Bushnell, Southfield, Mich., for plaintiffs.

W. Donald McSweeney, William A. Montgomery, Joseph R. Lundy, Schiff, Hardin & Waite, Chicago, Ill., Grant J. Gruel, J. Clarke Nims, Cholette, Perkins & Buchanan, Grand Rapids, Mich., for defendant.

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Proceedings | 960 |
| II. | Parties | 961 |
| | A. Plaintiffs | 962 |
| | B. Defendant | 963 |
| | C. Voluntary Hospitals of America | 963 |
| III. | The Hospital Supply Industry | 965 |
| IV. | The Purchasing Agreement | 972 |
| V. | Implementation of the Purchasing Agreement | 974 |
| VI. | Implied Antitrust Exemption | 977 |
| VII. | Market Analysis | 979 |
| | A. The Relevant Market | 979 |
| | 1. The Product Market | 980 |
| | (a) Medical-Surgical Supply Dimension | 982 |
| | (b) The Distributor Dimension | 986 |
| | (c) The Hospital Customer Dimension | 988 |
| | 2. The Geographic Market | 988 |
| | B. Market Volume and Defendant's Market Share | 993 |
| | 1. The Martin Potential | 994 |
| | 2. The Armbruster Potential | 995 |

TABLE OF CONTENTS

| | | |
|---|---|---|
| | 3. The Hepp Potential | 996 |
| | 4. Comparison | 996 |
| VIII. | Attempt to Monopolize | 999 |
| | A. Anticompetitive Conduct and Specific Intent to Monopolize | 1001 |
| | B. Dangerous Probability of Success | 1009 |
| IX. | Unreasonable Restraint of Trade | 1013 |
| X. | Exclusive Dealing | 1026 |
| XI. | Boycott | 1033 |
| XII. | Damages and Remedy | 1036 |
| | A. Proof of Damage | 1036 |
| | B. Amount of Damages | 1039 |
| | C. Injunctive Relief | 1044 |
| XIII. | Attorney Fees and Costs | 1045 |
| XIV. | Conclusion | 1045 |

OPINION

DOUGLAS W. HILLMAN, District Judge.

This antitrust action brought under the Sherman and Clayton Acts was filed by four regional distributors of medical-surgical supplies against the American Hospital Supply Corporation, the nation's largest manufacturer and distributor of hospital supplies. The suit challenges (1) the legality of a Purchasing Agreement executed by defendant American Hospital Supply Corporation ("AHSC") and the Voluntary Hospitals of America ("VHA") on July 5, 1979, and (2) the legality of the joint AHSC–VHA conduct implementing that Agreement. Federal jurisdiction exists under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

Plaintiffs filed this action on October 31, 1979. Trial to the court commenced on November 3, 1980, and proceeded for approximately 80 trial days, concluding September 21, 1981. In the course of the proceedings the court heard 43 witnesses, including nine experts. The proceedings are recorded in the trial transcript which runs almost 15,000 pages; includes approximately 800 exhibits and several hundred pages of designated deposition testimony.

Counsel have filed post-trial briefs and proposed findings of fact and conclusions of law that consume an additional 525 pages. The case was exceptionally well tried and briefed by able counsel.

In synopsis, the following factual circumstances underly this case. American Hospi-

tal Supply Corporation (AHSC) is a national manufacturer and distributor of health care products and services. In 1979, AHSC entered into a Purchasing Agreement with a group of hospitals known as the Voluntary Hospitals of America (VHA). The Agreement contemplates that AHSC will sell a high volume and broad range of products to at least 29 VHA hospitals spread across 22 states. In return, the hospitals become eligible for volume discounts, price protection and certain vendor services. Plaintiffs are engaged in the business of distributing medical-surgical and other supplies to hospitals and compete with defendant for this distribution business in eight VHA hospitals. Plaintiffs claim that in executing and implementing the Purchasing Agreement defendant AHSC, the VHA and individual VHA hospitals have conspired to violate the antitrust laws.

## I. PROCEEDINGS

The complaint alleges that defendant, AHSC, has violated Section 1[1] and 2[2] of the Sherman Act and Section 3 of the Clayton Act[3]. Five antitrust violations are charged: (1) attempt to monopolize; (2) price fixing; (3) tying; (4) exclusive dealing and group boycott; and (5) price discrimination under the Robinson Patman Act.[4] Counts II through V were framed in language alleging a conspiracy between the defendant AHSC and the VHA. The complaint prayed for treble damages and injunctive relief. In its answer, defendant denied any antitrust violation and raised as affirmative defenses a Robinson Patman immunity under the Nonprofit Institutions Act[5] and a general, implied antitrust ex-

1. In its relevant part, Section 1 of the Sherman Act, 15 U.S.C. § 1, provides that:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

2. Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that:
 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

3. Section 3 of the Clayton Act, 15 U.S.C. § 14, provides that:
 "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

4. In its relevant part, the Robinson Patman Act, codified as Section 2(a) of the Clayton Act, 15 U.S.C. § 13, provides that:
 "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."

5. The Nonprofit Institutions Act, 15 U.S.C. § 13c, provides that:
 "Nothing in sections 13 to 13b and 21a of this title, shall apply to purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit."

emption under Section 2103 of the HCFA Provider Reimbursement Manual.[6]

After presenting an extensive case in chief, plaintiffs were permitted to amend the complaint to include a sixth count which alleges a conspiracy between AHSC, the VHA and the individual VHA hospitals to unreasonably restrain trade. At the close of plaintiffs' case, defendant moved to exclude certain evidence conditionally admitted under Fed.R.Evid. 801(d)(2)(E) and moved to dismiss the amended complaint under Fed.R.Civ.P. 41(b).

Defendant's evidentiary motion attacked the admissibility of testimony concerning statements made by high-ranking VHA and VHA hospital personnel. Defendant objected to the admission of the evidence as hearsay. Plaintiffs contended the evidence was admissible under the co-conspirator exemption to the hearsay rule. In accordance with the procedure approved in *United States v. Vinson*, 606 F.2d 149 (6th Cir. 1979), the evidence was conditionally admitted pending a final determination by the court on the existence of a conspiracy sufficient to admit the evidence.

By a memorandum opinion dated April 13, 1981, this court determined that sufficient evidence of joint or conspiratorial activity existed to admit the evidence under the co-conspirator hearsay exemption. The court then dismissed plaintiffs' claims of price fixing, tying, and price discrimination. As a consequence of the dismissal of plaintiffs' price discrimination claim, the court did not address defendant's defense of immunity under the Nonprofit Institutions Act. As to plaintiffs' remaining claims, the court held defendant's motion to dismiss in abeyance. Accordingly, plaintiffs' claims of attempt to monopolize, exclusive dealing and group boycott and unreasonable restraint of trade are now before the court.

Pursuant to Fed.R.Civ.P. 52(a), this memorandum opinion constitutes the findings of fact and conclusions of law in this matter. In support of factual determinations, the court gives citations to designated deposition transcripts, trial record or exhibits where appropriate. These citations are not intended to represent the sole source of support for the fact determination involved. Similarly, those determinations of fact not accompanied by any specific reference to evidentiary material should be viewed as facts found by the court in light of its consideration of the record as a whole.

## II. PARTIES

The parties are competitive distributors of hospital supplies.

6. Defendant urges that Section 2103 of the Health Care Financial Administration Provider Reimbursement Manual authorizes hospital group purchasing and exempts hospital group vendors from the antitrust laws. Section 2103, in pertinent part provides:

"2103. PRUDENT BUYER

A. *General.*—The prudent and cost-conscious buyer not only refuses to pay more than the going price for an item or service, he also seeks to economize by minimizing cost. This is especially so when the buyer is an institution or organization which makes bulk purchases and can, therefore, often gain discounts because of the size of its purchases. In addition, bulk purchase of items or services often gives the buyer leverage in bargaining with suppliers for other items or services. Any alert and cost-conscious buyer seeks such advantages, and it is expected that Medicare providers of services will also seek them.

B. *Application of Prudent Buyer Principle.*—Intermediaries may employ various means for detecting and investigating situations in which costs seem excessive. Included may be such techniques as comparing the prices paid by providers to the prices paid for similar items or services by comparable purchasers, spotchecking, and querying providers about indirect, as well as direct, discounts. In addition, where a group of institutions has a joint purchasing arrangement which seems to result in participating members getting lower prices because of the advantages gained from bulk purchasing, any potentially eligible providers in the area which do not participate in the group may be called upon to justify any higher prices paid. Also, when most of the costs of a service are reimbursed by Medicare (for a home health agency which treats only Medicare beneficiaries, for example), the costs should be examined with particular care. In those cases where an intermediary notes that a provider pays more than the going price for a supply or service, in the absence of clear justification for the premium, the intermediary will exclude excess costs in determining allowable costs under Medicare."

The term hospital supplies includes several broad product categories. Three product categories figure prominently in this case: medical-surgical supplies, parenteral solutions, and laboratory supplies. Other hospital product categories, such as office furniture, equipment, dietary or laundry products are of peripheral significance. For the purpose of this general introduction, medical-surgical supplies are disposable health care products, used in high volume by hospital personnel and generally used directly with the patient in the course of medical treatment. Parenteral solutions are intravenous nutritional fluids. Laboratory supplies are reagents and minor equipment items used by hospital laboratory personnel.

Defendant is a national distributor of a complete line of hospital supplies. Plaintiffs are regional distributors of primarily medical-surgical supplies. The distribution function consists of purchasing products from manufacturers, warehousing then selling and delivering them in smaller quantities to health care institutions. The primary customers for this distribution service are hospitals.

A. *Plaintiffs.*

Plaintiff White and White Surgical Supply and Pharmacies, Inc. (White and White) is a Michigan corporation with headquarters in Grand Rapids. Eighty percent of White and White's sales are of medical-surgical supply products. (T 730) An insignificant volume of sales consists of parenteral solutions and no sales are made of laboratory supplies. (Byington Dep. 12/12/79, at 65) Seventy percent of White and White's sales are made to hospitals. (T 730) Other customers include physicians, nursing homes, retail pharmacies and industrial accounts. (T 852) White and White distributes from two warehouse facilities, one located in Grand Rapids and the other in Ann Arbor, Michigan. (T 679–680) The maximum sales area of the company includes the lower peninsula of Michigan, northwest Ohio and northeast Indiana. (T 862–863, DX 100) Corporate sales for fiscal 1980 were $18 million. (T 887)

Plaintiff Bluefield Supply Co. is an industrial wholesale distributor with headquarters in Bluefield, West Virginia. (T 3880) Bluefield distributes hospital supply products through its subsidiary, Skyland Hospital Supply Division (Skyland). Seventy percent of Skyland's sales are of medical-surgical supplies. (Rhodes Dep. 12/10/79, at 52) Ten percent of Skyland's sales consist of parenteral solutions (*Id.* at 50) and no more than two percent of the sales relate to laboratory supplies. (*Id.* at 52) Skyland's primary customers are hospitals. (T 4007) Secondary customers include physicians and nursing homes. Skyland has two distribution facilities, one in Bluefield and the other in Riply, West Virginia. (T 3989–90) The maximum sales territory of the company includes West Virginia, Virginia and parts of Ohio, Tennessee, and Kentucky. (DX 201) Total sales for fiscal 1979 were $15 million. (T 4137)

The Crocker-Fels Company (Crocker-Fels) is an Ohio corporation with headquarters in Cincinnati. Ninety percent of Crocker-Fels' sales are of medical-surgical supplies. (T 376) Crocker-Fels makes insubstantial sales of parenteral solutions or laboratory supply products. (T 374, Smith Dep. 12/6/79 at 52, 57) Eighty percent of the company's sales are made to hospitals and the remaining 20% are made to physicians and nursing homes. (T 377) Crocker-Fels maintains a principal distribution facility in Cincinnati, Ohio, and a secondary warehouse in Louisville, Kentucky. (T 372) Distribution is made to a maximum geographic area comprising a five-state region around Cincinnati, including parts of Illinois, Indiana, Ohio, West Virginia and Virginia. (DX 242–246) Total corporate sales in fiscal 1979 were $17.8 million. (T 608)

The final plaintiff, Ransdell Surgical, Inc. (Ransdell) is a Kentucky corporation with headquarters in Louisville. Approximately 80% of Ransdell's sales are of medical-surgical supplies. (T 94) Ten percent of sales consist of parenteral solutions and a small proportion of sales are of laboratory supplies. (Ransdell Dep. 12/4/79 at 49–50) Eighty percent of Ransdell's sales are made to hospitals. The remaining business is done with physicians, nursing homes and in retail trade. Ransdell operates from a single warehouse located in Louisville. (T 98)

The company's maximum sales territory is the area around Louisville encompassing parts of Indiana and Kentucky. (DX 185) Ransdell's sales for fiscal 1978 totaled $10.1 million. (T 209)

### B. Defendant.

Defendant American Hospital Supply Corporation (AHSC), headquartered in Evanston, Illinois, is engaged in the manufacture and distribution of over 120,000 health care products and services. (PX 81) Organizationally, AHSC is subdivided into a series of divisions, each with a specialized manufacturing or distributing function. The following manufacturing divisions of AHSC are relevant to this case: the McGaw Laboratories Division, Pharmaseal Division, Convertors Division, Dade Division and V. Mueller Division.

AHS McGaw Division manufactures and distributes irrigating and parenteral solutions and equipment for blood collection and storage. AHS Pharmaseal Division manufactures a wide range of disposable medical and surgical supplies such as needles, syringes, latex surgeon's gloves, procedure trays and anesthesia products. AHS Convertors Division manufactures disposable products for use in hospital operating and obstetrical departments, such as surgical gowns, face masks, caps, shoe covers and towels. AHS Dade Division manufactures reagents and other scientific products. AHS V. Mueller Division manufactures surgical instruments, equipment and supplies. Other AHSC manufacturing units of lesser, but some, relevance include Hamilton Industries Division (office and laboratory furnishings), Edward Laboratories and Edward Pacemaker Divisions (biomedical devices for cardiovascular surgery), and Heyer-Schulte Division (implant products). (See generally PX 244, Appendix 1)

AHSC distribution is carried out through the following divisions: McGaw Laboratory Division, Scientific Products Division, the American Hospital Supply Division, V. Mueller Division, Hospitex Division and the Dietary Products Division. McGaw Laboratory distributes its in-house manufactured parenteral solutions. Similarly, V. Mueller distributes its in-house manufactured surgical instruments and equipment. Scientific Products distributes reagent and scientific products manufactured by the Dade Division. The American Hospital Supply Division is the principal AHSC distribution unit for over 40,000 products which are primarily medical-surgical supplies. The Hospitex and Dietary Products Divisions distribute hospital textile and food products respectively. (See generally, PX 244, Appendix 1)

AHSC is the largest distributor of hospital supplies in the world. Its national network of warehouses allows the corporation to distribute a complete range of hospital supply products to over 7,000 hospital customers. (PX 244, Appendix 1, at 26) In fiscal 1978, AHSC reported net sales of $1,741,709,000. (Defendant's answer, ¶ 7)

### C. Voluntary Hospitals of America.

The Voluntary Hospitals of America (VHA) is an association of hospitals which, though not a party, is alleged to be a co-conspirator of AHSC. It has appeared and filed a brief in this case as amicus curiae. The VHA is a for-profit corporation organized under the laws of Illinois and headquartered in Troy, Michigan. The shareholders of the VHA are 29 prestigious, non-profit hospitals spread across 22 states.[7]

7. The AHSC–VHA Purchasing Agreement (PX 1) records the name, location and size of the member VHA hospitals as follows:

| Hospital/Location | Beds |
|---|---|
| Abbott-Northwestern Hospital, Minneapolis, Minnesota | 746 |
| Baptist Medical Center, Birmingham, Alabama | 1,012 |
| Baptist Memorial Hospital, Memphis, Tennessee | 1,821 |
| Baptist Hospital, Pensacola, Florida | 444 |

| Hospital/Location | Beds |
|---|---|
| Baylor University Medical Center, Dallas, Texas | 1,233 |
| Butterworth Hospital, Grand Rapids, Michigan | 535 |
| Charleston Area Medical Center, Charleston, West Virginia | 903 |
| Community Hospital of Indianapolis, Indianapolis, Indiana | 750 |
| Christ Hospital, Cincinnati, Ohio | 617 |
| Decatur Memorial Hospital, Decatur, Illinois | 377 |

These institutions are acute care hospitals, with an average capacity of 650 beds. The VHA hospitals provide primary, secondary and tertiary medical care[8] and in many cases are teaching facilities.

The VHA was founded in 1977 to provide its member hospitals management services, research and development activities, economics of scale, cost containment mechanisms and political strength. (T 5018–19, DX 502) The VHA board members believe the voluntary, non-profit hospital system is more responsive to community needs than proprietary hospital chains. (*Id.*) The VHA also believes that large, prestigious non-profit hospitals have common goals, problems and needs which can be better understood and managed through a collective association. Another stated purpose of the VHA is to contain rising hospital costs. (T 4607, 4610, DX 502) Incident to this last purpose, VHA negotiates group purchasing agreements on behalf of the member hospitals. (T 4989, 5000, 8677)

The Chief Executive Officer of the VHA is Robert Kitzman. The VHA is governed through a Board of Directors consisting of the chief executive officers of the shareholder VHA hospitals. Below the Board of Directors are subordinate committees which consider specialized problems. One such committee is the Materials Management Committee, which deals with product standardization among the VHA hospitals.

Membership in the VHA is increasing under two expansion programs. Through a 1977 stockholder expansion program, a large (500 bed) hospital may pay $50,000 and become a voting shareholder member. Through a 1979 stockholder expansion program, a smaller hospital, sponsored by one of the pre-existing shareholders, may pay $1,000 and become a non-voting affiliate. (PX 164) The VHA has added several affiliates. A recent affiliate is the Affiliated Hospitals of Indiana which is a network of small and medium sized hospitals in central and southern Indiana. (T 4996) The VHA has had at least seven nominees for 1977 stockholder status and seven nominees for 1979 stockholder affiliate status. (PX 277, 331, 346) New members are expected to

| Hospital/Location | Beds |
| --- | --- |
| Evanston Hospital, Evanston, Illinois | 551 |
| Ford Sanders Presbyterian Hospital, Knoxville, Tennessee | 535 |
| Henry Ford Hospital, Detroit, Michigan | 1,052 |
| Hillcrest Medical Center, Tulsa, Oklahoma | 546 |
| Lakeland General Hospital, Lakeland, Florida | 601 |
| Madison General Hospital, Madison, Wisconsin | 424 |
| Medical Center Hospitals, Norfolk, Virginia | 900 |
| Memorial Hospital System, Houston, Texas | 947 |
| Miami Valley Hospital, Dayton, Ohio | 669 |
| North Mississippi Medical Center, Tupelo, Mississippi | 529 |
| Norton-Children's Hospitals, Louisville, Kentucky | 492 |
| Ochsner Foundation Hospital, New Orleans, Louisiana | 510 |
| Presbyterian Hospital Center, Albuquerque, New Mexico | 618 |
| Riverside Methodist Hospital, Columbus, Ohio | 806 |

| Hospital/Location | Beds |
| --- | --- |
| St. Luke's Hospital, Kansas City, Missouri | 665 |
| Tallahassee Memorial Hospital, Tallahassee, Florida | 684 |
| Trinity Regional Hospital, Fort Dodge, Iowa | 225 |
| Tucson Medical Center, Tucson, Arizona | 604 |
| Wesley Medical Center, Wichita, Kansas | 705 |

8. The VHA hospitals provide a complete range of health care extending from simple to complex medical treatment and procedures. The terms primary, secondary and tertiary care were used by several witnesses to describe the degree of health care delivered by VHA hospitals. Primary care is basically general health care relating to simple or common illnesses, which involve the hospital's direct contact with a patient. Secondary care involves medical specialists such as cardiologists, urologists or dermatologists who do not necessarily directly treat a patient. Tertiary care involves the delivery of health care services by highly-specialized providers such as thoracic surgeons or neurosurgeons and may involve the use of highly-sophisticated equipment. *See, Institute*

participate in all VHA programs. (PX 347, 331, 303)

## III. THE HOSPITAL SUPPLY INDUSTRY

The focus of this antitrust inquiry is the hospital supply distribution industry. Distributors, by definition, purchase in bulk from manufacturers and sell a broader product mix in smaller quantities to their customers. Hospital supply distributors have developed certain practices for purchasing, inventorying, order processing and delivering supplies.

A regional hospital supply distributor purchases a substantial portion of its inventory from approximately 15 to 20 major manufacturers. (DX 200) These suppliers are national manufacturers of a broad line of products which hospitals use in high volume. For example: Johnson and Johnson, a national manufacturer of adhesive and gauze bandages and, through its subsidiary, Ethicon, a major suture manufacturer (DX 301); Kendall Co., a major manufacturer of urological products; Sherwood Medical Co. and Becton-Dickinson, national manufacturers of disposable needles, syringes, vacutainers and blood collection equipment (T 4303, DX 302); and C. R. Bard, a major manufacturer of catheters, enemas, tubes, procedural kits and trays (DX 294). In addition to these major suppliers, distributors purchase a narrower range of supplies from many, more specialized manufacturers. A distributor may purchase supplies from 200 to 500 suppliers. (Rhodes Dep. 12/10/79 at 50; Ransdell Dep. 12/4/79 at 46)

Distributors acquire inventory at discount prices by purchasing in bulk quantities from manufacturers. Manufacturers generally offer price discounts ranging from 5% to 15% on bulk purchases. A distributor normally must purchase goods in "truckload" quantities to be eligible for manufacturer price discounts. (T 742–744) Distributors, such as plaintiffs, generally earn a 10% to 15% gross profit margin. (T 742, 4015–

4016) Consequently, distributors regard the ability to purchase in bulk as essential. (T 742)

A regional distributor, such as White and White, inventories as many as 10,000 products. (T 684) Plaintiffs maintain inventory in warehouses ranging from 7,000 to 88,000 square feet. (Smith Dep. 12/6/79 at 39, Rhodes Dep. 12/10/79 at 24)

Hospital orders are solicited by distributors' salesmen who make periodic visits to a hospital's purchasing staff. An order is placed by the hospital with the distributor either manually with the salesman or by a computer order entry system that links the hospital to the vendor's in-house computer. If manually received, the distributor enters the order into the in-house computer. The computer scrambles the purchase order and prints out a "picking ticket." The picking ticket indicates a sequence in which an order can be filled by the warehouseman on a single trip through the warehouse. A copy of the picking order may also serve as the packing list or pre-invoice document for the customer. Once picked, the products are assembled in the shipping area and delivered to the hospital by truck, van or express mail. Emergency deliveries may also be made by cab or salesman's car.

If an order is entered into the computer for a product which is temporarily not in inventory, the computer records the item as "back ordered." Back orders are filled as inventory is replenished. (See generally, Ransdell Dep. 4/8/80 at 86–92, DX 324, 327, 328)

Hospitals generally purchase the bulk of their supplies from ten to fifteen primary suppliers. (DX 590, 363) Hospitals make remaining purchases of smaller volumes of products from thousands of suppliers. (PX 592)

The volume and mix of supplies which a hospital purchases vary with the hospital's function and size. Psychiatric and chronic care hospitals rarely perform surgery and consequently purchase a relatively small

*of Health Planning Book of Definitions: A Glossary of Health Care Delivery and Planning* *Terms*, August, 1981, at pages 31, 35 and 38.

volume and narrow mix of hospital supplies. (T 3515) Acute care hospitals are the primary focus of this suit. Such hospitals buy a broad range and high volume of hospital supplies. Similarly, on a per-bed basis, larger hospitals purchase more hospital supplies than do smaller hospitals. This is because larger hospitals perform more surgery, perform more complex surgical operations, usually have large outpatient programs, and are often teaching facilities for the medical profession. The VHA hospitals are large, teaching hospitals and consume a large volume of hospital supplies.

Purchasing for the hospital is done by a corps of buyers. The buyers are managed by a Materials Manager or Director of Purchasing. This supervisor is in turn managed by upper level hospital administrators who generally have little or remote purchasing experience and little involvement in the day-to-day purchasing function.

Purchasing decisions are also influenced by the opinions of the hospital professional staff. Hospital supply products can be categorized into two classes: commodity products and user preference products. Commodity products are generic products selected by hospital purchasers without concern for brand name considerations. User preference products are manufacturer branded items, preferred because of product quality. Which particular products become user preference items will vary from hospital to hospital. Generally, products which are ingested, injected or physically applied to patients become user preference items. Product preferences are formed by the particular group of professionals who routinely use the product, typically, physicians or nurses. In some hospitals, professionals are organized into committees which test, evaluate and recommend products. The hospital purchasing department gives considerable weight to the preferences of its professional staff. Consequently, the staff or its committee is a key marketing contact for distributors' salesmen.

Hospital purchasing decisions are made in consideration of three factors: product quality, vendor service and price.

The product quality factor pertains primarily to user preference items. Quality perceptions make a user preference item somewhat less price sensitive than commodity products. The possibility of a shift from one product to another product because of price fluctuation is minimized because of the brand allegiance of the hospital professional staff. However, interbrand competition does exist; manufacturers and dealers frequently request that their product be evaluated by the hospital staff. Intrabrand competition based on price and service also exists between competing dealers of the preferred product. Generally, the sale of user preference items yields a high profit margin; consequently, this business is highly desirable. In contrast, commodity products are high volume, fungible goods sold at lower profit margins. Commodity product profit margin is kept low by strong price and service competition.

Vendor service is a second crucial consideration in a hospital's purchasing policy. Distributors render several services to hospitals. Sales representatives are expected to call on large hospitals within their territory as frequently as two or three times a week. Salesmen explain new products, solicit and receive customer orders, arrange emergency deliveries and correct back order problems. Prompt, regular product delivery is expected and is essential to a hospital's effort to minimize inventory costs.[9] A

9. Hospital inventory cost control requires the balancing of two cross cutting costs: order cost and inventory holding costs. Order costs can be minimized by ordering infrequently and holding a large inventory. Inventory costs can be minimized by frequent reordering and maintaining a small inventory. The optimal balance between these conflicting costs is the economic order quantity (EOQ). (T 2958) The EOQ is that product quantity which allows the hospital to carry the smallest inventory which incurs the lowest reorder cost. The interval at which the EOQ is ordered is termed the reorder point (ROP). The ROP is that point in the inventory depletion when a new order must be entered so as to have a new shipment of supplies arrive as inventory on hand is exhausted. The ROP is dependent on the hospital's consumption rate of particular products and the lead time of the distributor. Lead time is the time that elapses between the hospital's placement of the order and receipt of the products. The shorter the lead time, the lower the hospital can allow its inventory to dip before the reorder point is

distributor's efficiency in product delivery is measured in terms of a vendor's "lead time." Lead time is the time that elapses between the hospital's placement of an order with a vendor and the actual receipt of the products. Quick distribution, evidenced by a short lead time, allows a hospital to deplete its inventory to lower levels before reorder is necessary. Reliable distribution permits the hospital to set aside a smaller amount of inventory as a cushion against unexpected back order problems. In short, efficient distribution service allows the hospital to shift much of the inventory function onto the distributor and thereby maintain a smaller, less costly in-house inventory. Vendors cooperate in this process by estimating the requirements of important hospital clients and reserving a portion of their inventory for these hospitals. (DX 258, 360, 417)

Incidental to rapid, reliable product delivery, many hospitals desire that their main suppliers have a computer order entry capability. A computer order entry system can create cost savings for distributors (T 5216–5217) but will not directly assist the hospital in reducing costs. (T 3627) Certain varieties of computer order entry systems which use computer cards may be keyed only to the sponsoring vendor. (Butschi Dep. 4/29/80 at 305) However, computer order entry systems which use a keyboard or teleprinter are capable of placing orders with any vendor having a complementary receiving terminal. (Butschi Dep. 4/29/80 at 370, T 723) The AHSC computer order entry system, acronymed ASAP, uses a Bell 43 printer as its basic entry hardware. (T 2954) This computer hardware can be used to gain access to other vendors. (T 723)

In this period of rapidly escalating costs, hospitals are interested in minimizing the "total cost" of hospital supplies. This total cost includes both the cost of acquiring the product and the cost of managing the product within the hospital until its use in patient treatment. The internal material

management cost associated with supplies is substantial. For every dollar spent to purchase a product, a second dollar is spent to manage that product to the point of end use. (T 3275, 3808–3810) Some distributors offer advice on hospital supply management. (PX 1, ¶ 5, T 7418, DX 567) Distributors also offer product consumption reports which summarize prior periodic and average purchases by the hospital from the reporting vendor. (DX 360 at 4, ¶ 12, PX 1) These reports and analyses are intended to aid the hospital in buying an economical product mix and minimizing internal handling costs. Opinions vary as to the value of these material management services. Some believe that the services are worthwhile. Others believe that the services are without value, either because they involve statistical analyses which the hospitals already can perform or because genuinely objective material management advice can best be obtained from an independent consultant and not from an interested supplier. (T 3713–3714)

A final service expected of a major distributor is emergency delivery of products when the occasional need arises.

Historically, price is the final and vital factor influencing a hospital's purchasing decisions. Hospitals' sensitivity to price has grown with government regulation limiting the third-party reimbursement system and proposed legislation to contain hospital costs.

Vendors operate under various pricing policies. By a catalog or price list each vendor publishes a list price for each product. Prices may also be established by a vendor's policy of "list-less" or "cost-plus" pricing. Under the list-less method, the hospital pays the list price appearing in a catalog less an agreed upon percentage discount. Under cost-plus pricing, the hospital pays the manufacturer's cost on the product plus some additional percentage for the dis-

---

reached. Thus, quick distribution allows a hospital to deplete its inventory to low levels before reorder.

In this manner efficient distribution service allows the hospital to transfer much of the task

of carrying an inventory to the hospital supply vendors. Consequently, the hospital can maintain a smaller, less costly in-house inventory. (T 4958–59)

tribution charge. Prices established under these pricing policies are subject to change with any increase or decrease in the list price or the manufacturer's cost.

These basic pricing policies are often modified by special contract terms. Vendors frequently modify their pricing policies by offering a price cap or volume discount rebate. A price cap limits or "caps" any price increase of a product for the duration of a contract. Through a price cap term a distributor may agree to limit any price increase to a fixed percentage or agree to increase its price only in response to a price increase by the manufacturer. Under a volume discount provision, a vendor offers a price discount if the hospital purchases a stated high volume of product. The discount is often expressed as a percentage. The discount percentage rate is often graduated with progressively larger discount percentages matched to progressively larger purchase levels. Some volume discounts are cumulative meaning that if the hospital purchases enough to trigger the discount, the discount relates back to all of the hospital's purchases from that vendor. Other volume discounts are incremental meaning that the discount applies to only those purchases beyond a stated volume. The discount is calculated at the close of the purchase period. Payment of the discount is made to the hospital in the form of a rebate check or a credit memo against any outstanding payment to the vendor. (PX 1, 472)

Product quality, vendor service and price are factors which hospitals consider in making their purchasing decisions. However, hospitals use no uniform method to purchase supplies. Among the many methods used are formal competitive bidding, restrictive list bidding, negotiation, prime vendor contracts, standing orders, open orders, Z contracts, and manufacturer contracts with a choice of distributor clause. (DX 497, 497a, T 7356–60, 7379–69, 9175–76, 9652–53 and 11916, DX 493, 494)

In its most formal aspect, competitive bidding entails a hospital identifying a needed product, determining product specifications, soliciting written bids from vendors, evaluating the bids and selecting a

vendor. (T 7357) Hospitals also use less formal variations of the competitive bidding process. Restrictive list bidding is much the same as general competitive bidding except that the hospital solicits bids from only selected distributors. (T 5206) Negotiation is merely price bargaining with a selected, usually the incumbent, distributor. (T 7358) Standing orders and open orders are types of agreements between a hospital and a vendor which are automatically renewed annually unless one party gives prior notice that the agreement is to be discontinued. (T 7368)

An important type of purchasing arrangement often found between a hospital and a vendor is a prime vendor agreement. A prime vendor contract is a type of requirements contract in which the hospital relies on a specific seller to provide it with the bulk of a product line in return for the seller's commitment to maintain adequate inventory, a high service level and lower prices. (T 3637) Large hospitals may have more than one prime vendor. (T 3647) Prime vendor contracts are usually for a short period of time or terminable on notice by the purchasing hospital.

In addition to the above forms of purchasing arrangements between a hospital and a distributor, hospitals may on occasion bypass the distributor and arrange direct purchasing from the manufacturer. This is not customary because the hospital's demand for flexible, rapid and reliable delivery of relatively small volumes of products is rarely compatible with a manufacturer's bulk sales requirements and rigid delivery schedule. Two kinds of supplies are routinely purchased directly from manufacturers: (1) bulky or heavy products which hospitals use in high volumes such as parenteral solutions or bandages; and (2) expensive, high technology items which must be special ordered for a specific patient such as an artificial hip. (T 3571) Products in the first category are direct ordered because the heavy weight or bulk of the product, coupled with the hospital's large demand for the good, makes truckload shipping efficient between the manufacturer and the hospital. The second category of products

is sold directly because the product is an inherently individualized good which a distributor cannot efficiently inventory. Apart from these direct sales, the more common practice is for hospitals to deal directly with a manufacturer and then arrange for delivery for the product through a distributor.

A hospital may deal directly with a national manufacturer, such as Johnson & Johnson, for a broad range of hospital supplies and have the agreement contain a clause specifying that the product shall be delivered to the hospital by a distributor of the hospital's choice. (DX 218, 493, 494) A variant of this hospital-manufacturer agreement is the Z contract. Under a Z contract a hospital negotiates with a manufacturer for the purchase of hospital supplies. The contract contains a price term and gives the hospital the option of naming a distributor. The hospital names a distributor who delivers the product for the price specified in the manufacturer's contract. The contract price may be above distributor's cost, in which case the distributor obtains a share of the contract price, which represents part of the distributor's profit. However, the Z contract price is invariably lower than the distributor's sale price, and to obtain its normal profit, the distributor will look to the manufacturer for a contribution. (PX 244 at 15)

Commerce in hospital supplies has been profoundly affected by spiraling health care costs. Health care is one of the most rapidly rising sectors of the American economy, currently costing $220–230 billion annually. (T 11874) ($247,000,000,000 according to a recent *New York Times* article.) Hospital costs account for 40% of all health care costs and have been one of the fastest escalating components in the general escalation of health care costs. (T 11875) Hospital costs rose at an average rate of 17.3% between 1974 and 1977. (T 11904) Currently, national spending on health is rising at about 15 percent a year.

Increased hospital costs have had three major effects on the hospital supply industry. First, rising hospital costs have brought about a shift from reusable to disposable hospital supplies. Second, hospital cost increases have prompted a variety of government cost containment regulations. Third, the threat of more government cost containment regulation has prompted private cost containment efforts by the hospitals and hospital suppliers.

As indicated above, hospitals in recent years have, to a large extent, shifted from reusable hospital supply products to disposable hospital supplies. Some experts believe this trend has now leveled off. In any event, the lasting effect of this trend has been to vastly expand the market for hospital supplies used in the course of patient care.

Rising hospital costs have also triggered state and federal hospital cost containment regulations. Government cost control is the natural consequence of the fact that over half of all hospital expenditures are paid by some government reimbursement agency.

At the federal level, the Social Security Amendments of 1972 limit Medicare reimbursement to prevent inefficient delivery of health services. Pub.L.No.92–603, Title II, §§ 223, 224. The statute influences hospital purchasing practices by admonishing the hospital to follow defined "prudent buyer provisions." *See* Health Care Financing Administration, *Provider Reimbursement Manual*, § 2103. (T 11901–03) A second piece of complex federal legislation, The National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k *et seq.* This Act requires regional planning in the development of health care facilities and encourages hospital shared services.

At the state level, 27 states have regulatory systems which establish rate setting or rate review mechanisms over hospitals. (T 11887) Most state programs provide for "caps" which limit rates of increase for health care services. (T 11888) Some states also require prior state approval of hospital charges. (T 10881–84)

Eighteen VHA hospitals are subject to some state rate review. (DX 630) All

VHA hospitals are subject to federal laws limiting third-party reimbursement to health institutions.

Apart from the existing government regulations noted above, federal legislation has been proposed to cap increases in hospital revenue. In 1977, President Carter proposed legislation which would impose a nine percent limit or "cap" on increases in hospital revenue. See, H.R. 6575, 95th Cong., 1st Sess., 123 Cong.Rec. 12085 (1977). Alternative legislation was proposed by Senator Herman Talmadge which would limit hospitals to reimbursement under rates to be established by HEW. See, S. 1470, 95th Cong., 1st Sess., 123 Cong.Rec. 13827 (1977).

The private sector of the hospital industry, including AHSC (PX 280), has consistently opposed a system of mandatory government controls on hospital revenue. Such legislation has not been enacted. Instead, the hospital industry sought to establish a system of voluntary cost containment. (T 2532–33) In late 1977, the American Hospital Association, the Federation of American Hospitals, the Pharmaceutical Manufacturer Association, and the Health Industry Manufacturers Association established a private cost control program called the "Voluntary Effort." (T 3218) The aim of the Voluntary Effort was to reduce the growth rate of hospital care expenditures from a level of 15.6% in 1977, to 2% annually.

Rising costs and cost containment regulations have impacted the structure of the hospital industry. To achieve cost savings and maximize government reimbursements, many hospitals now engage in centralized planning, purchasing and management. Organizationally, two types of arrangements have come into use: (1) multi-hospital systems, and (2) shared services arrangements. (T 571–74, 3624–26, 3667–68, 3964–65, 5008, 5370–73 and 11925–27)

Several forms of multi-hospital systems have developed in the United States. One such multi-hospital system is the proprietary (for profit) chain, such as Humana Hospital Corporation of America (HCA), and Hospital Affiliates International (HAI). (T 5177–78, DX 171 and DX 144) Several of the proprietary hospital chains are extremely large organizations. A recent proposed merger of two proprietary chains, HCA and HAI, would create a 40,000-bed chain, larger than any other investor-owned group and larger than most non-profit hospital groups. A second type of multi-hospital system is an association of non-profit hospitals structured along common religious affiliation, such as the Sisters of Mercy Hospital Group.

Less formally organized are the shared services arrangements among independent, non-profit institutions. Generally such shared services arrangements are organized on a geographic basis. Typical of this kind of association is the Hospital Purchasing Services (HPS), which has 235 hospital members throughout Michigan, Ohio, Indiana and Wisconsin. (T 911, 13038)

The VHA is structurally different from the above hospital associations. It is not an association based on common ownership, religious affiliation or regional ties. Instead, the common bond between VHA member hospitals is that each member is a large, prestigious, independent, non-profit hospital. This common status and a common financial and regulatory environment are believed to give rise to a set of common problems susceptible to group action. (DX 502)

Some 100–200 hospital associations, referred to generally as purchasing groups, currently exist in the United States. (T 3625) A hospital may be a member of more than one group. (T 744, 918–19)

Hospitals engage in group purchasing to obtain volume purchase price concessions. Some hospital associations, like the VHA, negotiate group purchasing agreements through their own for-profit corporation. Other hospitals retain a for-profit corporation to engage in group purchasing activities on behalf of the hospitals. An example of this latter practice is MedEcon Services,

which for a fixed fee negotiates group purchases of hospital supplies for 81 client hospitals. (T 5181)

Some purchase groups, such as MedEcon, require constituent hospitals to honor group contracts. These are "committed volume contracts." Some hospital supply experts consider committed volume contracts to be the most effective group buying method for obtaining price concessions. (T 3620–21) Other purchasing agreements, such as the AHSC–VHA Agreement, do not expressly commit the hospitals to purchase the contracting vendor's goods. (T 3739)

The expert testimony presented to the court generally indicates that competition for hospital group business rarely proceeds on a single product basis. Usually, related products are organized into product lines and trade proceeds on this scale.

The terms and conditions of hospital group purchasing agreements are similar to individual hospital purchasing agreements. Hospital group contracts commonly contain price cap provisions and volume discounts. (PX 1, DX 143, 149, 360) Deeper price discounts are usually accorded to hospital groups in recognition of their bulk purchasing. Group purchasing agreements which run as long as three years are not uncommon in the industry. (DX 360, 361, 414)

Hospital associations employ a variety of competitive group buying techniques. One example is the practice of MedEcon Services. MedEcon obtains a double price discount by overlapping contracts with both the manufacturer and a distributor for a fairly narrowly-defined product line. (T 5196) Initially, bids are solicited from manufacturers. Normally, the preferred manufacturer must offer a price concession and price protection for the contract period in order to obtain the association's bulk business. After negotiating a manufacturer's price, MedEcon presents the business to various distributors and negotiates a further discount. Assured of manufacturer price stability and a committed volume of hospital business, distributors are willing to discount their services. A double price concession is thus obtained. (*Id.*)

Hospital group purchasing has radically altered the service aspect of the supply distribution business. As noted earlier, hospital service requirements favor a vendor with local distribution facilities. Local distribution to members of a national hospital group is difficult for regional distributors. Some hospital associations, like MedEcon, divide national group purchase requirements among a series of regional prime vendors. (T 5210) Other hospital groups, such as the VHA, Humana, or Hospital Affiliates Incorporated (HAI), prefer to deal with national vendors who can service all members of the group. (Smith Dep. 12/6/79 at 177, 5/14/80 at 205) AHSC is the only vendor with complete national service capabilities. (*Id.*) The General Medical Corporation is the only other supplier capable of near national service. (DX 138, 292)

Regional distributors have attempted to compete for large hospital group purchasing business by forming nationwide consortia of dealers which collectively negotiate and provide national service. One such effort is Abco. Abco is a collection of 35 dealers which contracts for the manufacture of a line of private brand products and seeks to market these products to hospitals and hospital purchasing groups. (Smith Dep. 12/6/81 at 181) Abco succeeded in contracting to several large hospital groups. (*Id.* at 182) Subsequently, Abco lost these contracts because constituent dealers were small and insufficient in number to service their large hospital customers. (*Id.* at 183)

In 1979, sixteen regional dealers under the leadership of Crocker-Fels' president, Rufus Smith, formed a second consortium, United Hospital Supply Co. (USHCo). USHCo was organized for the general purpose of selling hospital supplies to national and multi-state purchasing groups. Specifically, it intends to be an alternative competitor to AHSC as a national hospital supplier. UHSCo has already signed sales contracts with two multi-state purchasing groups,

Hospital Affiliates International, Inc. and General Health Services. (DX 148–151)

\* \* \* \* \* \*

## IV. THE PURCHASING AGREEMENT

On July 5, 1979, AHSC and the VHA entered into the Purchasing Agreement which is at the heart of this antitrust action. The VHA is a signatory party on behalf of its member hospitals. The Purchasing Agreement expressly states that the member hospitals are third party beneficiaries to the Agreement and may enforce the Agreement against AHSC. (PX 1, ¶ 15) The Agreement has a life of 3½ years beginning July 1, 1979.

The Purchasing Agreement is unlike a traditional group purchasing contract. The VHA hospitals are not expressly obligated to purchase any AHSC product or service, nor is AHSC bound to sell any product to the hospitals at any stated group price. The product and price terms of any sale are to be negotiated between the individual VHA hospitals and AHSC.

The Purchasing Agreement offers a series of financial benefits which will accrue to VHA hospitals if the hospitals, as a group, reach certain fixed purchase levels for AHSC goods and services. After reaching these group purchase levels, the hospitals become eligible for a volume discount and price cap.

The price cap and volume discount provisions of the Purchasing Agreement apply to the sale of the following AHSC products: "medical/surgical, laboratory, dietary, laundry, housekeeping, parenteral therapy, surgical instruments and supplies, equipment and furnishings." (PX 1, page 2, ¶ 3) These products must be distributed by AHSC. AHSC manufactured products which are distributed by other vendors are not included within the Purchasing Agreement.

Paragraph 11 of the Purchasing Agreement provides for the volume discount to VHA hospitals on products purchased from AHSC after January 1, 1980. The discount is linked to the VHA group average, per-bed purchases of AHSC products within the calendar year. If the hospitals as a group fail to achieve an average purchase level of $2,000 per bed within the year, no volume discount is earned. Above this $2,000 threshold, the discount increases as the hospital group's average per-bed purchases within the year increase. Below is a chart appearing in the Purchasing Agreement (PX 1) which indicates the necessary group purchase level to reach a corresponding incremental discount:

| AGGREGATE ANNUAL PURCHASES PER BED PER CALENDAR YEAR | PER BED INCENTIVE DISCOUNT INCREMENTAL VOLUME |
|---|---|
| $ 0 – $2,000 | 0.0% |
| $2,001 – $2,500 | 1.0% |
| $2,501 – $3,000 | 2.0% |
| $3,001 – $3,500 | 3.0% |
| $3,501 – $4,000 | 4.0% |
| $4,001 – $4,500 | 5.0% |
| $4,501 – | 6.0% |

These volume discounts are a group-acquired benefit. The average purchases of the entire group determine the discount percentage. The Agreement does not require all or any VHA hospital to purchase at any threshold level to obtain the discount, nor can a single VHA hospital with a high per-bed purchase level alone qualify for the discount.

The average purchase level necessary to earn the discount is measured by the hospitals' purchases of AHSC products on a per-bed basis. The Purchasing Agreement notes that the VHA hospitals had a total of 20,501 beds as of July 1, 1979. If the group purchases at the threshold level of $2,000 per bed, annual group purchases of $41,002,000 must occur before any discount is earned.

The volume discount percentage progressively increases as the hospital group purchases increase. The Purchasing Agreement provides the following hypothetical calculation of the discount which would accrue if the VHA group purchases reach $4,000.00 per bed.

"If annual aggregate purchases by MEMBER HOSPITALS reach $4,000 per bed,

the MEMBER HOSPITALS in the aggregate will earn: 1.0% of $500/bed (2,001 - 2,500) = $5.00/bed = $102,505 + 2.0% of $500/bed (2,501 - 3,000) = $10.00/bed = $205,010 + 3.0% of $500/bed ($3,001 - $3,500) = $15.00/bed = $307,515 + 4.0% of $500/bed (3,501 - 4,000) = $20.00/bed = $410,020 for a total of $1,025,050."

(PX 1, page 12)

The discount is paid retroactive from the purchases in the form of a rebate. During the first quarter of the calendar year, AHSC will calculate the aggregate per-bed purchases for the preceding year to determine the rebate earned. Then AHSC will remit the rebate directly to the hospitals according to a distribution formula to be designed by the VHA.

Paragraph 10 of the Purchasing Agreement provides for price cap protection. The price cap is also triggered when the hospital group's average per-bed purchases reach a threshold level.

The price cap provision divides the 3½ year life of the contract into three price cap periods: an "initial period" from July 1, 1979, through December 31, 1980, and the two calendar year periods of 1981 and 1982. Price increases are limited to 9% within the initial period if the hospitals reach an average group purchasing level of $2,500 per bed. Price increases are limited to 6% in each of the two calendar year periods if the hospital group purchases average $3,400 per bed and $4,000 per bed respectively.

The price cap operates through a dual pricing system involving a "base price" and a floating purchase price for each AHSC item. At the end of each price cap period, the base price plus the 9% or 6% growth factor permitted by the Agreement retroactively places a cap on the purchase price. Any difference between the purchase price paid and the inflated base price is refunded to the VHA hospitals as a rebate.

During the initial period of the contract, AHSC and VHA will develop for each member hospital a list of "base products" each sold at a "base price." The base products include (1) every AHSC product purchased by a particular hospital in June of 1979 at a base price equal to the purchase price of that product on July 1, 1979; and (2) every additional AHSC product purchased at any time during the initial period at a base price equal to the purchase price prevailing when the product is first bought.

Throughout the life of the Agreement, each VHA hospital will negotiate with AHSC and pay the purchase price for any AHSC product it chooses to buy. The purchase price for a particular AHSC product may vary at different VHA hospitals. Also, at any VHA hospital the purchase price may increase or decrease during the price cap period.

At the end of the price cap period, the aggregate purchase price for all AHSC products is calculated for each hospital. Similarly, the aggregate base price for all AHSC products is calculated for each hospital. The aggregate base price is inflated by 9% in the initial price cap period or by 6% in each of the two succeeding calendar years as stated in the Agreement. This inflated aggregate base price is the maximum amount due from each VHA hospital for the products it purchased during the price cap period. If the aggregate purchase price exceeds the inflated aggregate base price, the difference is returned to the hospital as a rebate.

Between the three price cap periods established under the Agreement, the base price for each AHSC product is allowed to escalate. The average purchase price for the prior period becomes the new base price for the succeeding period.

The following example, taken from the Purchasing Agreement, shows the process for calculating the cap prices and the amount of any rebate due:

<col>

### EXAMPLE: AHSC/VHA "CAP" CALCULATION

#### FIRST TIME PERIOD

| | Item #1 | Item #2 | Item #3 |
|---|---|---|---|
| BASE PRICE | $10/ea. | $3/ea. | $20/ea. |
| Jan. | 2 at $10 = $ 20 | 10 at $3 = $ 30 | -- |
| Feb. | 1 at 10 = 10 | 15 at 3 = 45 | -- |
| Mar. | 3 at 10 = 30 | 20 at 3 = 45 | -- |
| Apr. | 2 at 10 = 20 | 15 at 3 = 45 | 2 at $20 = $ 40 |
| May | 2 at 11 = 22 | 10 at 3 = 30 | 1 at 20 = 20 |
| June | 1 at 11 = 11 | 15 at 3 = 45 | 3 at 22 = 66 |
| July | 3 at 11 = 33 | 10 at 3 = 30 | 2 at 22 = 44 |
| Aug. | 2 at 11 = 22 | 5 at 3 = 15 | 2 at 22 = 44 |
| Sept. | 2 at 11 = 22 | 10 at 4 = 40 | 1 at 24 = 24 |
| Oct. | 1 at 11 = 11 | 15 at 4 = 60 | 3 at 24 = 72 |
| Nov. | 3 at 12 = 26 [sic] | 20 at 4 = 80 | 2 at 24 = 48 |
| Dec. | 2 at 12 = 24 | 10 at 4 = 40 | 2 at 24 = 48 |
| | 24 units $251 ÷ 24 | 155 units $520 ÷ 155 | 18 units $406 − 18 |
| | $10.468/ unit | $3.355/ unit | $22.555/ unit |

| | | |
|---|---|---|
| Item #1 | 24 units at $10.00 = $ 240.00 | 24 units at $10.458 = $ 251.00 |
| Item #2 | 155 units at $ 3.00 = 465.00 | 155 units at $ 3.355 = 520.00 |
| Item #3 | 12 units at $20.00 = 360.00 | 16 units at $22.555 = 406.00 |
| Aggregate Base Price | $1,065.00 | Aggregate Purchase Price $1,177.00 |
| "CAP" Limit | 1.06 | |
| Maximum Aggregate Purchase Price | $1,129.00 | $1,129.00 |
| | | Payment to MEMBER HOSPITAL $ 43.00 |

---

The Purchasing Agreement also offers to the hospitals, for a standard charge, use of the AHSC computer order entry system, known as ASAP. Also, AHSC offers each VHA hospital material management consulting services for a fee and offers, without charge, a customer purchase analysis report. (See, e.g., DX 567)

### V. IMPLEMENTATION OF THE PURCHASING AGREEMENT

As noted earlier, the AHSC–VHA Purchasing Agreement is not a self-executing sales contract. VHA-member hospitals are not expressly obligated to buy any AHSC product or service. (PX 1, ¶ 8) Nor is AHSC obligated to provide the hospitals with any specific product or service at a definite price. Consequently, the Purchasing Agreement must be implemented by an underlying pattern of dealing between AHSC and the VHA member hospitals. The Purchasing Agreement contemplates this. It assigns the VHA the task of aiding AHSC in its presentation of various sales opportunities to the member hospitals. (PX 1, ¶ 8)

The underlying course of dealing between AHSC and VHA does not conform to the arm's length bargaining relationship tradi-

tionally found between buyer and seller. The VHA regards its major suppliers as "partners." This partnership theory of business is evident in VHA group contracts with General Electric for the purchase of CAT scanners, with the Standard Register Company for the purchase of business forms, and with AHSC for the purchase of hospital supplies. (T 4986–4989, PX 85) AHSC fully concurs with this partnership theme. (PX 5, 8, 37) AHSC has used the partnership theme in its implementation of the Purchasing Agreement at individual VHA hospitals. (PX 8, 101, 104–112, 115, 118, 121)

The Purchasing Agreement was introduced at each VHA hospital through a slide show presented by AHSC officials Robert Simmons or Terry Mulligan. (PX 149) VHA chief executive, Robert Kitzman, also participated in these presentations. (PX 6, 149) At the time of the slide show presentations, AHSC and the VHA anticipated that the VHA hospitals would increase their per-bed purchase levels from AHSC from $1,300 to $3,000 within the first year of the contract. (PX 3, 4)

Implementation of the contract also involved the presence of AHSC official Robert Simmons at the VHA Board of Directors meetings even if the agenda did not pertain to the AHSC–VHA contract. (PX 132, 148) At some of these meetings, Mr. Simmons distributed a monthly progress report. The report ranked the VHA hospitals according to their per-bed purchases from AHSC and also showed the percentage of increase or decrease in each hospital's purchasing level as compared to the prior period. (PX 146, 147, 148) These "scoreboarding" techniques were intended by AHSC to induce peer pressure among hospital chief administrators to support the Purchasing Agreement. AHSC expected the VHA hospitals would pressure each other to increase their purchases from AHSC so that the hospital group might qualify for the volume discount and price cap benefits. (PX 18, 138) Within each VHA hospital, AHSC also expected internal pressure to support the Purchasing Agreement. Hospital chief administrators were expected to require

lower level hospital purchasing agents to purchase more AHSC products. (PX 45)

VHA's Robert Kitzman acted as an intermediary seeking to induce the VHA hospitals to convert their hospital supply business to AHSC. Kitzman worked with AHSC personnel to inhibit competitive bidding for hospital supplies at the VHA hospitals. (PX 38, 39, 40, 158) Kitzman and Peter Frechette of AHS Scientific Products Division agreed to work to "preclude formal bidding" by AHSC's competitors. (PX 38) Kitzman's notes dated September 18, 1979, taken during a planning meeting contain statements that AHSC divisions should be viewed as a "vendor of choice and that competitor bids should not be accepted." (PX 39) Similarly, an AHSC memo dated August 14, 1979, states that Kitzman did not want the VHA hospitals to check out AHSC's pricing via the bidding process. (PX 40)

Mr. Kitzman viewed the volume discount and the price rebate provisions of the Purchasing Agreement as tradeoffs against any requirement that AHSC provide the lowest price on a product. In a letter to the purchasing agent for Baptist Medical Center, Kitzman noted that AHSC should not be expected to be the lowest bidder on hospital supplies in light of the price cap and volume discount incentives offered in the Purchasing Agreement. (PX 158)

The VHA, through Robert Kitzman, also attempted to persuade VHA member hospitals to disclose to AHSC its competitor prices so that AHSC could "match" these prices if it so chose. (PX 3, 4, 12, 14, 15, 17, 18, 19, 23, 31, 32, 35, 42, 47, 100, 170, 267)

The Agreement to permit AHSC to review the hospital records about other vendors' prices was made by the VHA Board of Directors, not by the individual hospital purchasing agents. (PX 3, 4, 12) AHSC sales representatives were told to confront hospital purchasing personnel diplomatically and draft a list of products convertible from other vendors to AHSC at an equal price. (PX 12) If permitted by the hospitals, AHSC sales representatives were to compile a price list of convertible products

on a document entitled a product analysis form. (PX 11, 100, 24 at page 27304, 20) Some VHA hospitals disclosed competitors' pricing information to AHSC personnel. (PX 17, 23, 32, 35, 42) At other hospitals, purchasing agents considered such disclosure to be illegal, unethical or unwise. (PX 12, Dietz Dep. 6/4/80 at 324, PX 33) AHSC also contacted hospital supply manufacturers and requested they provide pricing data on their VHA hospital clients. (PX 267, 70)

The AHSC matching policy was not intended to apply on a product-by-product basis. Instead price matching was intended to establish an overall price equilibrium for the bulk of the converted products. (PX 14, 267, 15) A memo authored by AHSC official Bob Simmons explains the matching program.

> "Regarding your question on matching prices, we *did* agree to 'be competitive' with the broad range of products they will purchase from us. In other words if they will give us a majority of their products, we will be able to come up with overall pricing that will be equal to pricing they currently have.
>
> This does not necessarily mean that we will match every price but that where we are above some of their items we will compensate by being below their pricing in other areas."

(PX 14)

The AHSC matching policy is limited by a "walk away privilege" by which AHSC could decline "unprofitable" business which the VHA hospital could obtain at an extremely low price from its usual vendor. (PX 45)

A long-term implementation goal of the AHSC–VHA Agreement is to develop a series of standardized products to be used by all VHA hospitals. (PX 1, ¶ 6) The VHA Material Management Committee is responsible for product standardization. This committee requested that AHSC submit to it a list of potential standard products. No similar request was made of other vendors. (PX 36) The VHA Materials Management Committee toured AHSC's California and Illinois facilities and later recommended to the VHA Executive Board standardization

on four AHSC Pharmaseal products. (PX 52, 36) The four AHSC Pharmaseal products were subsequently standardized. AHSC expects increased standardization of its products. (PX 36)

Implementation of the Purchasing Agreement at one particular VHA hospital, Charleston Area Medical Center (CAMC), in Charleston, West Virginia, involved the hiring away from Skyland of salesman Paul Bush by AHSC. Mr. Bush was Skyland's highly successful sales representative at CAMC. His sales accounted for $5.8 million of Skyland's hospital supply business. (T 4128) In 1978, Bush earned in excess of $100,000 in commission from Skyland for his sales in CAMC. (T 4103) Had he remained with Skyland during 1979, his annual income again would have exceeded $100,-000. Prior to his decision to leave Skyland for AHSC, Skyland had determined to lower his commission rate, thus lowering his earning potential. (T 4103) Bush was distressed by this commission rate change. (Bush Dep. 7/1/80 at 222–224) In July, 1979, Bush met with AHSC officials in Chicago. (Bush Dep. 6/18/80 at 157–170) During the visit, the AHSC–VHA Purchasing Agreement was discussed, as well as the future of small hospital supply firms. (*Id.* at 167–170, 178, 187–189) Later CAMC officials, Messrs. Dietz and Lowe, informed Bush that CAMC would support the Purchasing Agreement and that Skyland would lose much of its business at that hospital. (Bush Dep. 7/1/80 at 218–220; Lowe Dep. at 221–222; Deitz Dep. 6/4/80 at 277–278) Bush was concerned that the Purchasing Agreement would adversely affect his income. (Bush Dep. 6/18/80 at 170; 7/1/80 at 225) Aware of this expected loss of Skyland business in his sales territory, Bush accepted employment with AHSC on October 1, 1979. Bush went to work for AHSC on a salary of $84,000 per year without commission income, a sum considerably lower than his compensation from Skyland. (PX 60)

Bush was hired to represent AHSC at CAMC because of that hospital's request for an experienced salesman. (PX 56) AHSC shared that concern. (PX 57) In hiring

Paul Bush, AHSC intended to implement the Purchasing Agreement effectively at CAMC and reduce Skyland's competitive strength at that hospital. (PX 66, at page 14972)

In addition to new sales personnel, implementation of the VHA Agreement at CAMC required that AHSC construct a new distribution facility in the Charleston area to serve CAMC locally. (PX 660) The new facility was constructed at Nitro, West Virginia.

## VI. IMPLIED ANTITRUST EXEMPTION ISSUE

As a threshold legal matter, the court must consider if a Medicare regulation, Section 2103 of the Health Care Financing Administration (HCFA), *Provider Reimbursement Manual*, creates an implied antitrust exemption in favor of hospital purchasing groups and their vendors. Although the issue was initially raised by defendant, it was never thereafter arduously pursued.

Medicare is an important national health insurance program for the aged and certain disabled persons. 42 U.S.C. § 1395 *et seq.* Under this statutory system, Medicare beneficiaries may receive necessary health care services and the "provider" of such services may seek reimbursement from public agencies or designated private "intermediaries" such as Blue Cross. 42 U.S.C. § 1395h. Congress has limited reimbursement to providers to the "reasonable cost" of services rendered to Medicare beneficiaries. 42 U.S.C. § 1395f(b). Congress has also delegated to the Secretary of Health and Human Services the responsibility for enacting regulations to define the reimbursable "reasonable cost." 42 U.S.C. § 1395x(v)(1)(A). The Secretary through the Health Care Financing Administration (HCFA) has issued a *Provider Reimbursement Manual* which contains official interpretations concerning the enforcement of the reasonable cost provisions of the Medicare Act. Generally, Section 2103 of the Manual admonishes hospitals to be "prudent buyers" in purchasing supplies. If the hospital or health care provider purchases supplies at a price which exceeds the price a prudent buyer would

pay, the provider is reimbursed only to the amount of the prudent price. Unless justified, any excess cost of supplies is not reimbursable. Under Section 2103, hospitals as prudent buyers are permitted to engage in group purchasing.

"SECTION 2103. PRUDENT BUYER

A. *General*—The prudent and cost conscious buyer not only refuses to pay more than the going price for an item or service, he also seeks to economize by minimizing costs. This is especially so when the buyer is an institution or organization which makes bulk purchases and can, therefore, often gain discounts because of the size of its purchases. In addition, bulk purchase of items or services often gives the buyer leverage in bargaining with suppliers for other items or services. Any alert and cost conscious buyer seeks such advantages, and it is expected that Medicare providers of services will also seek them.

B. *Application of prudent buyer principle*—Intermediaries may employ various means for detecting and investigating situations in which costs seem excessive. Included may be such techniques as comparing the prices paid by providers to the prices paid for similar items or services by comparable purchasers, spotchecking, and querying providers about indirect, as well as direct, discounts. *In addition, where a group of institutions has a joint purchase arrangement which seems to result in participating members getting lower prices because of the advantages gained from bulk purchasing, any potentially eligible providers in the area which do not participate in the group may be called upon to justify any higher prices paid.* Also, when most of the costs of a service are reimbursed by Medicare (for a home health agency which treats only Medicare beneficiaries, for example), the costs should be examined with particular care. In those cases, where an intermediary notes that a provider pays more than the going price for a supply or a service, in the absence of clear justification for the premium, the intermediary will exclude excess costs in determining allowa-

ble costs under Medicare." [Emphasis added.]

Defendant's position is that plaintiffs' antitrust claims must fail because the above Medicare regulation authorizes joint hospital purchasing activities and impliedly exempts it from the antitrust laws. In turn, it is urged that the cooperative efforts of AHSC in such a joint hospital purchasing program are also immune from antitrust attack.

■ Congress has expressly exempted certain industries from the operation of the antitrust laws. *See, e.g.,* Clayton Act § 6, 15 U.S.C. § 17; exempting labor organizations and agricultural cooperatives; McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.,* partially exempting the insurance industry; and Webb-Pomerene Export Trade Associations Act, 15 U.S.C. § 61, exempting export trade associations. Similarly, on rare occasions, the courts have inferred congressional intent to create an implied antitrust exemption when necessary to implement effectively a subsequently enacted regulatory system in an industry. *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). Such implied antitrust immunities are disfavored and can be justified "only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States v. National Association of Security Dealers,* 422 U.S. 694, 720, 95 S.Ct. 2427, 2443, 45 L.Ed.2d 486 (1975).

■ Hostility towards implied antitrust exemptions reflects the fact that the antitrust laws represent a "fundamental national economic policy." *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709 (1966). Exemption of the antitrust laws "is to be regarded as implied only if necessary to make the [subsequent law] work and even then only to the minimum extent necessary." *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

Unquestionably, the health care industry is subject to extensive federal regulation. *See, e.g.,* National Health Planning and Resources Development Act of 1974, 42 U.S.C.

§ 300k *et seq.,* Health Insurance for the Aged Act, 42 U.S.C. § 1395 *et seq.* Nevertheless, the Supreme Court has recently determined that the health care industry is not so pervasively regulated to conclude that Congress impliedly intended to exempt the entire industry from the antitrust laws. *National Gerimedical Hospital and Gerontology v. Blue Cross,* 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981); *accord, see, Huron Valley Hospital, Inc. v. City of Pontiac,* 666 F.2d 1029 (6th Cir. 1981). In *National Gerimedical,* the Court did not foreclose the possibility that particular federal health care laws might justify narrow antitrust exemptions.

"Nevertheless, because Congress has remained convinced that competition does not operate effectively in some parts of the health care industry ... we emphasize that our holding does not foreclose future claims of antitrust immunity in other factual contexts...."

*National Gerimedical, supra* 101 S.Ct. at 2423.

*National Gerimedical* extends the general principles regarding antitrust exemption to the health care industry. Evaluation of an implied antitrust immunity claim requires the court to inquire into the precise relationship between the antitrust laws and the specific health care regulation under which immunity is claimed. If the antitrust laws and the health care regulation inexorably conflict with one another, the court may reasonably infer that Congress, in passing the health care regulation, intended to carve out an implied antitrust exemption. In other words, the antitrust exemption must be necessary to "make the regulation work." *Silver v. New York Stock Exchange, supra* 373 U.S. at 357, 83 S.Ct. at 1257.

■ The relevant Medicare regulation, Section 2103 of the HCFA, *Provider Reimbursement Manual,* does not inexorably conflict with federal antitrust laws. Section 2103 permits hospitals to engage in the group purchasing of supplies as a form of prudent buying. Under the Medicare regulatory scheme, if a hospital belongs to a purchasing group, but fails to purchase under the group contract and thereby incurs a

higher price for supplies, the hospital may be called upon to justify the higher price paid. If the hospital is unable to justify the higher price, Medicare reimbursement is limited to the prudent group purchase price.

This regulatory arrangement is not contradictory with the policies of the antitrust laws. Neither the Sherman Act nor the Clayton Act prohibit hospital group purchasing. Group purchasing contracts can be competitively designed and awarded in order to promote competition rather than suppress it. Not only are competition and hospital group purchasing compatible concepts, the Medicare prudent buyer regulations do not purport to outlaw competition. Part C of Section 2103 gives examples of the application of the prudent buyer principle. The following examples indicate that it is prudent for a hospital to engage in price comparison between competitive hospital supply vendors.

"1. Provider A consistently purchases supplies from supplier R and makes no effort to obtain the most advantageous price for its supplies. Supplier W sells identical or equivalent supplies at a lower cost and is also convenient to A. Unless the provider can clearly justify its practice of purchasing supplies from R rather than W, the intermediary should exclude any excess of R's charges over W's charges.

\* \* \* \* \* \*

"3. Doctor C, a hospital-based radiologist, purchases radiology equipment which he then leases to the provider where he is a staff member. Costs to the provider in this case are higher than if the equipment had been leased through competitive bidding from an outside source. The intermediary should reimburse the provider for only those costs which a prudent and cost-conscious buyer would pay. Therefore, those costs which the provider pays for the equipment leased from the staff radiologist which are in excess of costs for equivalent equipment obtained through competitive bidding should be denied."

Finally, the court notes that even where hospital group purchasing would result in a lower price for supplies, any hospital which individually purchases its supplies at a higher price is given the opportunity to justify its solitary purchase. Presumably, if a hospital can show that the hospital group purchasing plan may result in an antitrust violation, the solitary purchase is justified and any higher price is fully reimbursable. This opportunity to justify a higher cost is a viable mechanism to reconcile any conflicting interest between the prudent buyer Medicare regulations and the antitrust laws.

After a careful examination of the relationship between Section 2103 of the *Provider Reimbursement Manual* and the antitrust statutes, I am satisfied no conflict exists between these laws. Accordingly, I conclude that the Medicare provision does not exempt hospital purchasing groups or their vendors from compliance with the antitrust laws.

\* \* \* \* \* \*

### VII. MARKET ANALYSIS

#### A. *The Relevant Market.*

Plaintiffs' claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act require the definition of a relevant market. The Sherman Act Section 1 claim of unreasonable restraint of trade requires that the alleged restraint be tested under a Rule of Reason analysis in the context of relevant market. *United States v. Columbia Steel Company*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). The Sherman Act Section 2 claim of attempt to monopolize has traditionally required a finding as to whether the defendant has achieved a dangerous probability of success. *Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *Cf. Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *rehearing denied*, 327 F.2d 478 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). This dangerous probability has been traditionally assessed in the context of a defined market.[10] *Cf. Lessig,*

10. In pursuing the attempt to monopolize claim, plaintiffs have submitted evidence to

define the relevant product and geographic

*supra.* Plaintiffs' Clayton Section 3 claim of exclusive dealing requires a showing that the effect of exclusive dealing is to "lessen competition or tends to create a monopoly in any line of commerce." 15 U.S.C. § 14. This anticompetitive effect must be shown within a defined market. *Standard Oil Co. and Standard Stations v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Consequently, while each claim requires the application of a different legal standard to determine liability, liability is not determined in a vacuum but in the commercial reality of a defined market.

■■■ Plaintiff bears the burden of defining the relevant antitrust market. *United States v. Chas. Pfizer & Co.,* 246 F.Supp. 464 (E.D.N.Y.1965). The relevant market is identified by the same method whether the claim arises under Sherman Section 1 and 2 or Clayton Section 3. 2 Von Kalinowski, *Antitrust Laws and Trade Regulations,* § 6.02[4] at 6–125 (1981), compare *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), and *Tampa Electric Co. v. Nashville Coal Co., supra.* A relevant antitrust market is defined by two components: the product market and the geographic market.

### 1. The Product Market.

The relevant product market is the class of goods or services which effectively compete with the product which defendant offers in the course of the alleged anticompetitive conduct. *See DuPont, supra.* At the core of the product market is the identical product which other vendors offer in competition with defendant's product. At the periphery, but within the same product market, are substitute goods which either indirectly compete or have the capacity to compete with defendant's product. *Id.*

The Supreme Court has described two factors which identify substitute goods which belong in a single antitrust product market: (1) reasonable interchangeability of use, and (2) cross-elasticity of demand, between compared goods. *United States v. DuPont, supra; Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed. 1277 (1953). Each factor focuses on related but different criteria in assessing substitutability.

The reasonable interchangeability of use factor emphasizes the similar consumer use and similar physical characteristics of two goods. 3 Von Kalinowski, *supra* at 8–18 (1981). If the products have the same end use, they are functionally interchangeable and operate in the same product market. If the products are physically similar, interchangeable use may be reasonable and the goods may also be considered as part of the same market.

markets in order to calculate defendant's market share and to assess the dangerous probability of success incident to defendant's anticompetitive conduct. In addition to this proof, plaintiffs suggest that a precise market definition and an independent conclusion on the dangerous probability issue is unnecessary in light of *Lessig v. Tidewater Oil Company,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

In *Lessig,* the Ninth Circuit held that in an attempt to monopolize claim, the definition of a relevant product market "is not in issue" since Section 2 prohibits attempts to monopolize "any" part of commerce. *Lessig, supra* at 474. Similarly, the *Lessig* court rejected traditional thinking that a dangerous probability of success is an independent element to attempt to monopolize. *Cf. Swift and Co. v. United States,* 196 U.S. 375, 393, 25 S.Ct. 276, 277, 49 L.Ed. 518 (1905). Instead the *Lessig* court regarded an attempt to monopolize claim to require only a showing of defendant's specific intent to monopolize. The objective evaluation of defendant's dangerous probability of successful monopolization was considered relevant only as circumstantial evidence of specific intent. *Lessig, supra* at 474.

The Sixth Circuit Court of Appeals in the *United States v. Dairymen, Inc.,* 660 F.2d 192 (6th Cir. 1981), noted that dangerous probability of success remains a required element of a Section 2 attempt claim. The court also noted that where evidence relating to an antitrust market is ambiguous, the trial court is obligated to consider the possibility of antitrust product submarkets in evaluating an attempt claim. Apparently the *Dairymen* decision implicitly rejects the reasoning adopted in *Lessig.* Accordingly the court will require that plaintiffs define an antitrust product market or submarket and establish defendant's dangerous probability of success in order to prevail on their attempt to monopolize claim.

■ Product interchangeability must be measured in the context of the particular industry under scrutiny. In all events, interchangeability must be "reasonable." The *DuPont* Court rejected the argument that product interchangeability occurs only if the goods are fungible and available at substantially similar price levels. *United States v. E. I. du Pont de Nemours & Co.*, supra 351 U.S. at 394, 76 S.Ct. at 1006. However, an incomplete degree of functional substitution may make substitution between goods unreasonable and indicate the existence of two separate product markets. *Borden, Inc. v. FTC*, 674 F.2d 498 (6th Cir. 1982).

Whether two goods are reasonably interchangeable by consumers in the face of a substantial price differential depends on the cross-elasticity of demand between the goods. Cross-elasticity of demand is the rate of change in the demand of one product caused by a change in the price of a second product. Positive cross-elasticity exists between two products if an increase in the price of one good causes an increase in demand for the second good. A high, positive cross-elasticity of demand indicates that the pair of products are price competitive and, therefore, operate within a single product market.

■ The *DuPont* test for measuring product market by demand substitution principles is equally applicable to both goods and services. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Philadelphia National Bank*, 347 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963).

Since *DuPont*, the law of antitrust market definition has been refined to permit an antitrust inquiry in the context of a relevant submarket. The submarket concept was first applied in a Clayton Section 7 action in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). There the Supreme Court noted that:

"[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However,

within this broad market, well-defined submarkets may exist which, in themselves constitute product markets for antitrust purposes."

*Id.* at 325, 82 S.Ct. at 1523. The submarket concept has been applied to define the relevant product market for a distribution industry in a Clayton Section 7 action. *United States v. Healthco, Inc.*, 387 F.Supp. 258 (S.D.N.Y.), *aff'd* 535 F.2d 1243 (2d Cir. 1975).

■ Submarket analysis has been applied to antitrust market problems arising under Section 2 of the Sherman Act. *See United States v. Grinnell*, supra 384 U.S. at 572, 86 S.Ct. at 1704; *Heatransfer Corp. v. Volkswagenwerk A. G.*, 553 F.2d 964 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Submarkets may define both the product and geographic dimensions of an antitrust problem. *United States v. Dairymen*, 660 F.2d 192 (6th Cir. 1981); *Borden, Inc. v. FTC*, supra.

The Supreme Court in the *Brown Shoe* decision defined an economically significant submarket by the following indicia.

"A submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

370 U.S. at 325, 82 S.Ct. at 1523. And, "The cross-elasticity of production facilities may also be an important factor in defining product market within which a vertical merger is to be viewed."

370 U.S. at 325 n. 42, 82 S.Ct. at 1523 n. 42. These indicia are intended as "practical aids to identify the zones of actual or potential competition." *International T & T v. General T & E*, 518 F.2d 913, 932 (9th Cir. 1975). Consequently, in light of these legal standards, the task now before the court is to define the effective area of product competition.

Plaintiffs and defendant are in irreconcilable conflict over the relevant product market. The parties agree that the relevant

product is the service of distributing hospital supplies and not the physical supplies themselves. Plaintiffs contend the relevant market or submarket is the distributor's service of providing medical-surgical supplies to hospitals. Defendant, on the other hand, contends the product market is more broadly defined as the sale of medical-surgical supplies, laboratory supplies and parenteral solutions by the manufacturers and distributors of these commodities to all health care institutions including hospitals, nursing homes and physicians. These conflicting product market contentions frame three issues for resolution. First, whether the service product is limited to the sale of medical-surgical supplies or includes the sale of laboratory supplies and parenteral solutions. Second, whether the product is limited to the services of a distributor or includes manufacturer services. Third, whether the service product is limited to hospital customers or includes distribution to other health care facilities.

At the outset the court notes its inability to analyze these issues in terms of a cross-elasticity of demand test. Cross-elasticity data has not been offered to probe the price-demand relationship between the services of the manufacturer or distributor regarding the sale of any category of hospital supply products to any class of health care customer. Without such evidence, the relevant product focus of this action can be defined only by a market analysis using the reasonable interchangeability of product use standard developed in *DuPont* or by a submarket analysis using the factors noted in *Brown Shoe*.

As hereinafter explained, the *DuPont* standard of reasonable interchangeability of product use is insufficient to clearly define a product market. If an antitrust market cannot be clearly defined, the court is obligated to consider the existence of relevant antitrust submarkets. *United States v. Dairymen, Inc., supra* at 195. Using primarily the latter approach, the court finds that the hospital supply industry is divisible into submarkets. The proper focus of this antitrust inquiry is a submarket defined by three dimensions: (1) the sale of medical-surgical supplies, (2) by distributors, (3) to hospitals.

(a) *The Medical-Surgical Supply Dimension.*

Medical-surgical supplies, laboratory supplies and parenteral solutions are not interchangeable groups of commodities. This fact is significant, but not sufficient to define a product market in this case. This is because the precise question before the court is whether the services of providing medical-surgical, laboratory or parenteral supplies are reasonably interchangeable. Application of the *DuPont* standard of reasonable interchangeability of product use is difficult in this case because the proposed product is a goods/service combination. The *DuPont* standard is effective when the proposed product is a "pure" good, e.g., cellophane or a "pure" service, e.g., drycleaning. Any reasonable product substitute for these goods or services can be noted and included in a single product market. Here the proposed product is the service of selling and distributing a wide range of physical commodities.

The commodities portion of the product is highly noninterchangeable. Not only are medical-surgical supplies not interchangeable with laboratory or parenteral supplies, but individual items within a single product category are often not interchangeable. For example, a hospital requires both sutures and syringes and cannot substitute one for the other though these non-complementary commodities are both regarded as medical-surgical supplies.

The service portion of the proposed product is arguably a general, uniform activity which does not materially vary with whatever hospital supply is distributed. Arguably the distribution of medical-surgical supplies involves the same service as the distribution of laboratory supplies or parenteral solutions. The uniform nature of the distribution process suggests the existence of a monolithic market which includes all hospital supplies without regard for the fact that the physical commodities are not interchangeable.

In large part, the positions of the parties reflect these different perspectives of this service/goods product.

Plaintiffs contend that medical-surgical and laboratory supplies and parenteral solutions are distinct classes of hospital commodities. Medical-surgical distributors must acquire a specialized inventory of these goods at substantial cost. Also, such distributors ·must acquire an expert sales force which can explain the technical aspects of these goods to hospital personnel. The cost of acquiring this specialized inventory and expert sales force has given rise to specialized distributors and distribution practices for medical-surgical products. Accordingly, plaintiffs urge that the service of distributing medical-surgical supplies is distinct and not interchangeable with the services of distributing other hospital commodities.

In contrast, defendant adopts the position that the distribution function is a general service which is not significantly altered by the fact that a vendor is distributing medical-surgical, laboratory or parenteral supplies. Defendant urges that the essential capital fixtures and equipment, such as warehouses, computer order and inventory systems, and trucks, are freely transferrable to and from the distribution of any category of hospital supply products. Defendant asserts that a hospital supplier's inventory and sales force are not so specialized as to prevent suppliers from shifting distributive capacities from laboratory or parenteral supplies to medical-surgical supplies if it became profitable to do so. Defendant would include within the relevant market not only medical-surgical suppliers but all other hospital suppliers who can shift their distributive capacity to deal in medical-surgical supplies. Included in this latter group of suppliers are suppliers of parenteral solutions and laboratory supplies.

■ That a product category, such as medical-surgical supplies, is composed of hundreds of non-interchangeable commodities does not prevent the category from being a single antitrust market. A collection of similar but non-interchangeable goods may constitute a single antitrust market if the goods are linked through a "single use." *United States v. Grinnell*, 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

In *Grinnell*, the Court affirmed a market definition comprising a cluster of several kinds of central station alarm systems even though specific alarm systems, such as burglar, fire or water level alarms, were physically different and not substitutable. The Court defined the relevant market as a "single use," being the "protection of property, through a central station which receives signals." *Supra* at 572, 86 S.Ct. at 1704.

■ *Grinnell* teaches two propositions. First, a relevant market for a goods/service product is not narrowly defined by the particular use or physical appearance of the underlying good. Second, the appropriate market may be a cluster of services each providing physically non-interchangeable goods, if that cluster of services is integrated into a single "basic use," which itself is without substitutes.

The *Grinnell* decision adequately guides the court as to the inner limit of the relevant product market in this action. Under *Grinnell* it is clear that the court cannot construe the service of distributing each individual hospital supply commodity as a separate antitrust market simply because one commodity is not interchangeable with the next. To do so would fragment a broad product category such as medical-surgical supplies into hundreds of antitrust markets. This narrow construction of the *DuPont* reasonable interchangeability of product use test is rejected in *Grinnell*.

*Grinnell*, however, does not enable the court to clearly define the outer limit of the relevant product market. It is difficult, if not impossible, to isolate separate "basic uses" for each category of hospital supply products. The general purpose of medical supplies, whether medical-surgical supplies, parenteral solutions or laboratory supplies, is their use in the course of patient care. Such an application of the *Grinnell* standard arguably indicates that all hospital supplies may be included within a single antitrust product market.

Yet, the existence of a monolithic antitrust product market, which includes all hospital supplies, is far from certain. A single hospital supply product market is inconsistent with the clear evidence showing that manufacturers and distributors tend to specialize along specific product categories. A single product market may not realistically reflect the supply side of the industry.

■ Moreover, it is not clear that *Grinnell* compels the conclusion that a single hospital supply market exists. *Grinnell's* focus on the "basic use" of a product is a demand oriented test. The use to which the consumer puts the product controls. Exactly who consumes hospital supplies is debatable. Clearly, all hospital supplies are consumed on behalf of patients. However, actual use and consumption of supplies need not involve the patient. Medical-surgical supplies are directly applied to patients. However, most laboratory supplies are used by hospital laboratory personnel without patient involvement. Consequently, a construction of the *Grinnell* "basic use" standard, which focuses on the hospital personnel who use the supplies, might divide the hospital supply industry into several product markets.

A medical-surgical product market may be defined by the fact that nurses primarily use these products. Similarly, a laboratory supply product market might be identified by the fact that laboratory technicians use these products. Other product markets could be defined by products used in the hands of surgeons, neurosurgeons, radiologists, anesthesiologists and other medical professionals. This specialized use approach to defining the product market is also questionable. Certain hospital supplies are used by several professional groups in a hospital. Some supplies are used jointly by several professional groups in the course of an individual patient's treatment. Finally, which professional group uses specific hospital supplies may vary with work assignments from hospital to hospital. In short, the *Grinnell* standard, which focuses on product use, is not sufficient to clearly define an antitrust product market for hospital supplies.

If a hospital supply product market cannot be clearly defined, possible submarkets must be considered. The submarket indicia *Brown Shoe* indicate that the hospital supply distribution industry is not a generic service product as defendant contends. The industry is clearly composed of submarkets.

■ The existence of a submarket for medical-surgical supplies is demonstrated by four factors: (1) the industry recognition of a category of products termed medical-surgical supplies, (2) the existence of specialized, medical-surgical supply vendors, (3) distinctive marketing practices regarding medical-surgical supplies, and (4) the existence of special groups within hospitals which use medical-surgical supplies. A medical-surgical submarket is also verified by the inability of medical-surgical suppliers to shift their productive capacity to deal in parenteral or laboratory supplies.

Medical-surgical supplies are a definable category of hospital products. (T 1058–1059, 5190, 4379–3480, 3490) Medical-surgical supplies are high-volume, disposable items often used by nurses and usually applied directly to the patient. (T 813, 1060, 5613) In contrast, laboratory supplies are reagents and minor scientific equipment used in hospital laboratories. Parenteral solutions are intravenous, nutritional fluids which are considered pharmaceuticals. (T 3489, 1058–1061; Brown Dep. 5/28/80 at 21, 23; Schwartzman Dep. 10/16/80 at 31; T 5234, 3485–3487, 1060–1061, 5811–5812, 813) Disagreement may exist as to whether certain supplies fall within the fringe of the medical-surgical category. (*See,* e.g. 10733–10734). However, the majority of health care professionals are in agreement in defining the bulk of the products within the category. (*See,* T 3832–3833, 11428–11430, 10732) Products at the core of the medical-surgical category include sutures, syringes, needles and procedure kits and trays. (T 10733)

Further, the hospital supply industry recognizes the distribution of medical-surgical supplies as a specific area of trade. Both vendors and hospitals believe the term "medical-surgical supplies" has a sufficient-

ly clear trade meaning to use it in describing the subject matter of their contracts. For example, the AHSC–VHA Purchasing Agreement itself states that the Agreement applies to the distribution of "medical/surgical ... supplies." (PX 1, page 2, ¶ 3) Other distributor contracts are also defined by reference to the term medical-surgical supplies. (DX 360, PX 300)

A medical-surgical submarket is also evidenced by the existence of specialized vendors. Plaintiffs are medical-surgical houses. Medical-surgical supplies account for 70% to 90% of plaintiffs' sales. (T 376, Rhodes Dep. 10/12/79 at 52) Indiana Surgical, Inc., and the Goetze-Neimer Co. are other examples of medical-surgical supply houses. Separate groups of firms market laboratory supplies and parenteral solutions. (T 803–804, 4000–4002, 373, 195, 10734)

The organization of defendant American Hospital Supply Corporation itself reflects a division of trade between medical-surgical supplies, laboratory supplies and parenteral solutions. AHS–American Hospital Supply Division and the AHS–V. Mueller Division distribute the bulk of defendant's medical-surgical supply material. AHS–McGaw Laboratories markets defendant's parenteral solutions. AHS–Scientific Products markets defendant's laboratory supply products. (PX 1, Appendix 1)

In March, 1979, AHSC considered merging the parenteral marketing activities of McGaw Laboratories into the distribution functions of the American Hospital Supply Division. A study prepared to consider problems with such a consolidation noted that different technical sales expertise is required to market parenteral solutions and medical-surgical supplies. The study recommended a conservative approach to consolidation and suggested a single parenteral product be experimentally distributed by AHSD in a single distribution area. A particular parenteral product was selected because it required "the least technical product knowledge." (PX 79 at 5849) Current-

ly, McGaw Laboratories and AHSD remain independent entities which distribute their respective products separately. Consequently, defendant's integrated operation still reflects vendor specialization between medical-surgical supplies, laboratory supplies and parenteral solutions.

Likewise, medical-surgical supplies are marketed differently than parenteral solutions. (T 3495) Medical-surgical products are marketed through a tier of distributors. In contrast, 85% to 90% of all parenteral solutions are marketed directly from manufacturer to hospital. (T 1849)

Finally, hospital internal purchasing practices support a conclusion that the trade in medical-surgical supplies is a distinct submarket. Some hospital purchasing departments are organized so that specific personnel buy and handle medical-surgical supplies while others handle different hospital supplies. (T 98–63, 3490, 3492) Also brand preferences for medical-surgical products are developed by a different professional group in the hospital than those who form brand preferences for laboratory or parenteral supplies. Brand preference for medical-surgical supplies is formed by the nursing staff and, to a lesser extent, the physician staff. (T 3492–3494) Brand preferences for laboratory supplies are developed by pathologists and laboratory personnel. (T 3489)

The submarket analysis is confirmed by the inability of medical-surgical suppliers to reasonably shift their distribution capabilities to handle laboratory or parenteral supplies.

The capital assets of the hospital supplier, such as the warehouse, computer inventory and order systems and, with minor variations the delivery trucks [11] appear adaptable to the distribution of any type of hospital supply product. However, one of the largest costs incurred by the medical-surgical supplier is the cost of maintaining a large, specialized inventory. In addition, the medical-surgical supplier is required to

---

11. Apparently winter distribution of parenteral solutions requires a heated truck to prevent the solution from freezing. The trucks of distributors of other kinds of hospital supplies need not be heated.

maintain a specialized sales force which has sufficient technical knowledge about medical-surgical supplies to intelligently answer questions of professionals. The medical-surgical supplier's investment in a costly, specialized inventory and the lesser, but considerable expense, of a trained sales force limit the supplier's ability to shift its supply capabilities toward the distribution of parenteral or laboratory supplies.

The court cannot evaluate whether a shift in productive capabilities from laboratory or parenteral suppliers into the medical-surgical supply field is feasible. However, it is apparent from the specialization of the medical-surgical supplier that hospital supply distribution is not a monolithic service industry.

In short, the existence of a medical-surgical supply submarket is adequately established by a preponderance of the evidence that medical-surgical supplies are a defined category of hospital products, and that trade in these products involves specialized vendors, distinct marketing practices and specialized intra-hospital consumer groups. Accordingly, I find from the evidence, the relevant submarket in this action is limited to the service of providing medical-surgical supplies.

### (b) The Distributor Dimension.

■ The relevant submarket in this action is limited to the sale of medical-surgical supplies by distributors, excluding direct sale efforts by manufacturers. From the demand prospective, manufacturer services do not offer a reasonably complete substitute to the services rendered by medical-surgical distributors.

As a matter of general economics, manufacturers and distributors occupy different commercial spheres. Manufacturers produce and accumulate extensive inventory within a narrow product range to be sold in bulk. Distributors purchase a broad range of products for resale in smaller quantities to the end user. This division of trade applies to the hospital supply industry. (T 3568)

Relations between hospital supply manufacturers and distributors vary from being competitive to symbiotic.

There is evidence that manufacturers selectively penetrate the business of distributing medical-surgical supplies. Two types of medical-surgical supplies are customarily shipped direct from manufacturer to hospital: (1) high-volume, bulky items such as gauze or bandages, and (2) expensive, highly-personal, high-technology products such as an artificial hip. (T 3571, 3573)

Included in the first category are goods which a hospital buys in large enough quantities to meet the manufacturer's bulk sales requirement and which are bulky enough to make a single hospital order efficiently transportable in the manufacturer's truck. (T 3572) Medical-surgical distributors do not seriously compete for this business since the manufacturers enjoy a five percent price advantage over any distributor. (T 3572) Medical-surgical distributors are primarily limited to supplying small hospitals or a large hospital's emergency needs for these goods. (T 3573)

The second category of medical-surgical supplies typically delivered by manufacturers consists of expensive, high-technology, personal items exemplified by the artificial hip. Manufacturer distribution of these supplies is feasible for two reasons. The specification of the product varies with each patient making it an impractical item for the distributor to inventory. Also, the product is used in the context of a carefully-planned operation so there is no emergency demand for this type of product.

Apart from these two product areas, medical-surgical manufacturers sporadically assume distribution activity. A few manufacturers sell only directly to hospital customers. (T 8919) Some manufacturers use distributors and direct sale techniques interchangeably or simultaneously. (T 8910–8922) However, the usual practice in the industry is for manufacturers and distributors to act in a complementary manner in marketing hospital supplies. Many user preference items are promoted to a hospital through a complementary, if not joint, ef-

fort of the brand manufacturer and its dealers. Similarly, hospitals routinely deal directly with manufacturers and contract to have the goods transported to the hospital by a dealer of the hospital's choice. Also, some hospital purchasing groups, notably MedEcon, first negotiate with manufacturers for a discount purchase price and then negotiate with distributors for a discount delivery price. Consequently, most direct dealing between hospital and manufacturer involves delivery by a distributor. This distribution pattern is likely to continue for the foreseeable future.

■ Defendant's expert witness, David Schwartzman, testified that manufacturers do compete with distributors since hospitals can trade off distributor's services for the manufacturer's lower price. The existence of a price-service trade-off between manufacturer and distributor is an inevitable consideration in any antitrust inquiry involving a distribution industry. The crucial question is whether such a trade-off renders the manufacturer an effective competitor of the distributor. Manufacturer delivery services are qualitatively different from services rendered by distributors. As a result of this difference, manufacturer services do not effectively compete with the distributor's service.

Manufacturers generally require bulk purchasing to obtain discount pricing and product shipping may be from regional rather than local warehouse locations. Consequently, from the hospital's perspective, manufacturer delivery service may often involve larger orders, longer lead times until goods are received, and an infrequent, rigid delivery schedule.

Manufacturer delivery services qualitatively differ from distributor services in at least four respects. First, manufacturers cannot render the emergency services which hospitals require. (T 8308–8310) Second, manufacturers cannot provide the constant personal sales attention that hospital supply distributors provide their large hospital customers. (T 8922) Third, manufacturers cannot provide for a reliable, flexible volume of commodities to the hospitals within a short lead time. (T 15196, 5240–4241)

This latter service is essential if the hospital is to minimize inventory holding costs. Indeed, in purchasing hospital supplies from a manufacturer, the hospital is assuming the opposite role concerning inventory management that it would in dealing with a distributor. Small scale, rapid and reliable deliveries by a distributor allow a hospital to maintain a small inventory, thrusting the task of maintaining a product reserve onto the distributor. By contrast, bulk purchases from a manufacturer require the hospital to internalize a larger inventory and the manufacturer assumes no role in hospital inventory management. (T 13089)

The fourth difference between manufacturer and distributor service levels is the fact that a manufacturer offers only its specialized product line and not the distributor's broad product mix. Since medical-surgical distributors, such as the plaintiffs, primarily service hospitals, distributor buying patterns must parallel hospital buying patterns. It is true that major manufacturers, such as Kendell Co. or Johnson & Johnson Co., sell extensive product lines to distributors or even hospitals. Typically, however, the sales from ten of these major manufacturers account for approximately two-thirds of a distributor's entire inventory. The substantial remaining portion of the inventory is purchased from a multiplicity of manufacturers. Thus, distributors supply and hospitals presumably demand the consolidated supply of a broad product mix. Only through distributors are many minor manufacturers able to offer many products which hospitals buy in small volumes. These goods are not marketable directly from the manufacturers because of a bulk purchase requirement or prohibitive transportation costs. In short, the economics of manufacturing may render this significant portion of low volume business available only through distributors.

Qualitative differences may place two goods or services in different antitrust submarkets. See Borden, Inc. v. FTC, supra. Given the substantial qualitative differences between the services of the distributor and those of the manufacturer, the latter is not a reasonable substitute for the

former. Accordingly, the relevant product market includes only those services of the medical-surgical distributor.

### (c) The Hospital Customer Dimension.

Medical-surgical supplies are bought by physicians, nursing homes, health clinics and acute and chronic care hospitals. Hospitals are a distinct customer class apart from other medical-surgical supply buyers.

Hospital demand for medical-surgical products differs from the demand requirements of other consumers of these supplies. Hospitals demand a higher volume of product, a broader product mix, and a higher level of vendor service than do other customers. (T 1055–1056)

The economics of hospital supply differs from the supply of other health care institutions. The hospital supply trade is a low-profit margin, high-volume business. (T 1056) Trade to other non-hospital customers is a higher-margin, smaller-scale business. (T 1056)

Also, from a supply perspective, hospitals are regarded as a distinct customer class. Some medical-surgical supply houses deal exclusively with hospitals. (DX 328, 329, 330, 331) Other firms are physician supply houses. Plaintiffs' primary customers are hospitals. (T 730, 4007, 377) These firms meet a hospital's high service expectations by a specialized sales force which handles only hospital customer accounts. (T 1056)

Finally, it is apparent that while hospital supply companies can service smaller, non-hospital clients, the reverse is not true. Physician supply houses cannot effectively compete for hospital business. This is a consequence of the hospital's unusual demand requirement. Any transition from the physician supply business to the hospital supply business is difficult and requires increased warehouse space and computer capabilities and larger capital investments to expand inventory and delivery capabilities. (T 675–680)

■ The above factors support the conclusion that a group of specialized vendors meet the specialized demand of hospital customers. This distinct pattern of trade indicates that the relevant product market is limited to the distribution of medical-surgical supplies to hospitals.

### 2. The Geographic Market.

■ The legal standard to determine the boundaries of the relevant geographic market is set forth in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 321, 81 S.Ct. 623, 625, 5 L.Ed.2d 580 (1961). The relevant geographic market is that "area in which the seller competes and the purchaser can practicably turn for supply." *Id.* at 327, 81 S.Ct. at 627.

The *Tampa Electric* standard was developed in the context of an exclusive dealing claim under Section 3 of the Clayton Act. The test is equally applicable to claims arising under the Sherman Act. *United States v. Dairymen, Inc.*, 660 F.2d 192 (6th Cir. 1981).

*Tampa Electric* states a two-fold test which considers both where the seller competes and where purchasers can practicably obtain supplies. The chief limitation on the seller's area of competition is competitive price disadvantages due to transportation costs and any costs associated with legal regulation in the industry such as license fees or taxes. *Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 456 (9th Cir. 1966), *cert. denied*, 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994 (1963); Elzinga and Hogarty, *The Problem of Geographic Market Delineation in Antimerger Suits*, 18 Antitrust Bulletin, 45, 66 (1973). The area where the seller competes usually reflects the buyer's practicable area of supply, unless the buyer's need for convenient access to the product narrows the practicable supply area. *United States v. Phillipsburg National Bank and Trust Co.*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

■ The geographic focus of an antitrust suit may also be defined by a relevant geographic submarket. *Brown Shoe Co. v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962); *United States v. Dairymen, Inc., supra.*

The record suggests two possible geographic market definitions. Plaintiffs urge the following eight metropolitan areas as separate geographic markets: Grand Rapids, Detroit, Charleston (W. Va.), Cincinnati, Columbus, Dayton, Indianapolis and Louisville. Each of these cities contains a VHA hospital where at least one plaintiff and defendant compete. The territorial extent of these metropolitan markets is the Standard Metropolitan Statistical Area (SMSA) for each city. (DX 466) The SMSA is a statistical concept developed and used by the United States Bureau of the Census. An SMSA represents a large, economically-integrated, metropolitan area which includes a city of a specified population, the county in which the city is located and contiguous counties, if such counties are metropolitan and economically integrated to the city. (City and County Data Book at XVIII [1977], quoted in PX 244 at 10.)

Defendant's proposed geographic market consists of two regional areas: a "Michigan" area and an "Ohio Valley" area. The Michigan area includes the entire lower peninsula of Michigan, the northeast part of Indiana and the northwest part of Ohio. (See DX 465) The Ohio Valley area includes southeast Illinois, south central Indiana, nearly all of Ohio and all of Kentucky, West Virginia and Virginia. (See DX 465)

For reasons hereinafter stated, the court concludes that defendant's regional geographic market analysis must be rejected as too broad. Conversely, plaintiffs' proposed metropolitan market is too narrow to constitute an entire geographic market. However, it is sufficient to define a geographic submarket for the distribution of medical-surgical supplies to hospitals.

Defendant's proposed geographic markets are apparently intended to represent regions where plaintiffs and defendant compete. Since defendant's business operation is national, it is the smaller scope of plaintiffs' operations which carves out the area

of party competition. Consequently, to define the Ohio Valley market, defendant has aggregated the maximum sales territory [12] of Crocker-Fels, Ransdell and Skyland.

This aggregate sales region is not a viable geographic market because it does not reflect the area in which the three plaintiffs and defendant effectively compete. The maximum sales area of the three plaintiff firms is considerably broader than each firm's area of effective competition.

In part, a geographic market represents the area of effective competition as measured by the area of the seller's operation. The area of a seller's operation is the zone in which the seller and other suppliers are routinely price competitive in selling the relevant product. A single firm may supply more than one geographic market or may ineffectively compete in another market at the fringe of its sales area. The geographic market may be overstated if defined by the maximum sales area of a single firm. Consequently, the fringe of the firm's sales area must be disregarded if the firm is not an effective competitor in that part of its sales territory.

The area in which Crocker-Fels, Ransdell and Skyland effectively compete with defendant is narrower than each plaintiff's respective maximum sales territory. This conclusion is based on evidence that from both the supply and demand prospective the business of distributing medical-surgical supplies to hospitals is metropolitan oriented and unquestionably subregional in scope.

The metropolitan orientation of the medical-surgical distribution business is supported by three observations. First, hospitals, particularly large hospitals, are concentrated within metropolitan areas. Second, hospitals demand services which can be effectively provided only by suppliers with warehouses reasonably close to the client hospitals. Third, major suppliers locate

12. Defendant's Ohio Valley market shown in map DX 464 is a composite of sales maps for the three plaintiff firms. (Crocker-Fels: DX 242–246; Ransdell: DX 185 and Skyland: DX 201) These maps represent the maximum sales area of each plaintiff; that is, the total geographic area by states, counties and cities in which each plaintiff sells and exerts sales efforts in an attempt to sell its products. (Defendant's Interrogatory 5e to which plaintiffs' maps respond.)

their operations in or near a metropolitan area to service hospitals located in the same and adjacent metropolitan areas.

The evidence demonstrates that hospital customers for medical-surgical supplies are concentrated in metropolitan areas. This is clear from the large percentage of hospitals located within SMSAs. Within defendant's Ohio Valley area 65% of the area hospital beds are located in the Cincinnati, Dayton, Louisville, Charleston and Indianapolis SMSAs. (T 12456–12459) This Ohio Valley area contains other SMSAs such as Lexington, Huntington-Ashland and Parkersburg-Marietta, which if counted, would increase the concentration of hospitals in SMSAs. A similar concentration of hospitals in SMSAs is observed in defendant's Michigan area. The Detroit, Ann Arbor and Grand Rapids SMSAs account for over 61% of the hospital beds in the Michigan area. (T 12421–12440) The Michigan area contains other SMSAs such as Lansing, Kalamazoo, Muskegon and Toledo which, if counted, would increase the percentage of hospitals located in SMSAs. Not only are hospitals generally concentrated in metropolitan areas, but the largest hospitals are universally in SMSAs. There is no hospital of more than 300 beds located outside an SMSA in either the Michigan or Ohio Valley area. (DX 311a) Consequently, metropolitan areas represent zones of concentrated hospital demand for medical-surgical supplies.

A second point firmly established by the evidence is that hospitals demand services which can be effectively provided only by distributors with warehouse facilities which are reasonably near the hospital.

As noted earlier, hospitals require rapid and reliable delivery of relatively small volumes of supplies as an ordinary service. Hospitals demand this type of supply flow in order to minimize inventory holding costs. (Butschi Dep. 4/29/80 at 364, T 9508) In conjunction with timely product delivery, distributors are expected to reserve a portion of their inventory for special hospital customers. (T 9875, 8725, DX 258, 360, 417) Hospitals require quick access to this product reserve. In providing this service function, hospitals view their major distributors as external warehouses for the hospitals.

(T 9895) In practice, hospitals recognize that this essential product delivery can only be provided by a supplier with a nearby warehouse facility.

Hospitals also occasionally call on vendors to provide emergency delivery of supplies. Hospitals recognize that this service is economically feasible only from distributors with a local warehouse.

Witnesses and exhibits for both plaintiffs and defendant attest to the importance that hospitals attach to a distributor's local warehouse location. One purchasing agent testified that most of his vendors of medical-surgical supplies were located within ten miles of his hospital. (Roth Dep. 5/2/80 at 99–100) Another purchasing agent at a Louisville hospital testified that the only medical-surgical distributors with more than $100,000 in sales at his hospital in 1979 and 1980 were suppliers with warehouses in the Louisville area. (T 11535–11536) Similarly, VHA hospitals in Charleston and Grand Rapids have policies that favor local distributors. (DX 128a, T 11612) Significantly, the VHA hospital in Charleston, West Virginia, The Charleston Area Medical Center, induced AHSC to construct a warehouse in nearby Nitro, West Virginia, to locally supply the hospital under the AHSC–VHA Agreement.

This evidence demonstrates that it is the hospital's demand for constant, small scale delivery service that narrows the geographic area where a hospital can look for major medical-surgical vendors. Unlike the situation in *United States v. Phillipsburg National Bank, supra,* and *United States v. Philadelphia National Bank, supra,* the buyers' practicable area of supply is not contracted by mere customer convenience. Here the hospitals' area of practicable supply is narrowed by delivery requirements which are rooted in a purely economic need to minimize inventory costs. Similarly, economic factors narrow the area in which a hospital may look for emergency delivery of supplies. When emergency delivery is required, hospitals are unwilling to absorb the high cost of air transport when supplies can be obtained within the emergency time

frame by conventional means of transportation. In practice, emergency deliveries are routinely made to hospitals from a vendor's van, a salesman's car or a cab.

In short, economic factors such as inventory and transportation costs limit a hospital's source of supply to dealers with a nearby warehouse.

A final point is that most medical-surgical distributors locate their operations in or near metropolitan areas. From these locations, distributors service hospitals in their home metropolitan area, surrounding territory and nearby metropolitan areas.

The operations of both plaintiffs and defendant demonstrate a pattern of sales and distribution between a warehouse and hospitals located either in the same SMSA or adjacent SMSAs. White and White distributes supplies to the VHA hospital in Grand Rapids from a warehouse located in the Grand Rapids SMSA. The firm distributes supplies to the VHA hospital in Detroit from a warehouse located in the adjacent Ann Arbor SMSA. Crocker-Fels distributes supplies to VHA hospitals in Cincinnati and Louisville from warehouse locations in each of these SMSAs. VHA hospitals in Indianapolis, Columbus and Dayton are also serviced from Crocker-Fels' warehouse in the adjacent Cincinnati SMSA. Ransdell Surgical distributes supplies to the Louisville VHA hospital from a Louisville warehouse. Finally, Skyland has a warehouse located in Ripley, West Virginia, midway between two SMSAs and a short driving distance from each. From this location, Skyland services the VHA hospital in Charleston, West Virginia.

Similarly, defendant serves VHA hospitals in Louisville, Columbus, Indianapolis and Cincinnati from a warehouse within each of these SMSAs. Defendant serves a fifth VHA hospital in Charleston, West Virginia, from a newly-constructed location just outside the Charleston SMSA. (Def. Response to Interrogatory 35 of Plaintiffs' First Set of Interrogatories)

Generally, it appears that other medical-surgical houses have established warehouses in SMSA metropolitan areas to service local hospitals. (See DX 324, 325, 330)

The testimony of medical-surgical distributors confirms the metropolitan base and scope of the suppliers' operation. (T 5815–5816) In a federal securities disclosure document, the General Medical Company reported that:

> "The company believes that the best sales promotion of its general product is . . . fast and efficient distribution in local or metropolitan areas with adequate facilities to service and repair the products sold, rather than national or regional distribution without similar local facilities." (DX 242 at A00114)

Generally vendors believe a local warehouse is necessary for effective competition for the business of metropolitan hospitals. (T 708–709, 1010, 4019, 5815–5816) Defendant's business practices follow a metropolitan distribution strategy. AHSC constructed a local warehouse for the Charleston metropolitan area and noted the need for a local warehouse in the Grand Rapids area. (DX 92a) An internal AHSC memorandum noted the inability to effectively service Grand Rapids from the pre-existing Detroit warehouse and that a new, local warehouse was necessary to "increase the company's local identity." (DX 92a at 15791, 15795) Also, AHSC marketing reports analyze the competitive environment in terms of metropolitan and not regional competition. (See DX 92a at 15805, 93, 500)

One seeming exception to this metropolitan geographic analysis is the possibility that large hospital groups might pool their purchasing power, negotiate a group contract with a single vendor to obtain a large price concession and forego local for regional delivery service. This circumstance does not impeach the metropolitan orientation of the relevant geographic market.

The evidence suggests that even when a hospital group does pool its purchasing power and negotiates a group sale, the member hospitals still obtain delivery service within subregional areas. MedEcon negotiates group purchases with manufacturers and

then divides the distribution business among several distributors, who are capable of local delivery. Other hospital chains such as Humana, Hospital Affiliates Incorporated, and even the VHA, prefer to sign prime vendor agreements with the few, national, hospital suppliers which can locally supply each member in the hospital chain. (Smith Dep. 12/6/79 at 177, 5/14/80 at 205) This is evident from the fact that AHSC made a commitment to construct a new warehouse to locally service the VHA hospital in Charleston, West Virginia. In short, it appears that hospital groups still demand and receive delivery service on a subregional scale.

In sum, it appears that the business of distributing medical-surgical supplies to hospitals is carried out on a metropolitan scale. Metropolitan areas represent concentrated areas of hospital customers. Hospital customers demand delivery services which are effectively supplied by a distributor with a local warehouse. Suppliers, in turn, generally operate from metropolitan areas and cover both their home, metropolitan area and export sales to hospitals in nearby, adjacent metropolitan areas. In light of these facts, defendant's regional geographic market definition does not accurately reflect the area of competition between medical-surgical suppliers or the area in which hospitals may practicably turn for supplies. Accordingly, defendant's regional, geographic market definition is rejected as overbroad.

Although the record convincingly demonstrates that the relevant geographic market is metropolitan oriented and subregional in size, the evidence is insufficient to establish a more precisely defined geographic market. Plaintiffs' eight SMSAs are too small to reflect entire geographic markets. Nevertheless, the SMSAs adequately define geographic submarkets for this action.

■ Assuming a firm is a representative supplier in the industry, the geographic market may be defined as that area where the seller predominantly operates. Some scholars suggest that an area should encompass a minimum of 75% of a supplier's sales before designating that area as a geographic market. *See, Elzinga and Hogarty, supra.*

Plaintiffs appear to be representative suppliers in this industry. The following table abstracted from PX 244, Table 1, indicates the geographic locus of at least 75% of the sales made from each of plaintiffs' six warehouses.

TABLE 2

| Supplier | Warehouse Location | Radius From Warehouse (Miles) | Percent of Hospital Sales |
|---|---|---|---|
| White & White | Grand Rapids | 0 – 75 | 80% |
| | Ann Arbor | 0 – 50 | 85% |
| Crocker-Fels | Cincinnati | 0 – 160 | 84% |
| Ransdell | Louisville | 0 – 65 | 77% |
| Skyland | Bluefield | 0 – 100 | 76% |
| | Ripley | 0 – 50 | 79% |

An immediate conclusion which can be drawn from the above data is that a 75% sales volume area may represent geographic regions of varying sizes. A 75% sales zone may be as small as a 50-mile radius from White and White's Ann Arbor warehouse, or as large as a 150-mile radius from Crocker-Fels' Cincinnati warehouse. No factor has been brought to the court's attention which accounts for this significant geographic disparity.

This disparity demonstrates the impossibility of defining the relevant geographic market for this industry as an area within a uniform radius around a city containing medical-surgical suppliers. Witnesses for several plaintiffs stated that the geographic extent of their business is a 75-mile radius from each warehouse location. It is clear that these estimates are accurate only with respect to individual warehouse sales areas and cannot represent the sales area of the average medical-surgical supplier.

Not only does the 75% sales area vary with each metropolitan location, most of these sales areas are geographically much larger than the parallel SMSA. This is seen from the following table which compares the size of the 75% sales area noted above to the local SMSA.

TABLE 3

| Supplier and Warehouse Location | Relevant SMSA | Maximum Diameter of SMSA (Miles) (PX 244, Table 2, Col. 4) | Diameter of Sale Area (Miles) Accounting For 75% of Warehouse Sales (PX 244) |
|---|---|---|---|
| White & White, Grand Rapids | Grand Rapids | 57 | 150 |
| White & White, Ann Arbor | Detroit | 100 | 100 |
| Crocker-Fels, Cincinnati | Cincinnati | 71 | 320 |
| Skyland, Ripley, West Virginia | Charleston, West Virginia | 57 | 100 |
| Ransdell, Louisville | Louisville | 59 | 130 |

In all cases, except Detroit, the SMSA in which a warehouse is located is considerably smaller than the sales area which accounts for at least 75% of that warehouse's sales. This comparison makes it clear that the sales within the individual SMSAs account for considerably less than 75% of each warehouse sales. This is verified by the following table which reflects the percentage of shipments made from each plaintiff's warehouse to five selected SMSAs where a VHA hospital is located. (Source: PX 244, Fn. 37)

TABLE 4

| Supplier and Warehouse Location | Relevant SMSA | % of Shipments Made From Warehouse Into the SMSA |
|---|---|---|
| White & White, Grand Rapids | Grand Rapids | 35% |
| White & White, Ann Arbor | Detroit | 41% |
| Crocker-Fels, Cincinnati | Cincinnati | 22% |
| Skyland, Ripley, W.Va. | Charleston | 54% |
| Ransdell, Louisville | Louisville | 46% |

In my judgment, these sales' percentages are too low to find that each SMSA constitutes a separate geographic market. A substantial portion of the seller's operation is beyond its home SMSA. Nevertheless, it appears that these SMSAs constitute individual geographic submarkets.

The earlier-mentioned evidence establishes metropolitan areas are the centers of supply and demand for the medical-surgical supply distribution industry.

The SMSA is a reasonable economic portrait of a single, metropolitan area. Table 4, *infra*, indicates that a single SMSA does not account for 75% of the sales of any of the plaintiff firms. Consequently, a single metropolitan area does not represent an entire geographic market.

Nevertheless, suppliers perceive each metropolitan area as a discrete zone of competition. Defendant's marketing reports analyze competition on a metropolitan basis. (PX 92a, 93, 94, at 500) These reports indicate that each metropolitan area has a different collection of major suppliers. (*Id.*) The reports also confirm that most major suppliers operate from local warehouses. Table 4 indicates that a single metropolitan area may account for approximately one-quarter to one-half of the sales of a medical-surgical distributor. This quantum of business, while insufficient to establish a product market, is, in my opinion, indicative of a product submarket.

In short, the evidence supports the general conclusion that a single metropolitan area, defined as an SMSA, is a discrete and commercially-significant geographic area of trade in the medical-surgical distribution industry. As such, these areas may represent individual geographic submarkets. *Brown Shoe, supra; United States v. Dairymen, Inc., supra.* Accordingly, I find the relevant geographic submarkets for this action to be the SMSAs of the cities of Grand Rapids, Detroit, Charleston, Cincinnati, Columbus, Dayton, Indianapolis and Louisville.

B. *Market Volume and Defendant's Market Share.*

The relevant product is the distribution of medical-surgical supplies to hospitals. The relevant geographic submarkets are the eight SMSAs of Detroit, Grand Rapids, Cincinnati, Columbus, Dayton, Charleston, Indianapolis and Louisville. The court must now determine the volume of this defined market and defendant's market share.

The parties generally agree on the basic method for determining the market volume and defendant's market share. The market volume is measured from a demand prospective, i.e., the total demand of hospitals for the distribution of medical-surgical supplies in each of the eight SMSAs. This total demand is measured by multiplying two factors: (1) the number of hospital beds in each SMSA, and (2) a hospital's dollar-per-bed purchase potential figure.

The number of hospital beds in each SMSA is obtained by identifying all hospitals in the SMSA and totaling the number of hospital beds in these hospitals.

The second factor, the hospital purchase potential figure, is the total medical-surgical supply purchases of a hospital as measured on a dollars-per-bed basis. Health care experts have long noted that a correlation exists between hospital size and the purchase potential of supplies. On a per-bed basis, larger hospitals buy more medical-surgical supplies than do smaller hospitals. Taking this correlation into account, the parties have categorized hospitals according to size by the number of beds in the hospital. Progressively larger purchase potentials have been developed for progressively larger classes of hospitals.

Thus, plaintiffs and defendant have divided the hospitals in each SMSA into several size categories, then applied an appropriate per-bed potential to those hospital beds in each size category. The potential purchases for each size category were aggregated to determine an overall purchase potential for all hospitals in the SMSA. This aggregate is the total market.

Once the total market is determined, the defendant's market share is determined by dividing the defendant's sales in the market into the total market figure.

The parties dispute the sales volume of each of the eight SMSA markets.[13] There is no dispute as to the number or size of the hospitals in each SMSA. The dispute hinges on the proper purchase potentials to be assigned to these hospitals. Plaintiffs sponsor a series of purchase potentials formulated by their expert, Dr. Stephen Martin: the Martin potential. Defendants developed two alternative series of purchase potential, the Armbruster potential and the Hepp potential both named for their sponsoring expert witnesses.

The dispute over the purchase potentials creates a related dispute as to defendant's share of the market. Defendant claims that the Martin potential underestimates the total market volume and thereby overstates defendant's market share. Plaintiffs substantially agree with the Armbruster potential, but contend that it slightly overstates the market volume and, therefore, understates defendant's market share. Plaintiffs also claim that the Hepp potential greatly overstates the market volume and greatly understates defendant's market share.

At the outset, the court notes that the Martin, Armbruster and Hepp potentials are all estimates as to hospital potential purchases of medical-surgical supplies. Each estimate contains inaccuracies which have been deftly exposed by opposing counsel. Consequently, two questions confront the court. First, which, if any, of the potentials is acceptable as a reasonably reliable indicator of hospital purchasing potential for medical-surgical supplies? Second, between alternative acceptable potentials, which potential is the most reliable?

### 1. The Martin Potential.

The Martin potential is derived from a 1973 survey of hospital purchase practices

13. Plaintiffs' market sales volume analysis assumes a product market of the distribution of medical-surgical supplies and a geographic market defined in terms of the eight SMSAs. Defendant proffers several market volume sales analyses. Some assume a broader product definition consisting of medical-surgical supplies, laboratory supplies and parenteral solutions. Some of defendant's market volume analysis also assumes a broader defined geographic market consisting of the Michigan and Ohio Valley regions. Consistent with the court's prior determination that the relevant product market is the distribution of medical-surgical supplies and that the relevant geographic submarkets are these eight SMSAs, the court will consider only those market sales volume analyses which reflect these product and geographic assumptions.

conducted by Dr. Dean Ammer. This survey was launched when Dr. Ammer sent questionnaires to 1,150 private, acute care hospitals having more than 150 beds. Of this sample, 500 hospitals responded. The hospital data generated was organized and tabulated by product class and hospital size. So tabulated, this data represents a series of per-bed purchase potentials for particular product classes at hospitals within 11 size categories. (DX 452)

Dr. Martin modified the original Ammer potential to reflect a contemporary definition of the term "medical-surgical supplies." Two of Ammer's product classes, "medical-surgical supplies" and "sterile supplies" were consolidated by Martin for his analysis. This consolidation was necessary because Ammer's study was conducted before hospitals shifted from reusable to disposable supplies. Many products which are now regarded as disposable medical-surgical supplies were considered reusable "sterile supplies" at the time the Ammer study was conducted. Consequently, consolidation of these two product classes was necessary to fully reflect the class of medical-surgical products hospitals currently purchase.

Finally, Dr. Martin applied a series of inflation factors to the modified Ammer data to convert the 1973 purchase potentials into second quarter 1979 dollars.

### 2. *The Armbruster Potential.*

The Armbruster potential is derived from hospital purchasing data compiled in the *Hospital Supply Index*, a publication prepared by the IMS America Corporation.

The *Hospital Supply Index* is a quarterly statistical analysis which projects hospital purchasing in particular product categories from specific suppliers. These national and regional purchasing projections are derived from actual purchasing data collected from a sample group of hospitals. (T 10129)

The sample base for the IMS analysis is 450 acute care hospitals, 410 non-psychiatric hospitals and 40 psychiatric hospitals. The

sample design is stratified to reflect three factors: (1) the geographic location of the hospitals, (2) hospital size, as measured by the number of hospital beds, and (3) the "ownership" status of the hospital.

Hospital data is collected for nine geographic regions of the United States. Hospitals are also categorized according to five size classes: hospitals with (1) under 100 beds, (2) 100–199 beds, (3) 200–299 beds, (4) 300–499 beds, and (5) 500 beds and over. Finally, two types of hospital ownership are considered: (1) "private hospitals," which includes non-profit and profit institutions, and (2) "CCS hospitals," which includes city, county and state hospitals.[14] (T 10131)

Each variation of these geographic, size and ownership factors constitutes a statistical cell. A sample hospital is selected to represent the universe of all hospitals within each cell. (T 10140) Purchasing data from the sample hospital is obtained from hospital invoices collected by IMS field personnel. The sample hospital purchasing data is then multiplied or projected to reflect the purchases of all hospitals within the particular statistical cell. Regional cell projections may be aggregated into a national projection.

Mr. Armbruster used IMS data to derive two figures: the national total of hospital beds at hospitals in each IMS size class and the national total purchase dollars of medical-surgical supplies for each IMS hospital size class.

The number of hospital beds was determined by adding beds in the private and CCS hospital categories for each size class. (*See* DX 610 derived from DX 517(B)(1) page C13, column 10 and page C14, column 10)

The total purchase dollars of medical-surgical supplies was obtained by taking the total purchase dollars for all IMS product categories in each size class and then excluding those product categories which were either not sold by AHSC or not sold

---

14. Federal hospitals are not analyzed by the IMS survey. This is because the IMS study is intended to measure purchasing habits of acute care hospitals. Many federal hospitals are vet-

erans hospitals or tuberculosis care facilities. As such, these institutions are chronic and not acute care health facilities.

generally by medical-surgical supply dealers. (DX 595, T 10157)

The Armbruster per-bed potential was obtained by dividing the total purchase dollars of medical-surgical supplies for that size class by the number of hospital beds in each size class. (DX 514(C)) The resulting figures are national per-bed purchasing figures for hospitals in each of the five IMS size classes.

### 3. *The Hepp Potential.*

The Hepp per-bed potential is identical to the Armbruster potential for four of the five IMS hospital size categories. Only in the largest size class, hospitals having 500 or more beds, is a separate per-bed potential developed. The Hepp per-bed purchase potential for this largest hospital size class is the average of the actual purchases of five VHA hospitals which have over 500 beds. (*See* DX 503, 578, 582, 589 and 611, averaged in DX 628, pages E–1, row 6.)

### 4. *Comparison.*

The court regards the Armbruster potential as the most reliable indicator of a hospital's potential purchases of medical-surgical supplies.

At the outset the court notes that none of the potentials precisely measure hospital demand for the distribution of medical-surgical supplies. The Martin potential is based on Ammer's sales data which does not exclude hospital's direct purchases from manufacturers. Similarly, the Armbruster and Hepp potentials contain some manufacturer sales. (*See* PX 368, 369, DX 643, 644.) Inclusion of manufacturer's sales in the purchase potential will result in a conservative estimate of the defendant's share in the distribution market.

A relatively minor flaw in the Martin potential is the fact that Dr. Martin's analysis does not include purchases made by hospitals with less than 200 beds. (T 1099–1100) This is a relatively small inadequacy as the smallest hospitals purchase the smallest volume of medical-surgical supplies. A serious deficiency is the fact that the Ammer study predates the shift from reusable to disposable hospital supplies. Concomitant with this shift to disposable supplies has been considerable growth in new products offered by medical-surgical vendors. In addition to making disposable versions of initially reusable goods, vendors periodically offer a new tray or package which is a collection of previously-known but singly-used goods. Dr. Martin's addition of Ammer's "medical-surgical" and "sterile supplies" product categories may reflect the shift to disposable products with respect to products existing in 1973. This consolidation, however, does not reflect the substantial growth in new products since 1973. Nor can the consolidation allow for increased hospital expenditures due to product upgrading, in large part caused by expansion of medical malpractice claims. (T 10373) [15] In contrast, the IMS data base underlying the Armbruster study is derived from current purchasing data and product categories are redesigned periodically to reflect new product offerings.

As noted earlier, the Hepp potential uses the Armbruster per-bed purchase potential in the four smallest hospital size classes. In the fifth and largest hospital size class, Hepp developed an independent per-bed potential. This potential is less reliable than the parallel Armbruster potential since the Hepp potential overstates hospital demand.

Mr. Hepp's sample structure gives reason to question the reliability of this potential. The IMS data, underlying the Armbruster potential, is based on a larger sample of large hospitals. The IMS sample of 410 acute care, non-psychiatric hospitals in-

---

**15.** Evidently the failure to allow for the development of new products and the tendency toward product upgrading not only understates the quantities of supplies purchased by hospitals, it may also understate the inflation rate for such hospital supplies. The inflation index Dr. Martin used from 1974 to 1979 was developed by IMS and reflects inflation in price of a fixed "market basket" of hospital supplies. Dr. Armbruster opined that new products, not included in the "market basket," may rise at a faster rate of inflation. Thus, the overall rate for medical-surgical supplies may be higher than that reflected in the IMS inflation index. (T 10351)

cludes 75 hospitals with more than 500 beds. (T 474) The Hepp potential for hospitals with over 500 beds uses a sample of five VHA hospitals as a basis for a purchase projection for all hospitals over 500 beds.

Another source of unreliability in the Hepp potential is the unreliable nature of the five underlying purchase analyses of the sample VHA hospitals.

Actual purchase data was compiled from the following VHA hospitals: Miami Valley Hospital, Norton-Children's Hospitals, Butterworth Hospital, Henry Ford Hospital, and Charleston Area Medical Center. These purchase analyses were not prepared in the normal course of business but were prepared for this litigation.

One difficulty is that each hospital has its own distinctive internal accounting system. Consequently, no uniform methodology could be adopted to account for each hospital's purchases of medical-surgical supplies. This problem is exacerbated by the fact that the accounting systems of several hospitals did not directly segregate purchases along product category lines. Three hospitals, Miami Valley Hospital, Norton-Children's Hospitals and, to some extent, Butterworth Hospital sought to indirectly measure their medical-surgical purchases by calculating the total purchases from "vendors which sell products available from distributors of a broad range of medical-surgical supplies." (DX 528a, 589a, 611) Two substantial inadequacies exist with these analyses.

The first flaw is that no consistent method was adopted to identify "vendors which sell products available from a distributor of a broad range of medical-surgical supplies." Some hospitals classified certain suppliers [16] as such vendors and included purchases from these companies in their purchase analyses; while at other hospitals, these same suppliers were not so classified and purchases from these companies were excluded from the hospitals' purchase analyses. Consequently, these three VHA hospitals do not agree as to which firms supply products available from a distributor of a broad range of medical-surgical supplies. Absent such an agreement, the methodology behind these purchase analyses is inexact and the data is unreliable.

As noted above, the intent of these three purchase analyses is to indirectly account for each hospital's medical-surgical supply purchases by measuring the purchases from manufacturing or distribution firms which sell products generally available from medical-surgical suppliers. Even where such vendors are accurately identified, not all of the products sold by these vendors constitute medical-surgical supplies. Consequently, a second flaw in these analyses is that they include purchases of supplies which, in fact, are not sold by either AHSD or a typical medical-surgical supply distributor.

This error occurred for several reasons. Invoice identification of which particular products were purchased from each vendor was impossible because of the voluminous quantity of invoices each hospital handles. Consequently, decisions to totally or partially include purchases from this or that vendor in the analysis were based on the judgment of the compiling hospital purchasing agent and were occasionally verified by a second purchasing agent. Some of the compiling hospital purchasing agents specialized in buying nonmedical-surgical supplies. These purchasing agents did not have personal knowledge as to whether their hospital actually purchased medical-surgical supplies from the vendors which they included in their purchase analysis.

One purchasing agent testified that if a company was known to sell any product available from a medical-surgical supply distributor, he included all of his hospital's purchases from that company whether or not the products actually sold to the hospital could be purchased from a distributor. (T 10759, 10691–10692, 10751, 10690, 10687–10688, 10693) The same purchasing agent

---

**16.** The following suppliers were treated inconsistently within the three VHA purchases analyses: Bentley Laboratory, Malkin Instruments, Olympus Corporation, Richards, Inc., Edward Weck and Co., Cobe Laboratories, Extracorporeal, Medtronics and Physio-Control. (Compare DX 579, PX 590, 618)

admitted that a number of companies included in his hospital's purchase analysis did not generally compete with AHSD. (T 10766) A second purchasing agent testified that she included the total purchases of a company in her analysis even though only part of the products available from that company are available from medical-surgical distributors. (T 11447–11449, 11461–11464, 11467, 11487, 11450–11451, 11454) A third purchase analysis was corrected for accounting errors. After correction, the analysis still contained large purchases from firms which should have been excluded as selling products not generally available from medical-surgical distributors. (T 12991, PX 440, 418)

In short, each of the purchase analyses from the five VHA hospitals was made without adherence to a uniform methodology. The accuracy of these analyses varies widely. Given the substantial degree of error within several of the analyses, the court cannot accept the average of these five analyses as a reliable purchase potential for hospitals with more than 500 beds.

Consistent with the above reasoning, I reject the Hepp potential as a measure for determining the market volume.

The court's adoption of the Armbruster potential should not suggest that this potential is without fault. The court finds only that the Armbruster study is sufficiently reliable to determine market volume and is more reliable than the alternative potentials. These conclusions are arrived at after careful scrutiny of several defects in Mr. Armbruster's analysis.

Three defects are noted in the Armbruster analysis. The first is that in calculating the per-bed potential, Mr. Armbruster included purchases by psychiatric hospitals when calculating the total purchase dollars, but in dividing this total by the number of hospital beds, he excluded psychiatric beds. (T 10181, 10364, 10366) Psychiatric hospitals buy a negligible quantity of medical-surgical supplies. (DX 6388) The effect of including the small psychiatric purchases in the total dollar purchase figure, but excluding psychiatric beds from the total number of hospital beds, is to inflate the per-bed potential, overstate the market volume and understate defendant's market share. (PX 400a) The margin of this error is reduced by the fact that, under the AHSC–VHA contract, psychiatric beds are considered as one-half a bed for the purpose of determining the price cap and volume discount. Consistent with this contract term, the relevant group of hospital beds in the relevant SMSAs includes all acute care hospital beds and one-half all psychiatric hospital beds. Thus, the margin of this error in Armbruster's analysis is significant, but halved.

Plaintiffs claim as a second error that in calculating the total purchase dollars, Mr. Armbruster included purchases of hospital supplies which are not generally available through distributors. (DX 368, 369) However, the IMS data indicates that while many of these supplies are not distributed by the nation's four largest distributors, they are available from other dealers. (DX 643, 644) In any event, Armbruster's inclusion of purchases from manufacturers creates a margin of error which is similar to that error caused by Martin's inclusion of manufacturer sales in his potential. Nevertheless, the court recognizes that inclusion of hospital purchases from manufacturers is a factor which results in an overstatement of the market volume and a conservative estimate of defendant's market share.

A third error in the Armbruster methodology relates to the inclusion of purchases of surgical instruments in the total purchase figure. These products are sold by AHS V. Mueller and not AHSD. Consequently, either such sales should have been excluded from the calculation of the per-bed potential, which purports to reflect only goods AHSD could sell (DX 603a), or the V. Mueller sales should have been included in the calculation of defendant's market share. Without either of these adjustments, the Armbruster potential understates defendant's market share.

Having noted and weighed these errors, I remain of the opinion that the Armbruster potential is a reasonably accurate indicator of hospital per-bed purchases of medical-surgical supplies. The underlying IMS data

is based on invoice purchase data obtained from a carefully designed sample of hospitals. Purchasing data is gathered quarterly and product categories are periodically redesigned to reflect new products. The court concludes that the Armbruster analysis, though flawed, nevertheless, is the most reliable of the three proffered potentials.

In chart form, the following is the Armbruster estimate for hospital potential purchases of medical-surgical products within each hospital size-class, based on 1979 IMS purchase data.

TABLE 5

| | Hospital Size: 500 Beds and Over | 300–499 Beds | 200–299 Beds | 100–199 Beds | Under 100 Beds |
|---|---|---|---|---|---|
| 1979 | $3,253 | $2,924 | $2,426 | $2,336 | $1,743 |

Source DX 514 C

Generally, the volume of the market for each SMSA is calculated by multiplying the Armbruster potential by the number of hospital beds in each SMSA.[17] This total market volume figure is then divided by defendant's sales in the SMSA [18] to obtain defendant's market share within each submarket. So calculated, I am satisfied and find the following to be a slightly conservative, but reasonably accurate, estimate of defendant's market share percentage in each of the relevant SMSAs. (Source PX 423)

TABLE 6

| SMSA | Defendant's Market Share Percentage |
|---|---|
| Cincinnati | 30.32 |
| Columbus | 39.57 |
| Indianapolis | 27.02 |
| Louisville | 13.86 |
| Charleston | 45.81 |
| Grand Rapids | 18.04 |
| Detroit | 23.26 |
| Dayton | 28.67 |

\* \* \* \* \* \*

17. More specifically, the Armbruster potential for each IMS size class is multiplied by the number of hospital beds in SMSA hospitals in each IMS size class. The result is a dollar purchase figure for the SMSA hospitals in each size class. All of these size class purchase figures are added to obtain the total dollar

## VIII. ATTEMPT TO MONOPOLIZE

Count 1 of the complaint alleges that AHSC has unlawfully attempted to monopolize the business of distributing medical-surgical supplies in the eight relevant SMSAs in violation of Section 2 of the Sherman Act. Section 2 makes it illegal to "monopolize, or attempt to monopolize, or ... conspire ... to monopolize ... trade ... among the several states. ..." 15 U.S.C. § 2.

Section 2 of the Sherman Act literally forbids the establishment of any monopoly. However, it is clear that Congress did not intend nor have courts construed Section 2 to make monopolies per se illegal. In sponsoring the Sherman Act, Senators Hoar and Edmund noted that the legislation would not apply to firms who "merely by superior skill and intelligence ... got the whole business because nobody else could do it as well." 21 Cong.Rec. 3146–3152. Similarly, the United States Supreme Court has observed that lawful monopolies could occur by marketing a superior product or by patent grant. *See, United States v. Grinnell, supra* 384 U.S. at 571, 86 S.Ct. at 1704.

While Section 2 does not prohibit monopolies per se, it does proscribe monopolization. 3 Von Kalinowski, *supra* ¶ 8.02(3) at 8–41 (1979); *Berkey Photo, Inc. v. Eastman Kodak, Inc.,* 603 F.2d 263 (2d Cir. 1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Monopolization is the possession of market power to control prices or exclude competitors coupled with the general intent to exercise that power through anticompetitive conduct. *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). Anticompetitive conduct to deliberately acquire a monopoly or preserve or extend a pre-existing lawful monopoly is unlawful monopolization. *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96

purchase figure for all hospitals in the SMSA. This is the market sales volume.

18. AHSC corporate sales in each SMSA were calculated by defendant's expert witness, Mr. Hepp, and appear in his work papers at DX 629 D–2.

L.Ed. 162 (1951); *SmithKline Corp. v. Eli Lilly and Co.*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

■ That Section 2 selectively tolerates "innocent" monopolies but prohibits anticompetitive monopolization, flows from the policy of protecting competition, which is the central purpose of the Sherman Act. The Sherman Act is intended to preserve competitive markets from destruction through the predatory practices of monopolists. *See generally Berkey Photo, Inc., supra* at 272, *Appalachian Coals, et al. v. United States*, 288 U.S. 334, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825 (1922).

■ A clear corollary of this pro-competitive policy is that, under the antitrust laws, a monopoly firm has an unconditional right to compete. As Judge Hand noted in *Alcoa*, "[t]he successful competitor, having been urged to compete must not be turned upon when he wins." *United States v. Aluminum Company of America*, 148 F.2d 416, 430 (2d Cir. 1945). The monopolist's right to engage in competitive conduct is limited, however, by the principle that many actions which are not anticompetitive if done by a small firm may have anticompetitive effects if done by a dominant firm. *See Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 925–926 (10th Cir.), *cert. dismissed* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). Nevertheless, it is clear that a firm's market power constrains but cannot eliminate its right to compete.

■ Consistent with this pro-competitive policy, a large firm is entitled to marketing capabilities and economies solely attributable to the firm's large scale operation or integrated structure. *Berkey Photo, Inc., supra* at 276. Such large scale marketing capabilities may include more efficient production, greater ability to develop complementary products, reduced transaction costs and the general benefits from economies of scale. These abilities and economies are legitimate competitive conduct only if they are derived solely from the firm's size or organizational structure and not from the firm's market power. Conduct which is possible because of the firm's market power is inherently anticompetitive and therefore monopolistic.

The limited definition of unlawful monopolization has a direct bearing in assessing whether particular business conduct amounts to an attempt to monopolize. If a defendant's conduct is judged to be competitive and not predatory, no attempt violation is made out. Just as the *Berkey* Court noted that a monopolist is entitled to the natural benefits of its size and integration, so too is the large firm whose conduct is challenged as an attempt to monopolize. Accordingly, one of the issues before the court is whether the construction, operation and implementation of the Purchasing Agreement are competitive by-products of defendant's size and structure or whether they are anticompetitive fruits of defendant's market power.

While the law of monopolization provides some guidance to the legal analysis of an attempt to monopolize claim, the fact that the trade practice is challenged as an attempt introduces several independent legal elements.

An attempt to monopolize has generally been defined as:

"The employment of methods, schemes and practices which would, if successful, accomplish monopolization, and which though falling short nevertheless approach so close as to create a dangerous probability of it. *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1966)."

■ Two elements form the basis of an attempt to monopolize claim: (1) proof that the defendant has engaged in anticompetitive conduct with a specific intent to monopolize, and (2) proof that there is a dangerous probability that the attempt could be successful. *United States v. Dairymen, Inc., supra* at 194. *Northeastern Telephone Co. v. American Telephone and Telegraph Co.*, 651 F.2d 76, 85 (2d Cir. 1981); *Kearney and Trecker Corp. v. Giddings and Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

Specific intent to monopolize may be inferred from circumstantial evidence such as defendant's past anticompetitive conduct, statements or business policies. *Lorain Journal Co. v. United States, supra; Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F.Supp. 476 (E.D.Mo.1965), aff'd 368 F.2d 679 (8th Cir. 1966). Specific intent to monopolize may not be inferred from the defendant's activities which are primarily motivated by legitimate business aims rather than an intent to exclude competition or create a monopoly. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953).

The dangerous probability of success element is a measure of the defendant's capacity to monopolize. *Walker Process Equipment, Inc. v. Food Machinery and Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); 2 Von Kalinowski, *supra* § 9.01[2] at 9–6 (1979). By definition an attempt is conduct which has not yet ripened into the completed substantive offense. Consequently, it is not necessary to show that a defendant charged with an attempt to monopolize possesses the market power necessary for an actual monopoly. *American Football League v. National Football League*, 205 F.Supp. 60 (D.Md. 1962), aff'd 323 F.2d 124 (4th Cir. 1963). Instead it is necessary to demonstrate that the attempt poses a "dangerous probability" that a monopoly could be established. *Swift and Co. v. United States, supra* at 396, 25 S.Ct. at 279; *Alles Corp. v. Senco Prod., Inc.*, 329 F.2d 567 (6th Cir. 1964). Proof of a dangerous probability of success does not require a showing that the attempt would result in the establishment of a monopoly but for the intervention of the antitrust laws. *Alles Corp. v. Senco Prod., Inc., supra.* Instead, the dangerous probability requirement goes to capacity and inclination of the defendant to commit unlawful monopolization. As the Seventh Circuit explained in *Kearney and Trecker Corp. v. Giddings and Lewis, Inc., supra* at 598.

"We do not understand the 'dangerous probability' test to involve an evaluation of the actual likelihood that an attempt would have succeeded if not frustrated by an intervening event. Rather, it requires an appraisal of the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions. In an antitrust context we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market." [Footnotes omitted.]

The dangerous probability of success of an alleged attempt must be assessed by reference to defendant's market power in a defined market. *Mowery v. Standard Oil Company of Ohio, Inc.*, 463 F.Supp. 762, 772 (N.D.Ohio 1976), aff'd without opinion, 590 F.2d 335 (6th Cir. 1978); *United States v. Dairymen, Inc., supra* at 195. *Kearney v. Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 373 (6th Cir. 1977). Within this relevant market, the court must consider such factors as defendant's relative size, conduct, business policies, and business performance as well as the market structure. 3 Von Kalinowsk, *supra* § 9.02[2], page 9–11. Relevant features of the market structure which a court must consider include the number, size and strength of competitors in an industry, increase or decrease in defendant's market share, past and probable development in the industry, entry barriers and consumer demands. 3 Von Kalinowski, *supra* § 8.02[3], at 8–36 (1979).

In light of these legal principles, the court now considers plaintiffs' attempt to monopolize claim. A two-fold analysis recently used by the Sixth Circuit Court of Appeals in *United States v. Dairymen, supra* will be employed. First, I will examine whether defendant's business practices constitute anticompetitive conduct indicative of a specific intent to monopolize. Then the dangerous probability of success element will be assessed.

### A. Anticompetitive Conduct And Specific Intent to Monopolize.

The terms of the AHSC–VHA Purchasing Agreement and defendant's conduct in

implementing this Agreement are integral parts of a single business practice. Therefore the court will analyze both the Agreement and its implementation in assessing the issue of defendant's specific intent to monopolize.

As will be seen below, I find that the terms of the AHSC–VHA Purchasing Agreement and the conduct through which it was implemented are anticompetitive. The terms of the Purchasing Agreement erect a commercial environment between the contracting parties which tends to exclude all other, smaller competitors and impairs price competition within individual product submarkets. Without this anticompetitive environment, defendant's implementation strategy would not have been feasible. The implementation strategy is itself anticompetitive as it also seeks to exclude competitors from access to VHA business and impair price competition. The construction and implementation of the Purchasing Agreement are anticompetitive acts which are collectively sufficient to establish defendant's specific intent to monopolize.

The AHSC–VHA Purchasing Agreement does not require the VHA hospital to buy anything from AHSC. Nor does the Agreement establish a common price at which AHSC will sell its goods and services to the VHA hospitals. The Agreement does, however, provide that the VHA hospitals, as a group, may become eligible for a price cap and volume discount on purchases of a wide range of hospital supplies from AHSC distribution divisions. The price cap and volume discount apply if the VHA hospitals, as a group, meet certain specified average per-bed purchase levels of AHSC goods. Under the procedure of the Agreement, each hospital individually negotiates and buys goods from AHSC at a floating price. At the end of the year, VHA purchases are totalled and averaged on a per-bed basis. If the VHA average per-bed purchase level exceeds the threshold purchase levels specified in the Agreement, the price cap and volume discount are earned and calculated. Monies due under these provisions are paid to the hospitals in the quarter after the close of the purchase period.

The design of the AHSC–VHA Purchasing Agreement is anticompetitive in at least three respects. First, the extraordinarily wide product and geographic scope of the Agreement impairs competitive opportunities of all of defendant's competitors who are smaller and who specialize in narrower product and geographic submarkets. Second, the Agreement is anticompetitive since the price cap and volume discount terms of the Agreement create a leverage relationship which operates in favor of defendant's products. This leverage relationship operates between AHSC goods in many different product submarkets and impairs the competitive opportunities of defendant's competitors who operate in no more than a few product submarkets. A third and final anticompetitive aspect of the agreement is that the price cap and volume discount terms encourage the hospitals to buy AHSC products at indeterminate prices. The cap and discounts are incentives to purchase AHSC goods but are constructed so as to obscure defendant's prices for these supplies. This incentive to purchase AHSC goods at indeterminate prices thwarts price competition for the distribution of medical-surgical supplies.

On its face, the Purchasing Agreement covers such a broad expanse of product and geographic markets that it necessarily impairs the competitive opportunities of defendant's smaller competitors. An official AHSC press release described the magnitude of the Agreement in the following words:

> "In terms of number of beds, this is almost twice the size of any other agreement of this type. The VHA represents the largest group of non-profit hospitals in this country and American is the largest one source supplier of more than 120,000 health care products and services." (PX 81)

Not only does the Agreement cover a vast array of hospital supply products, it applies to a large hospital group spread across 21 states. (PX 1, Exhibit A)

A purchasing agreement with this broad product and geographic coverage is unprec-

edented in the hospital supply industry. (T 3662–3665) Only AHSC has the capacity to supply a hospital group so widely disbursed with such broad product requirements. (T 3690–3692)

The Purchasing Agreement, designed to encompass broad product and geographic perimeters, tends to exclude defendant's smaller competitors from gaining access to this bulk of business. Plaintiffs' expert on hospital group purchasing, William Wooldridge, testified on the effect of this broad product coverage:

"The concern I have with the number of dissimilar products that are covered by this [agreement] is that there is virtually no other distributor or series of distributors that can compete . . ., because there is no other distributor that can handle such diverse products as disposable packs and gowns, IV solutions, linens and textiles, laboratory supplies, et cetera, so that the tremendous mix of products makes this approach, in my opinion, quite unbiddable." (T 5283)

Wooldridge also noted the anticompetitive aspect of including entities within many geographic markets within the Purchasing Agreement.

"The tremendous geographic expanse that this contract covers . . . hospitals scattered all over the United States, would effectively prevent open competition for this base of business, because as I have mentioned, there is no other distributor or company that comes to mind that can handle the breadth of line and the diverse geography that this contract . . . covers." (T 5284–5285)

Unquestionably the AHSC–VHA Agreement relates to such a broad distribution service that it limits the competitive opportunities of all of defendant's competitors at individual VHA hospitals. In this respect, the scope of the contract has an anticompetitive effect.

In assessing the antitrust consequences of the Purchasing Agreement, the court is aware that the hospital supply industry is in the midst of several far reaching transformations. Both proprietary and voluntary hospitals continue to form large purchasing groups of as many as 200 to 300 hospitals. Many of these large hospital purchasing organizations prefer to buy their requirements from distributors which can service all of the group's member hospitals. Thus, within the hospital supply industry, small independent hospitals are forming into larger buying groups which wish to deal primarily with national suppliers. AHSC and, to a lesser extent, the General Medical Corporation are the principal beneficiaries of this consumer consolidation.

Whether the specific intent to monopolize can be inferred solely from the fact that the scope of a purchasing agreement is so large as to exclude all competitors is not essential to the resolution of this case.

The court assumes, without deciding, that the broad scope of the Agreement alone does not evidence a specific intent to monopolize. Nevertheless, the combined anticompetitive effect of the scope of the Agreement, the other provisions of the Agreement and the implementation of the Agreement collectively evince defendant's specific intent. Thus, the exclusionary scope of the Purchasing Agreement is probative but not dispositive of defendant's specific intent to monopolize.

A second anticompetitive aspect of the Agreement is that the price cap and volume discount provisions create an anticompetitive leverage relationship which cuts across separate product submarkets.

This interproduct leverage effect is created by linking a broad range of products under all encompassing price cap and volume discount terms. The following AHSC products may be purchased by the VHA hospitals to obtain the price cap and volume discount: "medical/surgical, laboratory, dietary, laundry, housekeeping, parenteral therapy, surgical instruments and supplies, equipment and furnishings." (PX 1, page 2)

No elaborate market analysis is needed to conclude that the Purchasing Agreement applies to many different product categories. Different collections of suppliers provide such disparate products as hospital food, parenterals, surgical instruments, laundry and office furniture. Indeed,

AHSC is the only consolidated supplier of these products. It is also obvious that the individual products in this Agreement are independently used. They are not functionally related or economically complementary products. Consequently, one would not expect a single supplier to develop and market these independent items. Indeed AHSC supplies this collection of products through the united effort of its constellation of purchases from AHSC during the purchase period. Consequently, by purchasing the additional AHSC products and qualifying for the cap, the VHA hospitals obtain price protection for both these additional products and the earlier purchased independently preferred AHSC goods. In contrast, the volume discount is an incremental benefit since the various discount percentages apply only to increments of purchases beyond the threshold purchase level. By purchasing the additional AHSC products to meet the volume discount threshold, the hospitals obtain the option to purchase more AHSC goods at indeterminate but lower prices. Thus, the purchase of additional AHSC goods buys two benefits: (1) retroactive price protection on earlier purchased, independently preferred goods, and (2) the opportunity for price reduction on future purchases from AHSC.

The VHA hospitals have responded to these incentives with expected enthusiasm. The record establishes that many of the VHA hospitals have dramatically increased their purchases from AHSC since the execution of the Agreement. (PX 166; HF 219, 234–236, 238–240, 242–243, 248–250, 252–255, 258–260) The record also demonstrates that the VHA hospitals are purchasing a broader mix of AHSC products under the agreement.

Plaintiffs initially alleged that this link of unrelated hospital supplies amounted to an unlawful tying agreement. The court rejected this argument and dismissed the tying claim at the close of plaintiffs' case. In doing so, the court noted that the price cap and volume discount provisions of the Agreement in fact lever purchases of additional AHSC goods off of purchases of those AHSC goods which the VHA hospital would independently prefer. However, since each hospital in its own judgment, determined which products it independently preferred and which products it preferred because of the Agreement, no specialized manufacturing subsidiaries. Accordingly, the court finds, without difficulty, that but for the link established by the price cap and volume discount provisions, these products would be separately marketed.

The effect of linking unrelated hospital supply products through single price cap and volume discount terms is to create intra-product and interproduct leverage relationships.

Prior to the Agreement, each VHA hospital had preferences of varying strengths for each of defendant's products based on the interplay of competitive forces. Presumably each VHA hospital had favorite AHSC products by reason of product quality, price or service. The VHA hospitals would buy these products regardless of the Purchasing Agreement so they could be thought of as independently preferred goods.

Besides these independently preferred goods, the Agreement encourages the VHA hospitals to make additional purchases of AHSC goods to qualify the group for the price cap and volume discount benefits. Consequently, under the Purchasing Agreement, each VHA hospital purchases, not only AHSC goods which are independently preferred; but additional AHSC goods, not preferred, but which are purchased solely in expectation of a price cap and volume discount. These additional purchases will be of two kinds: (1) greater quantities of the independently preferred AHSC goods and (2) different AHSC goods not previously purchased by that hospital. Thus, the price cap and volume discount provisions have discernable intra-product and interproduct leverage effects.

By purchasing additional AHSC goods and becoming eligible for the price cap and volume discount, the hospitals will achieve cost savings in two ways. The price cap is cumulative, so when the hospitals reach the price cap threshold, the price cap "relates back" and covers all of the hospital's specific pair of products could be identified as the tied and tying products.

Although this interproduct levering is not tying, it is anticompetitive. The court is aware that price caps and volume discounts are common features of contracts in the hospital supply industry. (DX 143, 149, 360) As the foregoing analysis demonstrates, such price caps and discounts exert leverage on the buyer to increase purchases from the contracting vendor. Yet it is not the leverage effect itself which is anticompetitive. The anticompetitive aspect of the leverage relationship in the AHSC–VHA Agreement is that it cuts across product submarket lines. The immense diversity of products linked together under a single price cap and volume discount is not customary of the industry contracts. (PX 1 and DX 130, 118a, 492, 493, 494, 495)

If the price cap and volume discount terms were limited to a single, broad product submarket category such as medical-surgical, laboratory or parenteral products, no apparent injury to competition would result. Each distributor within the product submarket could offer similar incentives. Competition could proceed through this device as well as through product quality, price and service. To some degree this form of competition did occur within the industry prior to the Purchasing Agreement. (DX 495, 572)

Since the price cap and volume discount cut across product lines, it is inevitable [19] that these terms have an impact on the prices of goods within several separate product categories. Hospitals will make additional purchases from one AHSC product category to "subsidize" the price protection on independently-preferred goods in a different product category. Similarly, hospital purchases in one AHSC product category create the opportunity to obtain a volume discount on AHSC goods in other prod-

19. That each VHA hospital will inevitably purchase among several product categories under the Purchasing Agreement seems evident for several reasons. First, in many product submarkets if the VHA hospital bought its entire requirement from AHSC, these purchases would fall short of the volume discount price cap thresholds. Compare:

| AHS Division | General Product Submarket Involved | AHS Div. Purchase Potential (166) | Minimum Group Purchase Requirement for Volume Discount (1980) PX 1 | Minimum Group Purchase Requirement for Price Cap (July 1970– Dec. 1980) PX 1 |
|---|---|---|---|---|
| AHSD | Medical-Surgical Supply | $3,550 | $2,000 | $2,500 |
| McGaw | Parenterals & Solutions | $1,350 | $2,000 | $2,500 |
| Scientific Products | Laboratory Supplies | $1,040 | $2,000 | $2,500 |
| Dietary Products | Food | $ 800 | $2,000 | $2,500 |
| Hospitex | Linen, Textile Products | $ 660 | $2,000 | $2,500 |

As this chart indicates, hospitals having a strong independent demand for AHSC parenteral, laboratory supplies, food or hospital linen products must buy AHSC products in a second product class to reach the price cap and volume discount levels. It is possible for a single hospital to meet the minimum purchase levels by buying only medical-surgical supplies from the AHSD Division. This is not occurring at any VHA hospital. Each hospital buys from several AHSC divisions which specialize in goods of different product submarkets. (PX

166) Although no hospital is buying only medical-surgical supplies under the Agreement, it is clear the the VHA hospitals, as a group, buy disproportionately more medical-surgical supplies than other products available under the Agreement. AHSD's percentage potential of the total purchase potential from all AHSC participating divisions is 44.37%. (PX 166) As of March 31, 1980, 55.10% of the actual VHA purchases were from AHSD. Conversely, 44.90% of the hospitals' purchases were from

uct categories. In other words, the expectation of price concessions in several product categories may induce the hospital to purchase an entirely unrelated AHSC product which, if competitively traded, would have been purchased from another vendor.

The competitors of AHSC are smaller firms which market products within a single or few product categories. Such competition cannot offer the VHA hospital a similar interproduct price cap or volume discount. Consequently, to remain competitive in their respective product categories, other distributors must offer a price concession either by a cap, discount or price cut, which compensates the hospital for incentives it may forego with respect to its purchases of other AHSC products. In other words, the competitor must not only match dollar-for-dollar the AHSC price concession on goods within its particular product category, the competitor must offer additional concessions in compensation for the blanket incentives available on other AHSC products. In this manner, the price cap and volume discount provisions thwart competition within the various hospital supply product submarkets.

The above analysis of the interproduct leverage effect of the Agreement is limited to a discussion of leverage between generally defined product submarkets. No leverage relationship has been mentioned between any specific pair of product submarkets such as medical-surgical supplies and laboratory supplies. Indeed, it is unlikely that the type of leverage created by the Agreement would occur between any two specific product categories at all VHA hospitals. The essence of the leverage inherent in the Agreement is that in each hospital, additional purchases of AHSC goods are levered off of the hospital's pre-existing demand for independently preferred AHSC goods. Since each hospital decides which AHSC goods are purchased because they are independently preferred and which goods are purchased because of the price cap and volume discount, the specific lever-

ing and levered product categories will vary from hospital to hospital. Plaintiffs' concede this in their brief. "Such leverage [between the products of different AHSC divisions] may differ from hospital to hospital in terms of the specific sales representative and the specific AHSC division which is the door opener." (Plaintiffs' brief, page 158) Consequently, the court is unable to conclude that additional purchases of medical-surgical supplies are levered off of a pre-existing demand for any specific product categories such as laboratory supplies at all of the VHA hospitals. Instead it appears that the interproduct price cap and volume discount provisions are general contaminates to competition in all of the product submarkets covered by the Agreement. The fact that the Agreement is generally anticompetitive is some quantum of proof of defendant's specific intent to monopolize the medical-surgical supply distribution industry.

A final anticompetitive aspect of the Purchasing Agreement is the fact that the Agreement impairs price competition through the offer of a price cap and volume discount which are constructed so as to make it impossible for a hospital to calculate the AHSC net price on any product. The price cap and volume discount are substantial incentives for the VHA hospitals to purchase supplies from AHSC. Nevertheless the amount of any price concession from these provisions is dependent upon several factors beyond the prediction or control of the individual VHA hospitals. It is impossible for any VHA hospital to determine, at the time of sale, the net price of any AHSC product and compare this price to a competitor's offer. In this manner, price competition is impaired.

 Unquestionably, the price cap and volume discount present substantial incentives for the VHA hospitals to purchase supplies from AHSC. As an unstated basis for this Agreement, AHSC generally promised to offer its products at a "competitive" purchase price.[20] (PX 5) Beyond this

---

other AHSC divisions which primarily specialize in nonmedical-surgical supplies. (PX 166)

20. That AHSC agreed to "be competitive" in its pricing to the VHA hospitals does not mean that the defendant was acting competitively as that term is used in the antitrust law. It is

promise, AHSC intended that the price cap and volume discount would be the prime inducement to cause the VHA hospitals to divert a large amount of their business from other distributors to AHSC. (PX 4) The VHA executive director, Robert Kitzman, acted as an intermediary between AHSC and the member hospitals and advised the hospitals to weigh the price cap and volume discount heavily in making their purchasing decisions. (PX 6) Mr. Kitzman also advised one hospital purchasing agent to recognize the benefits of the cap and discount and not expect AHSC to be the lowest priced vendor on all products. (PX 158) The hospital purchasing personnel regarded the price cap and volume discount as factors in deciding to purchase AHSC products. In response to the Agreement incentives, a substantial amount of VHA business has been converted to AHSC. (PX 166)

■ Although attractive, the price cap and volume discount provisions are constructed so as to make it impossible for the VHA hospitals to ascertain the net price for any AHSC product. Part of this price ambiguity is caused by the rebate form of the incentives. The hospital purchases its volumes of supplies in one purchase period and after the end of the period any price concession is determined and returned to the hospital as a rebate. This rebate format, if limited to a single hospital, is not an insuperable barrier to price competition. A single hospital can gauge its intended aggregate purchases from a vendor, estimate the price concession and be in a position to estimate a net sale price of the vendor's product and compare prices. More importantly, if the rebate incentive is limited to a single product category, other vendors who deal in that product category can offer competing rebates and price competition can proceed in this format.

However, the operation of the price cap and size of the volume discount in the AHSC–VHA Agreement is dependent on the average, per-bed, purchase level of the entire VHA group. This means the net price for a particular medical-surgical product at a particular VHA hospital is influenced by the different purchasing decisions of other VHA hospitals. The net price for an AHSC medical-surgical product purchased by the VHA hospital in Grand Rapids, Michigan, for example, is indirectly influenced by a purchase of AHSC dietary products by the VHA hospital in Houston, Texas. No VHA hospital is able to predict the group's performance and cannot estimate the size of any price concession due under the Agreement. With the size of the rebate indeterminate, the hospital cannot estimate the AHSC net price on the product at the time of sale. Consequently, a hospital cannot incorporate the value of the AHSC rebate into a price comparison analysis. Moreover since defendant's competitors are not able to offer a similar interproduct price concession, the incentive of the price cap and volume discount cannot be competitively matched. In short, the price cap and volume discount are inducements for the hospitals to purchase AHSC goods at indeterminate prices in a commercial environment devoid of price competition.

Defendant's implementation of the Purchasing Agreement also reflects practices intended to preclude price competition.

Defendant secured from the VHA a promise that the member hospitals would open their books and disclose the prices of vendors currently supplying each hospital. (PX 3, 4, 12, 19) Defendant's sales representatives were told to confront diplomatically hospital purchasing personnel and compile a list of products convertible from other vendors to AHSC at an equal price. (PX 12) At some hospitals, purchasing per-

clear that a firm which fixes prices cannot justify its conduct by proof that prices were fixed at competitive levels. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, *rehearing denied*, 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421 (1940). Similarly, AHSC's anticompetitive trade prac-

tices cannot be justified by proof that they result in prices which competition would affirm. The antitrust laws protect the competitive process and not merely low price levels which may be the fruits of competition or a benevolent monopolist.

sonnel believed the disclosure of prices of competing vendors was unwise, unethical or illegal. (PX 12, 33, Dietz Dep. 6/4/80 at 324) Nevertheless, some VHA hospitals revealed the data to AHSC. (PX 17, 23, 24, 26, 27, 30, 32, 35, 42, 171) AHSC also attempted to obtain pricing from those manufacturers having purchasing arrangements with VHA hospitals. (PX 70, 267)

Obtaining the competitor's pricing was a prelude to implementation of the AHSC matching program for establishing the purchase prices for AHSC goods. Under this matching program, AHSC conceded that each division would assume its bulk of new business at each VHA hospital at the same aggregate price at which the previous vendors enjoyed the business. (PX 14, 15, 267) AHSC did not intend to match the prior vendor's price on a product-by-product basis. (PX 14) Also, the matching policy was qualified by a "walk away" privilege whereby AHSC could decline unprofitable business in products which the hospital enjoyed a low price. (PX 45)

After offering to match the prices of an incumbent vendor, AHSC sought to preclude these or other vendors from rebidding on the business. VHA executive director Robert Kitzman worked with AHSC personnel to inhibit competitive bidding at the member hospitals. (PX 38, 39, 40, 158) Kitzman and Peter Frechette of AHSC's Scientific Products Division agreed to work to "preclude formal bidding" by competitors. (PX 38) In response to this activity, many hospitals converted business to AHSC at a matched price without giving the prior vendor the opportunity to rebid. (McDonald Dep. 11/27/79 at 65; Lowe Dep. 6/5/80 at 85; T 7656–7660, T 10795–10796, Butschi Dep. 4/29/80 at 79–80; Brown Dep. 5/28/80 at 145; T 11576)

AHSC's general purpose behind these pricing strategies was to acquire a large volume of new VHA business and maintain its existing gross profit market. (PX 14, 18, 21) Specifically, AHSC wished to avoid assuming a disproportionate amount of trade in commodity products which carry a low profit margin. (PX 18)

As part of the implementation process AHSC official, Robert Simmons, attended meetings of the VHA Board of Directors. As previously pointed out, the VHA directors are chief executive officers at VHA hospitals. At these meetings, Mr. Simmons distributed a monthly progress report which ranked the VHA hospitals by their per-bed purchases of AHSC goods and showed the percentage of increase or decrease in each hospital's purchases from AHSC in comparison to the prior month. (PX 146, 147, 148) This "scoreboarding" technique was the principal method through which AHSC hoped to create peer pressure among the hospital chief executives to support the agreement. (PX 18 at 0304)

Implementation of the Agreement at the Charleston VHA hospital, the Charleston Area Medical Center (CAMC), involved AHSC hiring a salesman named Paul Bush from the employ of its principal competitor, plaintiff Skyland. Paul Bush was Skyland's most successful sales representative at CAMC. Bush accounted for approximately $5.8 million of Skyland's business. (T 4128)

Prior to his decision to leave Skyland for AHSC, Skyland reduced Bush's commission rate, thus lowering his earning potential. (T 4103) Bush was unhappy with this commission change. (Bush Dep. 7/1/80 at 222–224) In July, 1979, Bush met with top AHSC officials in Chicago. (Bush Dep. 6/18/80 at 157–170) During this meeting, both the Purchasing Agreement and the future of the small hospital supply firms were discussed. Later, CAMC officials, Messrs. Dietz and Lowe, told Bush that CAMC would support the AHSC–VHA Agreement and that Skyland would lose much of that hospital's business. (Bush Dep. 7/1/80 at 218–220; Lowe Dep. 6/5/80 at 221–222; Dietz Dep. 6/4/80 at 277–278) Concerned that the Purchasing Agreement would adversely affect his income, Bush accepted employment with AHSC on October 1, 1979. (Bush Dep. 6/18/80 at 170, 225) His salary from AHSC was considerably lower than his commission earnings from Skyland. (PX 60) Shortly after joining AHSC, Bush was asked to prepare a

study concerning the feasibility of converting products from Skyland to AHSC. (PX 67, T 8972–8974, 9074–9075)

Bush was hired as the AHSC representative to CAMC because of that hospital's request for an experienced salesman. (PX 56) AHSC shared its concern. (PX 57) By hiring Bush, AHSC intended to implement the Purchasing Agreement and weaken Skyland's competitive strength at that hospital. As one AHSC document notes:

"With the commitment of Charleston Area Medical Center and the VHA, we will make some significant inroads into Skyland's business. One of their major strengths is that they have a strong senior sales rep in the Charleston area. At this point, it appears that this individual will be leaving Skyland to join AHS. *If this materializes, we will have significantly reduced Skyland's strength.*" [Emphasis added.]

(PX 66 at 14972)

In the opinion of the court, these AHSC implementation practices and the terms of the Purchasing Agreement have destroyed price competition at and excluded competitors from individual VHA hospitals. Defendant's anticompetitive conduct at these hospitals is an adequate basis to conclude that defendant has formed the specific intent to monopolize the respective metropolitan markets.

The individual VHA hospitals constitute a significant percentage of the total hospital beds in each of the eight relevant metropolitan markets. (PX 244, Table 2) This percentage of hospital beds within the VHA system will increase in some of the metropolitan areas as the VHA grows through its affiliate program. Finally, the VHA hospitals are leading institutions in their respective health care communities. (PX 346) Their commercial and management practices are likely to be emulated by nearby institutions. Similarly, AHSC has indicated its intent to export this type of purchasing agreement to hospitals outside the VHA system. (PX 288) Consequently, I conclude that the AHSC anticompetitive conduct at the eight VHA hospitals is sufficient to establish defendant's specific intent

to monopolize the distribution of medical-surgical supplies in the eight relevant metropolitan markets.

\* \* \* \* \* \*

B. *Dangerous Probability of Success.*

▮ The dangerous probability of success requirement goes to the capacity of defendant to commit the completed offense of unlawful monopolization. *Kearney and Trecker v. Giddings and Lewis,* 452 F.2d 579 (7th Cir. 1979). This capacity is measured by reference to the character and objective of the defendant's conduct in relation to a defined market. *Kearney and Trecker, supra* at 598; *Mowery v. Standard Oil of Ohio Co., supra* at 771.

In applying these legal standards, it is apparent that the court must make an individual assessment of the dangerous probability in each of the eight SMSA geographic submarkets. This is not difficult. Except for the hiring of Paul Bush, which pertains only to the Charleston submarket, the terms and general implementation strategy of the Purchasing Agreement are identical in all the submarkets. Also, nothing in the record suggests that the general structure of the medical-surgical supply distribution industry varies at any of these submarkets. The only major variable at each submarket is defendant's market share.

It is in light of defendant's variable market share that the court concludes that the record establishes defendant's dangerous probability of success in the following five SMSAs: Charleston, Columbus, Cincinnati, Dayton and Indianapolis. In the remaining three SMSAs, no dangerous probability is apparent.

The character of defendant's conduct has already been considered in detail. The Purchasing Agreement was found to be anticompetitive by reason of the large product and geographic dimensions of the Agreement and the interproduct leverage and price ambiguity caused by the Agreement. In implementing the Agreement, additional anticompetitive conduct occurred. Defendant caused VHA hospital personnel to disclose competitor prices, selectively matched these prices and sought to preclude compet-

itive rebidding on this business. Defendant also acted to induce the hospital's chief executive officers to apply "peer pressure" among themselves and internal pressure within their respective hospitals to divert business to AHSC. At Charleston, defendant hired a key salesman away from a competitor with the stated intention of weakening the strength of that competitor.

Defendant engaged in these trade practices to further several related objectives. The immediate objective of this conduct was to establish a non-competitive commercial environment at each VHA hospital wherein AHSC became the dominant supplier. Price competition was impaired and competitors were excluded from access to VHA business. Defendant sought to appropriate all reasonably profitable business from these hospitals. Low margin business was left for competitors. Defendant hoped to entrench itself as the dominant supplier to these hospitals after the expiration of the contract. So entrenched, defendant expected to augment its pre-existing dominant position in those metropolitan submarkets where VHA hospitals were located.

In the eight relevant SMSAs of Charleston, Columbus, Cincinnati, Dayton, Indianapolis, Detroit, Grand Rapids, and Louisville, defendant's share of these submarkets is respectively 45%, 39%, 30%, 28%, 27%, 23%, 18%, and 13%. (*See* Table 6, *supra*, page 999.)

▇ In five of the above SMSAs defendant's market share exceeds 27%. This statistic, standing alone, is meaningless and must be evaluated in the context of any trend in defendant's market share and the market structure. *See, General Communications Engineers, Inc. v. Motorola Communications and Electronics, Inc.*, 421 F.Supp. 274 (N.D.Cal.1976), holding that defendant's market share of 60% created no dangerous probability because of the competitive nature of the two-way radio industry; *Huron Valley Publishing Co. v. Booth Newspapers, Inc.*, 336 F.Supp. 659 (E.D.Mich.1972), holding defendant's 29% market share inadequate to establish a dangerous probability in the competitive newspaper advertisement industry; and *Yoder Bros., Inc. v.*

*California-Florida Plant Corp.*, 537 F.Supp. 1347 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977), holding defendant's 20% market share did not create a dangerous probability of monopolization of the flower breeding industry after finding the industry competitive and having low entry barriers; and other cases collected at J. Von Kalinowski, *supra* § 9.02[2] at 9–10.

▇ Unfortunately, the court does not have before it any analysis of the trend of defendant's market share under the Purchasing Agreement based on the Armbruster potential earlier adopted by the court. However, the record unmistakably reflects a substantial increase in AHSD sales in all eight SMSAs from 1979 to 1980. (DX 629 at 039425–039426)

The character and objectives of defendant's anticompetitive conduct must be measured in relation to the structure of the medical-surgical supply distribution market.

On a national level, the medical-surgical supply distribution industry consists of some 600 local supply houses, numerous regional supply firms, several multi-regional firms and the international concern of AHSC. The plaintiff firms typify regional suppliers. IPCO, Will Ross, and General Medical Corp. are the multi-regional medical-surgical supply distributors. (T 1339, DX 300, 299, 292)

Traditional entry barriers into the industry have been modest. In the past, the necessary capital requirements have consisted of a warehouse, truck fleet and sales force. Recently, these capital requirements have increased substantially. In addition to traditional capital assets, a medical-surgical supply distributor now requires a computer system to manage inventory and to receive hospital purchase orders. Also, the technical knowledge required of a distributor's salesman has increased as these salesmen are expected to give hospital customers advice on a growing array of complex hospital supply and related management problems. In the words of Paul Bush, one of the industry's foremost salesmen, the medical-surgical supply distribution business is now

"a very highly-technical industry." (T 9162)

Given the past conditions of easy entry, a spiraling demand for hospital supplies, and generous hospital cost reimbursement programs, strong competition has flourished amid small, medium and large supply firms. This strong competition has been evidenced by a number of small firms or new outlets occasionally entering or leaving various metropolitan submarkets.

As a consequence of this history of easy entry and strong, small-scale competition, AHSC has generally been faced with smaller and weaker competitors in the eight relevant metropolitan markets. Most local medical-surgical supply houses have annual sales under $4 million. · Regional suppliers such as plaintiffs' firms have annual corporate sales ranging between $10–$20 million. Plaintiffs' sales figures must be divided between the various markets in which they operate. (T 208–209, 607–610, 866–867, DX 315, 485)

Defendant's main competitor in Columbus is the Burrows Company which has annual sales of approximately $8 million. (DX 334) Indiana Surgical, the AHSC competitor in Indianapolis has annual sales of $7 million. (DX 329) In comparison, AHSC's Cincinnati operation has annual sales of $10 million. (DX 337) The AHSC Columbus-Obetz facility has annual sales of $11 million. (DX 336)

The evidence suggests that the nation's few multi-regional suppliers are also weak competitors. Will Ross and General Medical are subsidiaries of larger, parent corporations.[21] Nevertheless, these firms do not have the commercial strength of AHSC. General Medical, Will Ross and IPCO suffered a drop in earnings for 1979. (P 92 at 04136, DX 300 at A00460 and DX 299 at A00414) Nationally, Will Ross, General Medical and IPCO combined have less than two-thirds of the distribution market held by AHSC. (PX 91 at 04265) In the relevant metropolitan market, these firms are also relatively weak competitors. IPCO

was not mentioned as a significant competitor by any witness who testified at trial. General Medical has relatively low annual sales at Louisville, Cincinnati and Indianapolis of $6, $4, and $8 million respectively. (DX 325, 332, 324)

While this evidence is less than complete, it is satisfactory to establish that AHSC faces markets composed of smaller and financially weaker competitors.

The formation of hospital purchasing groups is an additional and significant barrier to the entry of new firms into the industry. Hospital group purchasing is also a significant suppressant to small-scale competition in the industry. Defendant's dominance in the industry is certain to grow as hospitals align themselves into group purchasing organizations.

In the past, AHSC has enjoyed most of the hospital supply distribution business with the large proprietary chains such as Humana and Hospital Corporation of America. (Smith Dep. 5/14/80 at 205) Even regional suppliers such as Crocker-Fels could not obtain such business as these chains purchase their requirements from a single supplier who can serve each of the far-flung members of the group. (Smith Dep. 12/6/79 at 176–177, 179–180) Under government and private pressure to contain hospital supply costs, non-profit hospitals as small as 200 beds are forming into hospital purchasing groups. As the president of plaintiff Crocker-Fels, Rufus Smith, stated: "Everybody is a member of a group today." (Smith Dep. 12/6/79 at 173) Some groups, such as MedEcon, divide group business among regional suppliers. (T 5210) However, many national, non-profit groups, such as the VHA, prefer to deal with a single vendor. Consequently, large amounts of group business are being removed from local competition.

To date the competitive response of the small firms to gain the business of these hospital customer coalitions has been ineffective. A consortium of 35 local and re-

---

21. General Medical Company is now owned by Whittaker Corp. Will Ross is owned by G. D. Searle and Co.

gional suppliers was formed under the name of the Associated Buying Company, Inc. (ABCO). ABCO's primary purpose was to enable the smaller distributor to sell a standardized hospital product to national hospital chains. (Smith Dep. 12/6/79 at 183) After some initial measure of success with hospital purchasing groups, ABCO lost this business because its constituent members were insufficient in number and size to service the hospital chains. (Smith Dep. 12/6/79 at 183–184, 5/14/80 at 213) A new consortium of regional suppliers, United Hospital Supply Corporation (UHSCo), has been formed with the same purpose. (Smith Dep. 12/6/79 at 161–162, 5/14/80 at 204) The court is not apprised of the present health of this organization but one of the consortium's founding members, Crocker-Fels, has quit the organization. (Smith Dep. 5/14/80 at 194) This kind of joint venture has several manifest barriers to overcome. The group must supply a uniform product and a high level of service to each member of the hospital group. Moreover, it would appear that some centralized computer system is necessary to manage efficiently and monitor the transactions of each member of the consortium. (DX 138) Given the failure of the previous consortium and the organizational difficulty in establishing a functional entity, the court cannot presently regard such consortium as a significant competitive factor in the industry.

The restructuring of hospital demand through the formation of hospital purchasing groups is a salient factor in assessing the defendant's capacity to unlawfully attempt to monopolize the relevant metropolitan markets. It is important to note that if competitive, this consolidation is not a basis for finding any antitrust liability. Group purchasing may be highly competitive and its high volume buying may bring about substantial savings to the individual hospitals within the group.

An entire industry can undergo a natural transition from competition between many, smaller entities to competition between fewer, larger entities. In such a case, the larger firms which benefit from such a transition are not subject to antitrust liabil-ity. The Sherman Act preserves competition, not competitors, large or small. Consequently, if more medical-surgical business is consolidated into hospital purchasing groups, and such groups prefer to deal with a national vendor such as AHSC, then by the ebb and flow of competitive transactions, a national firm may flourish and local firms may die of attrition. If this evolution occurs through natural competition, the demise of small medical-surgical houses is not actionable under the antitrust laws. However, the fact that this industry is evolving naturally toward large group purchasing does not excuse or justify defendant's anticompetitive trade practices.

The AHSC–VHA contract is anticompetitive both in its construction and in its implementation. These anticompetitive practices are the proximate cause of defendant's increased sales at the VHA hospitals in the eight relevant submarkets. In the future, one or more of the plaintiff firms may fail from the competitive preferences of hospital purchasing groups for the broad-based distribution services of the defendant. However, if such is their fate, the firms must collapse from the forces of competition and not because their life has been cut short by the anticompetitive practices of a dominant firm.

The restructuring of hospital demand through group purchasing was already an important feature of the market at the time of the execution of the AHSC–VHA contract. This trend remains an important force as the Purchasing Agreement is being implemented. Accordingly, the fact that hospital purchasing groups are forming in these eight relevant submarkets and that defendant is the primary beneficiary of this trade are important factors to consider in assessing defendant's capacity to monopolize these metropolitan submarkets.

Tying together these individual strands of evidence concerning the character and objective of defendant's conduct and the nature of the market, the following circumstance emerges. Through the anticompetitively designed and implemented Purchasing Agreement, defendant sought to appro-

priate for itself all reasonably profitable medical-surgical supply business at VHA hospitals in the eight relevant metropolitan submarkets. Appropriation of this block of business was to be achieved by two broad strategies. First, defendant sought to create a commercial environment between AHSC and the VHA hospitals which precluded price competition on business which AHSC wished to assume. Price competition was limited to low margin business. Second, through the strategy of peer pressure and group incentives, AHSC sought to exclude competitors and gain exclusive access to VHA business. AHSC's objective in this undertaking was to become the primary supplier to these important hospital customers and also to increase its prominent position in the respective metropolitan submarkets.

On a metropolitan level, defendant considers itself to have two to four primary competitors in each local area. (DX 92, 500) Generally, AHSC is larger and stronger than these competitors. On a multi-regional level, AHSC is challenged by a handful of generally weaker firms. On a national level, AHSC has no competitor.

AHSC has traditionally enjoyed the vast majority of medical-surgical supply business with the larger proprietary hospital chains. Non-profit hospitals are increasingly entering into multi-regional purchasing groups. Many of these groups prefer a vendor capable of serving the wide geographic area embracing their membership. Consequently, AHSC's dominance in the medical-surgical distribution business is certain to increase as new, multi-regional groups form and transfer business to the defendant. Concomitantly, the strength of metropolitan and regional firms will decline as hospitals purchase under multi-regional instead of local contracts.

Entry and survival of new firms into the industry is increasingly precluded by rising capital requirements. Entry and survival are also hampered by the fact that important blocks of business are frequently awarded to large distributors.

The serious anticompetitive character and objectives of defendant's conduct, the frag-

ility of the defendant's competitors, and defendant's ever increasing dominance in the relevant metropolitan submarkets, leads the court to conclude that where defendant's metropolitan market share exceeds 25%, the defendant's anticompetitive conduct is performed with the requisite dangerous probability of success to establish an attempt to monopolize violation. In the following five SMSAs, the plaintiffs have satisfied the dangerous probability of success requirements: Charleston, Cincinnati, Columbus, Indianapolis and Dayton. In the remaining three SMSAs, Detroit, Grand Rapids and Louisville, no dangerous probability is shown.

Consistent with the above reasoning, I conclude that defendant has engaged in anticompetitive conduct with the specific intent to monopolize and that such conduct poses a dangerous probability of successful monopolization in the markets of Charleston, Cincinnati, Columbus, Indianapolis and Dayton. Defendant has unlawfully attempted to monopolize these submarkets in violation of Section 2 of the Sherman Act.

\* \* \* \* \* \*

## IX. UNREASONABLE RESTRAINT OF TRADE

The final count of the complaint alleges that in entering into and implementing the Purchasing Agreement, AHSC, the VHA and the member VHA hospitals have conspired to restrain trade in violation of Section 1 of the Sherman Act.

Section 1 of the Sherman Act provides that: "[e]very contract, combination ... or conspiracy in restraint of trade or commerce among the several States ... is declared illegal...." 15 U.S.C. § 1.

The policy behind Section 1 is to preserve competitive markets from destruction by anticompetitive concerted action. As the Supreme Court noted in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 694–695, 98 S.Ct. 1355, 1366–1367, 55 L.Ed.2d 637 (1978), "The Sherman Act does not require competitive bidding; it prohibits unreasonable restraints on competition." The Act reflects

the judgment of Congress that competition is the essence of our national economic policy. *Standard Oil v. FTC,* 340 U.S. 231, 248, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1950).

The early cases construing the Sherman Act applied a literal interpretation of the statute. Joint business practices were declared illegal if they caused any actual trade restraint. The reasonableness of such a practice was no defense from liability. *See, United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897) and *United States v. Joint Traffic Association,* 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898).

In the Standard Oil Trust decision, the Supreme Court reconstrued the Sherman Act to prohibit unreasonable joint restraints on trade. *Standard Oil Co. v. United States,* 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). The logic for testing joint trade restraints under this Rule of Reason was explained by Justice Brandeis in the Chicago Board of Trade case:

> "The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; it's condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of the intent may help the court to interpret facts and to predict consequences."

*Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

Under a Rule of Reason analysis, a court must inquire into the nature of the joint trade restraint, balance this against any justification or reason offered on behalf of the restraint, and determine the net impact of the restraint on competition. *National Society of Professional Engineers, supra,* 435 U.S. at 688, 98 S.Ct. at 1363. While the Rule of Reason is applicable to every joint business practice covered under Section 1, sometimes the rule has no saving effect. Certain specified business practices are, in the experience of the courts, so inherently pernicious to competitive trade that they are declared per se illegal without regard to any stated justification. *See e.g., United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, *rehearing denied,* 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421 (1940); *United States v. Arnold, Schwinn and Co.,* 388 U.S. 365, 87 S.Ct. 1853, 18 L.Ed.2d 1249 (1967).

Plaintiffs' unreasonable restraint of trade claim requires the court to ask and answer two questions. First, whether there is a contract or conspiracy which restrains trade in a relevant, defined market. Second, whether an adequate justification exists for the restraint which makes it reasonable. As to the matter of reasonableness, only one consideration governs: whether the restraint operates to "regulate" and thereby "promote" competition. *Chicago Board of Trade, supra* at 238, 38 S.Ct. at 243. In other words, "the inquiry mandated by the Rule of Reason is whether the challenged restraint is one that promotes competition or one that suppresses competition." *National Society of Professional Engineers, supra* 435 U.S. at 691, 98 S.Ct. at 1365.

Section 1 of the Sherman Act reaches only trade restraints which are accomplished through the concerted action of a conspiracy, combination or contract. Although no legal distinction is drawn between these three forms of concerted ac-

tion, intuitively a conspiracy marks the broadest formulation of the scope of Section 1. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 445–446 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

■■■■ A conspiracy is a combination of two or more persons who act in concert to accomplish an unlawful purpose or accomplish a lawful purpose by unlawful means. *Lamb Enterprises, Inc. v. Toledo Blade Co.*, 461 F.2d 506, 518 (6th Cir. 1972). Concerted action in the context of an antitrust conspiracy requires evidence of a conscious commitment by the alleged co-conspirators to a common, illegal scheme. *Edward J. Sweeney and Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). This conspiratorial commitment need not be evidenced by a formal agreement. *American Tobacco Co. v. United States*, 147 F.2d 93, 107 (6th Cir. 1945), *aff'd* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Instead, an antitrust conspiracy may be inferred from three elements: (1) evidence of an unlawful "common design" between the alleged co-conspirators, (2) knowledge by each alleged member of the others' involvement, and (3) joint participation in the unlawful scheme. *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.*, 459 F.2d 138, 146 (6th Cir. 1972).

Plaintiffs claim that the signing of the AHSC–VHA Agreement is itself a contract in restraint of trade within the purview of Section 1. Plaintiffs also urge that the Agreement, as implemented, is a conspiracy between AHSC, the VHA and individual VHA hospitals.

The defense concedes that some degree of concerted action has transpired between AHSC, the VHA and the VHA member hospitals. However, defendant denies that this concerted action is a conspiracy since the parties did not jointly agree upon any unlawful scheme. Defendant further characterizes the concerted action as a lawful foundation for subsequent bilateral sales transactions between AHSC and each VHA member hospital. Defendant urges that the AHSC–VHA Agreement was implemented by the independent purchasing decisions of each hospital. Accordingly, defendant contends that to the extent that any hospital elected to forego competitive bidding, this election was the product of a unilateral choice by that hospital which does not offend Section 1.

In assessing whether the inter-relationship between AHSC, the VHA and the individual VHA hospitals amounts to a conspiracy, the court will consider the three elements of a tacit conspiracy identified in *Elder-Beerman, supra*, in reverse order. Consequently, the court first considers the degree of joint participation among the alleged co-conspirators.

The record establishes a high degree of joint action exists among these parties. This is reflected in the following evidence.

All of the alleged co-conspirators subscribed in one capacity or another to the Purchasing Agreement. AHSC and the VHA are signatories to the Agreement. The individual VHA hospitals unanimously approved the Agreement prior to VHA acceptance. Also, the hospitals are designated as third party beneficiaries who can enforce rights provided for under the Agreement against AHSC.

The terms of the Purchasing Agreement contemplate a close commercial relationship between AHSC, the VHA and member VHA hospitals. The Agreement clearly contemplates that each member VHA hospital will purchase large amounts of supplies from AHSC to obtain price protection and volume discounts. The VHA is to act as an intermediary in this sales relationship by aiding AHSC in presenting sales opportunities to each VHA hospital. Apart from a long term sales arrangement, the Agreement contemplates that AHSC will provide consulting and material management services to member hospitals.

In addition, the Purchasing Agreement was introduced at each VHA hospital through the joint participation of the alleged co-conspirators. AHSC officials, Terry Mulligan and Robert Simmons, introduced the Agreement at each hospital

through a slide show presentation. VHA director, Robert Kitzman, and the chief executive officer of the host hospital attended these presentations.

The implementation of the Agreement also involved a sustained pattern of joint activity. After the initial presentation of the Agreement, VHA director Kitzman continued to intercede on behalf of the AHSC sales effort at individual VHA hospitals. (PX 151, 155, T 2557) Kitzman collaborated with AHSC personnel to minimize competitive bidding at the member hospitals. (PX 38, 39, 40, 89, 158) Kitzman also worked with AHSD official Robert Simmons to induce the hospitals to disclose competitors' prices to AHSC and allow AHSC to assume new VHA business at a matched price if it so desired. (PX 3, 4, 12, 14, 15, 17, 18, 19, 23, 31, 32, 35, 42, 47, 150, 170, 267)

Incident to the Purchasing Agreement, AHSC has become closely involved in the internal operations of the VHA. AHSC officials participated in all VHA Board of Director meetings. (PX 148) At these meetings, AHSC officials distributed monthly progress reports which rank each hospital's purchases from the AHSC divisions. (PX 146, 166) AHSC officials have also met with other VHA committees which monitor the Agreement. AHSC meetings and proposal presentations to the VHA Material Management Committee resulted in that committee's recommendation that VHA standardize on four AHS Pharmaseal products. (PX 52) Subsequently, the VHA Board of Directors voted to standardize on these products. AHSC has also met and negotiated with the VHA committees concerning the terms under which new VHA affiliates will be brought under the AHSC–VHA Agreement.

The individual VHA hospitals participate in the AHSC–VHA partnership on two levels. As purchasers, the hospitals have engaged in a sustained pattern of business with AHSC. (PX 146, 166) As VHA stockholders, the hospitals formulate VHA policy and their chief executive officers sit on various committees which monitor the Purchasing Agreement. (PX 131)

The above evidence clearly establishes a close-knit commercial relationship between AHSC, the VHA and individual VHA hospitals. If unlawful, this joint participation evidences a conspiracy.

The second element of an antitrust conspiracy, is that each of the alleged co-conspirators has knowledge of the others' involvement in the concerted activity. This also is easily satisfied on the record. In executing the AHSC–VHA Agreement, both the signators and all of the third-party beneficiaries knew of each other's identity and participation in the venture. The VHA directors met and unanimously voted to approve the Agreement prior to its execution. After the signing of the Agreement, AHSC provided the VHA and each member hospital with a monthly statistical report which traced the purchasing activity of each hospital from each AHSC participating division. Consequently, there is absolutely no question that each AHSC division and each VHA hospital knowingly participated and knew of the participation of the other alleged co-conspirators in this venture.

A final and vital element to finding an antitrust conspiracy is whether the alleged co-conspirators acted to further an unlawful common design. Defendant admits that the execution and some portions of the implementation of the Agreement involved concerted action, but contends that such action was a lawful foundation to bilateral sales transactions to AHSC and each VHA hospital. Defendant also contends that the decision of any VHA hospital to forego competitive bidding was an independent, unilateral decision of that hospital and not a conspiratorial common design.

The court rejects both of defendant's characterizations of the transactions between AHSC, the VHA and the VHA hospitals. The evidence establishes that the execution of the AHSC–VHA Agreement was concerted anticompetitive action. Similarly, the implementation of the Agreement which caused VHA hospitals to abandon competitive bidding is part of a common course of anticompetitive conduct.

In considering plaintiffs' attempt to monopolize claim, I have analyzed the AHSC–VHA Purchasing Agreement and concluded that the Agreement is anticompetitive in three respects. The Agreement applies to such broad product and geographic dimensions that it excludes all other suppliers. The application of the price cap and volume discount provisions to so many hospital supply products creates an anticompetitive leverage effect among otherwise independent product markets. Finally, the group nature of the price cap and volume discount provisions obscure defendant's net price on any product and thereby precludes price competition. Although the defendant structured the Purchasing Agreement, the VHA accepted the Agreement and individual VHA hospitals approved the Agreement and received benefits thereunder. The actions of all parties subscribing to the Purchasing Agreement are the proximate cause of a commercial relationship between AHSC and the VHA hospitals which excludes competitors and impairs price competition.

Defendant's claim that VHA hospitals unilaterally decided to abandon competitive bidding fails on two grounds. First, assuming arguendo that a VHA hospital did unilaterally decide to abandon competitive bidding, this abandonment is so intertwined with the VHA group action that it is not truly unilateral, but is, in reality, a link in the conspiracy. Second, in fact the evidence demonstrates that any VHA hospital policy to abandon competition was not unilateral, but rather a group inspired action.

As to the first point, it is clear that the AHSC–VHA Purchasing Agreement is a strong invitation or inducement to any VHA hospital to abandon competition and undertake a "unilateral" shift in purchasing policies toward AHSC. Also, if such a unilateral decision is made, the benefits of such policy redound to the VHA hospitals as a group. Consequently, the inducement for and gain from such a "unilateral" policy is group oriented. Given these circumstances, the adoption of an anticompetitive purchasing policy by any VHA hospital is an act intended to benefit all the VHA hospitals and is in furtherance of the conspiracy.

Moreover, it is clear from the record before the court that the abandonment of competitive practices at VHA hospitals was not a unilateral decision but the product of a common design to exclude competitors and impair price competition at the member hospitals.

■ Defendant mistakenly asserts that no conspiracy exists because the alleged co-conspirators did not agree upon an unlawful plan. The court has previously concluded that AHSC has formed the specific intent to monopolize and thereby suppress competition in the relevant metropolitan submarkets. No similar intent is necessary regarding the VHA or the VHA hospitals. A violation of Section 1 of the Sherman Act may be established by concerted action born of an unlawful purpose or having an anticompetitive effect. *McClain v. Real Estate Board of New Orleans*, 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). That the VHA hospitals did not act with a specific motive or intent to restrain trade is irrelevant. It is enough that the evidence indicates that AHSC, the VHA and the VHA hospitals entered into a common design which had as its effect a restraint of trade. A brief review of the evidence establishes both the existence of this common design and that its effect is to suppress competition.

The AHSC–VHA Agreement was, in part, an outgrowth of dissatisfaction by the VHA hospitals with the traditional arm-slength competition among suppliers. Defendant proposed the formation of an AHSC–VHA partnership. Under this arrangement, the hospital would look to AHSC as a single source supplier for a complete line of hospital supplies. By implication, the VHA hospitals were to abandon the piecemeal purchases of supplies from many vendors selected through competition. In a letter dated September 27, 1979, to the Executive Director of Butterworth Hospital, AHSC official, Robert Simmons, frankly conceded that the AHSC–VHA contract introduced a new philosophical and economic concept between sellers and buyers. This letter was in response to

the concerns of a purchasing agent at Butterworth Hospital who favored the traditional competitive bidding method and was skeptical of the new AHSC–VHA partnership arrangement. The agent openly expressed his concern at the apparent lack of competitive purchasing which he predicted would follow in the wake of the Purchasing Agreement. In reply to this skepticism, Mr. Simmons did not deny the competition would be lessened but sought to convince the hospital administration that both it and the AHSC would be better off under the "partnership" approach. (PX 37) [22]

This AHSC–VHA "partnership" contemplates the exclusion of bidding at VHA hospitals by plaintiffs, and other competitors, and, thereby, seeks to exclude them from a substantial and highly desirable group of customers.

Prior to the AHSC–VHA Agreement equal opportunity for distributors to compete for sales opportunities has been the norm in the medical-surgical supply distribution industry. (T 11,038, 9317, 733) This is not to imply, of course, that all purchases were put out for formal, written quotations. The particular method of competition is unimportant. As Dr. Edward Heiden testified, "It's equality of opportunity that's the key." (T 5914–5915) In the vernacular of Robert Derzon, defendant's own expert witness, competition means having "a fair shot" at the business. (T 12,032)

Equal opportunity in the distribution of medical-surgical supply products has been born out of a healthy adversary relationship between the hospitals and their vendors. William Wooldridge, President of MedEcon Services, testified that this adversarial relationship is natural, logical and necessary:

> "The vendor's job is to maximize profitability. Of course the purchaser's responsibility is to minimize profitability or buy at the most advantageous price that the purchaser can achieve. So, I think the very nature of those roles dictates that an adversary relationship has got to exist between the buyer and the seller.... I think a partnership, in my mind, is an incomprehensible term when it comes to dealing with a supplier from a buyer's vantage point." (T 5279)

Thus, by agreement, AHSC, the VHA and individual VHA hospitals seek to create a unique seller-buyer partnership which destroys traditional competition at VHA hospitals.

The foundation of this partnership is the AHSC–VHA Purchasing Agreement which is structured to destroy price competition. The AHSC–VHA Agreement is unlike traditional group purchasing agreements where competitors offer price concessions on large volume orders of narrowly defined product requirements. Under the AHSC–VHA contract, sales of many unrelated products, such as laboratory equipment, lin-

---

**22.** Mr. Simmons' letter (PX 37) in pertinent part reads as follows:

> "Although there would appear to be major philosophical differences between the structure of the VHA/AHSC agreement and the traditional group purchasing approach, ... I think it eventually boils down to a matter of trust.
>
> [The Butterworth purchasing agent's] involvement with the Michigan Group Purchasing Program has reinforced in his mind the traditional group purchasing approach of putting all items out to bid, taking the lowest bid in each instance.
>
> While this approach has its benefits, it also has serious limitations which we have seen for several years. Typically, it does not address the need for a systems approach to ordering, inventorying and distributing products to the point of end use, and it never gets beyond the adversary role between the buyer

and seller, which creates a very 'suspicious' atmosphere.

... our new agreement *is* unique. The 'spirit' of cooperativeness attempts to get at some of the shortcomings of the traditional approach and hopefully will allow us to reach a position where we both 'win'.

Through close cooperation, we will be able to seek cost efficiencies in each others operations which will allow us to produce and handle supplies more efficiently, allowing our mutual costs to come down.

Much of what [the Butterworth purchasing agent] challenged in the agreement reflects his uneasiness with the 'partnership' approach to purchasing and materials management. As I mentioned at our meeting, most of his questions will be answered in the next 18–24 months as we work together with each of the hospitals and scoreboard our activities...."

ens and intravenous fluids are tied together to compute a single volume price discount. Also, the actual discount received by any hospital depends on the total purchases of all VHA member hospitals. The hospital purchasing agent literally does not know the net price quoted by AHSC on any particular sale. Consequently, it is impossible for a distributor of medical-surgical supplies to compete on a price basis with AHSC. (Martin, PX 244, page 20)

The practical effect of this hoped-for discount dooms AHSC competitors at VHA hospitals. No matter at what price plaintiffs offer their products to each VHA hospital, the hospital has no way of knowing what purchases are being made by other VHA hospitals and what rebates it may earn as the group converts more of its business to AHSC. In other words, the net price for any particular product purchased from AHSC is unknown but decreases with purchases by other VHA hospitals from AHSC. (T 3693–3695) Consequently, an AHSC competitor cannot simply challenge AHSC on its own prices and services because the rebate provisions make such a comparison meaningless to the hospital.

In addition to subscribing to the terms of the Purchasing Agreement, the VHA directors apparently have committed their hospitals to attain certain purchase levels. Such commitment inherently ignores the *sine qua non* of competition, namely; the price, quality and service of individual hospital supply products.

Despite repeated courtroom denials by hospital officials, internal AHSC documents expressly state that the VHA board of directors agreed to attain rebate levels. A July 18, 1979, memo (PX 3) stated:

"The board of directors has determined to meet performance levels by *insisting upon hospital member compliance* . . . The VHA has committed itself to grow from its current 1,300/bed to 3,000/bed in the first year alone!" [Emphasis added.]

This VHA commitment is confirmed by the statement of Wade Mountz, President of Norton-Children's Hospitals, Inc., and Chairman of the VHA at the time the Purchasing Agreement was signed. In a note written to another VHA director, Mr. Mountz stated:

"Even with that [internal VHA discipline] it is certainly going to be difficult for some of us to reach the volume requirement that we have contracted to do." (PX 10)

At trial, the chief executive officers of many of the hospitals denied that the Purchasing Agreement, particularly the rebate provisions, were taken into consideration in making their purchases. I am satisfied that the truth is to the contrary. The record establishes that many hospital administrators and purchasing managers thought that the rebate provisions of the contract were important. James Lowe, Corporate Director of Materials Management at the Charleston Area Medical Center and Robert L. Deitz, Jr., Director of Purchasing, Charleston Area Medical Center, stated that the rebate provisions of the contract were important in forming purchasing decisions. (Lowe Dep. 6/5/80 at 23–24; T 4315–4317, 4043–4044, 4241–4247) Win Butschi, Purchasing Agent at Miami Valley Hospital, testified at her deposition that the rebate provision played a role in her purchasing decisions. (Butschi Dep. 4/29/80 at 38) Frank Roth of Christ Hospital also regarded the rebate as important. (Roth Dep. 5/2/80 at 33–34) Finally, Thomas Jeffers, Purchasing Agent at Riverside Methodist Hospital stated: "Riverside's obligation is to do all in its power as a member to contribute towards the aggregate incentives that were established in the agreement." (Jeffers Dep. 11/27/79 at 89–90)

Another aspect of the parties' common commercial design is the so-called "match it" program. Under the "match it" program, each AHSC division agreed to accept its share of business at each VHA hospital at the same aggregate price the hospital had paid to its previous vendors. Under a "walk away provision," AHSC reserved the right to refuse to match prices on any specific product which the hospital could obtain at a low price from its incumbent vendor. With this understanding, defendant could elect to assume the business at a matched

price and could expect to receive the business.

Throughout trial, defendant emphasized that the principal benefit of the contract will be better service and lower costs to the hospital and, ultimately, to the consumer. The so-called "match it" program raises serious questions about these noble objectives. Admittedly, all VHA hospitals did not respond to the contract in the same manner. Nor were the purchasing programs identical. Yet at the highest level in the VHA hospitals, a tacit understanding existed that once American "matched" the competitor's price, all bidding or competition was over. Such a plan, of course, is not competitive. If the price offered by an AHSC competitor is just "an opening gun" and that price is matched by AHSC, the sale might well be awarded to AHSC, at a non-competitive price. The hospital has no incentive to seek further bids since by "going with American" it is contributing to the over-all aggregate of purchases and year-end rebate. Such a program in no way assures the hospital it is buying its medical-surgical supplies at the best possible price. The American public spent an estimated $247,000,000,-000 for health care in 1980. This figure represents an increase of 15.2% from 1979 figures and marks the highest acceleration rate in the past 15 years.[23] For the trustees of the VHA hospitals not to require that their hospital purchasing agents buy their medical-surgical supplies at the very best possible price, while taking into consideration other equally-important factors such as quality and service, is not only anticompetitive, but an abdication of their responsibility to control health care costs.

Another non-competitive aspect of the "match it" scheme is the necessity of sharing competitor prices with the favored vendor. Indeed, as Robert Simmons testified, "It's not possible for us [AHSC] to match the price if we don't have access to the price." (T 2019)

The understanding between AHSC and the VHA to disclose the prices charged by other vendors is evidenced by many AHSC documents. One AHSC memorandum on the subject of "VHA implementation" states:

"One of the promises made by the Board of VHA was that the hospitals' records would be available for our evaluation in order to show the hospital's specific areas of potential growth.... It is necessary to point out that the agreement to examine the hospitals' records was made by the VHA Board of Governors and not by the hospitals' Purchasing Agents. This will be explained to each of them in the visits done by Bob Simmons and Mr. Kitzman of VHA in the next couple of months." (PX 3; *Accord* PX 4)

Another AHSC memorandum states:

"At our introductory briefing meeting in Chicago on July 6, we were told that we were to meet with the hospital personnel, mutually draw up a list of items that the lab could be buying from S/P [AHSC Scientific Products Division] with the hospitals present pricing, and we would match these prices wherever possible. At this meeting we were told that each hospital in the VHA agreed to do this." (PX 12)

Still another document states that the VHA and the AHSC had "thoroughly investigated" the price disclosure approach. (PX 47) In fact a Product Analysis Form "was especially constructed by American Hospital Supply Corporation with the agreement and approval of the Voluntary Hospitals of America Group" to implement the price-disclosure program. (PX 19, 20, 21, 100)

The record shows that the VHA hospitals did in fact participate in the price-disclosure program. AHSC representatives "requested each of the Materials Managers through Administration to provide specific line item by line item prices for merchandise they are now purchasing from vendors other than AHS." (PX 21) The record reflects that almost all of the VHA hospitals in the metropolitan areas concerned here disclosed competitors' prices to AHSC. The prices of AHSC's competitors were disclosed to defendant by Christ Hospital (Roth Dep. 5/2/80 at 25); Riverside Methodist Hospital

23. Source: *Hospitals*, December 31, 1981, at page 34.

(Defendants' Response to Plaintiffs' First Request for Admission of Fact ¶ 2); Norton-Children's Hospitals (PX 23); Community Hospital of Indianapolis (Defendant's Second Supplemental Response to Plaintiffs' First Request for Admissions ¶ 8); and the Charleston Area Medical Center. (PX 344, 170, 171)

An AHSD Representative "spent one and one-half days in Norton-Children's this week getting *all* of their med/surg pricing." (PX 23) Regarding Memorial Hospital Systems, the VHA hospital in Houston, another AHSD memorandum states:

"We have worked closely with the hospital for the past couple of months in auditing their purchasing records and determining which products we would be price competitive on. As a result of that audit we will begin servicing the majority of their commodity lines effective December 1st." (PX 35)

At the same hospital, still another AHSC document states:

"The VHA Administration has directed their purchasing to lean toward American and we've seen evidence already that Helen [the AHSD rep] is being shown pricing and *given the opportunity to select business that was previously directed to low-bid winners only.*" (PX 42) [Emphasis added.]

Dr. Heiden testified that the practice of disclosing to one vendor its competitors' prices is anticompetitive:

"When you have a situation where a potential supplier is given that kind of information about the prices of other competitors, you are effectively removing him as a factor in competitive price determination and making it less likely that you will have a competitive outcome to the transactions that we are talking about, and therefore achieving the benefits of competition as well."

(T 5920–5921)

Richard Byington of White and White testified that the disclosure of his pricing philosophy at one VHA hospital undermines White and White's competitive position at other hospitals:

"Not only does it give our competition an unfair advantage in that particular hospital, but it discloses to them our entire pricing philosophy, which is ... potentially devastating to us in hospitals of similar sizes." (T 832)

Even Wade Mountz, the Administrator of Norton-Children's Hospitals, acknowledged that if one vendor's prices were disclosed to another vendor, the vendor to whom the prices were disclosed could have a competitive advantage. (T 8692–8693)

In addition to the match-it program, AHSC and the VHA sought to use peer pressure to freeze out competitors from doing business at VHA hospitals.

An AHSC planning document concerning the VHA contract recommends the strategy of using "peer pressure to bring about decisions on contract participation." (PX 18 at 03004) AHSC considered peer pressure between the executive directors of each VHA hospital necessary to obtain contract support at all 29 hospitals. (PX 48)

To sustain this peer pressure AHSC official Robert Simmons attended all of the meetings of the VHA Board of Directors even though much of the meeting agenda did not pertain to the AHSC–VHA Purchasing Agreement. At these Executive meetings, Mr. Simmons distributed a "scoreboard report" to each of the representatives of the VHA hospitals. These scoreboard reports were a statistical compilation of the performance of each VHA hospital under the Agreement. The report ranked each VHA hospital according to its current purchases from AHSC and measured each hospital's growth in AHSC business from the prior period.

Another aspect of this peer pressure strategy was the agreement between AHSC and VHA official Robert Kitzman to affirmatively pressure VHA hospitals not to do business with AHSC's competitors. Kitzman agreed with officials from the Scientific Products Division to use his position as the Executive Director of the VHA to preclude competitive bidding at VHA hospitals. (PX 38) In his handwritten notes of an AHSC–VHA planning meeting, Kitzman

wrote: "Recommend that in view of VHA/AHSC Agreement ... competitive bids not be accepted." (PX 39) Similarly, in an AHSC memorandum of August 19, 1979, AHSC official Terry Mulligan wrote: "Bob Kitzman explained ... that he does not want the hospitals to check out our pricing via the bidding process." (PX 40) Kitzman also advised the hospital that AHSC should be regarded as the VHA vendor of choice. (PX 39)

Pursuant to this peer pressure, each VHA hospital administrator instructed his purchasing agents to convert substantial amounts of business to AHSC. (See PX 322) Accordingly, hospital purchasing agents denied opportunities to AHSC's competitors. (McDonald Dep. 11/29/79 at 98; Lowe Dep. 6/5/80 at 84–85)

Unquestionably, this use of pressure is anticompetitive. As Dr. Heiden testified: "When you substitute peer pressure, what you're really doing here is substituting a basis for awarding business on the grounds of what others are doing; of seeking approval of others, of other members of the VHA, of other hospital administrators, of your group, if you will, and using that as a basis or motivating force for the completion of business transactions. And when you substitute that, or some other non-price or non-economic more sociological, if you will, basis, for what's ordinary economic activity, you're doing damage to the competitive process and the benefits that are achieved by it." (T 5918)

Through this campaign of peer pressure, AHSC expected to assume the bulk of profitable business at the VHA hospitals. A Scientific Products memo observed, "A national VHA contract with some [acceptable] form of order entry system should lock us in." (PX 77) Similarly, a Pharmaseal memorandum of October 1, 1979, noted that under the Purchasing Agreement, "We cannot only pick up business, but potentially lock up large blocks of business without having to substantially lower prices." (PX 80)

AHSC sought to secure its position as the dominant vendor to the VHA hospitals through a product standardization program. Product standardization was a cooperative effort between the VHA and only one of its hospital supply vendors, AHSC. Only AHSC products were considered for standardization. (PX 36, 146, 52; Kitzman Dep. 6/23/80 at 32–33) AHSC intended to recommend standardization on products which it manufactured and distributed so as to maximize its profit margin. (PX 36) This standardization program involved close cooperation between AHSC and the VHA Materials Management Committee. AHSC was the only hospital supply vendor to act as a consultant to the Committee in recommending products for standardization. AHSC officials participated in the meeting and drafted minutes for the Committee. The Materials Management Committee toured several AHSC facilities in Illinois and California and subsequently recommended standardization on four AHSC products. The Committee's recommendation was accepted by the VHA Board of Directors and the VHA has standardized on these AHSC products.

A final instance of concerted action which evidences a common anticompetitive design concerns the "pirating" of Skyland's salesman, Paul Bush.

As a part of the implementation of the Purchasing Agreement, Charleston Area Medical Center requested an experienced AHSC salesman. (PX 56) VHA Director Robert Kitzman also realized that a seasoned salesperson would be essential to a successful conversion of CAMC business to AHSC. (PX 55) AHSC shared this concern and targeted Mr. Bush, of Skyland, as a suitable representative. In July, 1979, Bush met with AHSC officials in Chicago. (Bush Dep. 6/18/80 at 157–170) At this meeting, the Purchasing Agreement was discussed as well as the future of small hospital supply firms. (*Id.* at 167–170, 178, 187–189) Later CAMC officials, Robert Deitz and James Lowe told Bush that CAMC would support the Purchasing Agreement and that Skyland would lose much of its business at the hospital. (Bush Dep. 7/1/80 at 218–220; Lowe Dep. 6/5/80 at 221–222; Deitz Dep. 6/4/80 at 277–278)

Bush feared that the Purchasing Agreement would adversely affect his income. (Bush Dep. 6/18/80 at 170; 7/1/80 at 225) Expecting a loss of business in his sales territory, Bush joined AHSC on October 1, 1979. Immediately after becoming the Charleston AHSC sales representative, Bush conducted a thorough study to determine the degree of difficulty in converting business then held by Skyland to AHSC.

Before Mr. Bush decided to leave Skyland for AHSC; Skyland had decided to lower Bush's commission rate, thus lowering his earning potential. (T 4103) Mr. Bush was distressed by this cut in his commission rate. (Bush Dep. 7/1/80 at 222–224) Although defendant has intimated that this commission decrease caused Mr. Bush to seek a new employer, this is clearly not the case. Mr. Bush joined AHSC for a salary which is considerably lower than his commission compensation from Skyland. (PX 60) It appears to the court that Mr. Bush joined AHSC because Skyland would no longer be a viable competitor at the Charleston Area Medical Center.

In hiring Mr. Bush, AHSC intended to effectively implement the Purchasing Agreement at CAMC. More importantly, however, AHSC hired Mr. Bush with the specific purpose of weakening Skyland as a competitor at that hospital. This intent is expressed in the following AHSC planning document:

> "Our major competitors in the Charleston area will be Skyland Medical and General Medical.... With the commitment of Charleston Area Medical Center and the VHA, we will make some significant inroads into Skyland's business. One of their major strengths is that they have a strong senior sales rep in the Charleston area. At this point, it appears that this individual will be leaving Skyland to join AHS. *If this materializes, we will have significantly reduced Skyland's strength."* [Emphasis added]

(PX 66, at page 14972)

■ It is clear that the successful effort of one employer to hire a talented employee away from another employer is itself no basis for an antitrust violation. As pointed out by Professors Areeda and Turner, the free and unrestricted flow of talent is not discouraged by the antitrust laws. *See* P. Areeda and D. Turner, *Antitrust Law*, ¶ 702b (1978). However, acquisition of a competitor's key employee can be considered as part of a larger conspiracy to destroy competition in violation of Section 1 of the Sherman Act. *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283, 286 (6th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). Defendant's hiring of Mr. Bush from Skyland cannot be characterized as a mere transfer of talent. The evidence indicates that AHSC induced Mr. Bush to leave Skyland as part of a larger plan to cripple Skyland. Both VHA Director Robert Kitzman and the purchasing managers of CAMC were involved in the effort to establish Bush as the AHSC representative at Charleston. Accordingly, this concerted action is probative of a common design to restrain competitive trade at the Charleston VHA hospital.

The above evidence points to the existence of a common design between AHSC, the VHA and the individual VHA hospitals. Regardless of the intent of the VHA hospitals, this common design has had the effect of destroying price competition and excluding competitors at the hospitals. In turn, this anticompetitive activity has restrained trade and impaired competition in the relevant metropolitan submarkets containing those hospitals.

■ A conspiracy need not blockade an entire market to constitute an unreasonable restraint on trade. A restraint which isolates substantial portions of markets from competitive activity is anticompetitive. *Bale v. Glasgow Tobacco Board of Trade, Inc.*, 339 F.2d 281, 287 (6th Cir. 1964). In *National Society of Professional Engineers v. United States, supra,* the Supreme Court struck down a ban on competitive bidding which affected 21% of the registered professional engineers and only 9% of all graduate engineers in the United States. As the table below indicates, with the exception of Detroit, the VHA hospitals represent a substantial portion of each metropolitan submarket.

TABLE 7

| SMSA | Percent of Total Hospital Beds Represented by VHA Hospitals |
|---|---|
| Charleston | 67% |
| Cincinnati | 9% |
| Columbus | 13% |
| Dayton | 15% |
| Detroit | 5% |
| Grand Rapids | 21% |
| Indianapolis | 13% |
| Louisville | 9% |

Source: Report of Dr. Stephen Martin, (PX 244 Table 2).

The VHA percentage of these metropolitan submarkets is certain to increase with VHA growth under its two expansion programs. Significant VHA growth is expected in the Louisville SMSA since a second major Louisville hospital, Jewish Hospital, will shortly join the VHA. (PX 331) Not only are the VHA hospitals quantitatively significant in their respective submarkets, they are qualitatively significant customers. Each of the VHA hospitals are nationally known and locally preeminent hospitals. Plaintiff and other competitors can legitimately fear that other hospital groups and individual hospitals in these metropolitan submarkets will seek to emulate the AHSC–VHA arrangement. AHSC is willing to export the purchasing arrangement to individual hospitals outside the VHA. (PX 288)

■ The evidence before the court warrants the following conclusions. The AHSC, the VHA, and the individual VHA hospitals have jointly participated in a "partnership" arrangement whereby AHSC would supply the VHA hospitals with medical-surgical and other hospital supplies. Each partner knew of the participation of all other partners in this joint venture. The AHSC–VHA partnership is a common design which has had the effect of impairing price competition at and excluding competitors from each VHA hospital. Accordingly, this concerted action is a conspiracy as defined by criteria set forth in *Elder-Beerman, supra.*

The AHSC–VHA partnership has injured competition at seven of the eight relevant metropolitan markets which contain VHA hospitals. The only uninjured metropolitan submarket is the Detroit SMSA. The Detroit VHA hospital, Henry Ford Hospital, is not so significant a portion of the Detroit submarket to conclude that anticompetitive practices at that hospital have isolated a substantial portion of that submarket from competition. In the other SMSAs, the AHSC–VHA concerted action has had substantial adverse effect upon competition. Unless justified by some procompetitive effect, this AHSC–VHA concerted action is a conspiracy in restraint of trade at these seven submarkets.

■ Defendant has offered two justifications for its trade practices with the VHA and the VHA hospitals. First, defendant claims that the Purchasing Agreement has forced its competitors to become more competitive in dealing with the VHA hospitals. Second, the Agreement is urged to be intrinsically reasonable as a new approach to hospital cost containment. The first justification is wholly without merit. The second justification is inadequate to avoid the conclusion that defendant, the VHA, and the VHA hospitals have conspired to restrain trade.

Defendant contends that the AHSC–VHA Purchasing Agreement has caused other hospital supply vendors to become more competitive. This argument is disingenuous. A trade restraint is not made reasonable simply because other firms seek to evade injury from the restraint by engaging in increased competition. An antitrust conspirator cannot be relieved from liability because his anticompetitive acts have been competitively opposed. That defendant's competitors should redouble their efforts to maintain their position in the marketplace is understandable and does not mitigate the anticompetitive character of the AHSC–VHA partnership.

■ As its second justification, AHSC claims that the Purchasing Agreement is an important method of hospital supply cost containment. Factually this assertion is suspect. In spite of the understanding that AHSC would match prices, it appears that the VHA hospitals are paying more for supplies from AHSC than from their prior vendors. (PX 30, 253a)

Legally this cost containment justification is insufficient. Assuming the Purchasing Agreement does actually contain hospital costs, this goal can be achieved through more competitively structured group purchasing arrangements. Hospital group purchasing is one example. As the experience of the MedEcon hospital group demonstrates, hospitals can contain supply costs by putting their collective business up for bid among a group of preferred competing vendors.

The AHSC–VHA Purchasing Agreement was arranged through negotiation and not competition. AHSC was the only serious candidate for VHA's bulk business. The VHA considered General Medical as an alternative, but unlikely prime supplier, only after the hospital group was "well along with its negotiations with the American Hospital Supply Corporation." (T 8803) According to the minutes of the VHA Board of Directors' meeting, the purpose of contacting General Medical was cosmetic: "Because the proposal [of AHSC] implies an exclusive arrangement with AHSC." (PX 259)

■■■ If competitively bid, a hospital group purchasing agreement which clearly defines a group price for particular product lines is reasonable under the antitrust laws.[24] This is the case whether or not the hospital group purchasing agreement is a "committed volume" contract under which each member of the hospital group must purchase from the contracting vendor.

If the group agreement is a committed volume contract, its initial award through a process of meaningful competitive bidding may satisfy the antitrust laws. Such a contract exemplifies the harmony between competition and efficient hospital group purchasing. Individual hospitals amalgamate their buying power into the group which offers its collective business to competitive vendors. The successful vendor obtains a large bulk of business while the hospital group obtains supplies at a low bulk price. The disappointed competitors have no recourse to the antitrust laws.

■■■ If a hospital group purchasing agreement is not a committed volume contract but has not been awarded through competitive bidding process, the agreement may still survive antitrust scrutiny if it defines clear group prices for the various product lines which the hospitals may buy from the contracting vendor.

Price comparison, specifically the opportunity for a hospital to intelligently compare a group price versus its individual price offers, is essential to competitive trade in the medical-surgical supply distribution industry. Price concessions in the form of rebates make it more difficult for a hospital to determine a vendor's net price on a specific product line. Nevertheless this price ambiguity caused by a rebate is not invariably anticompetitive.

Rebates may spur competition if confined to a single product submarket and a single hospital customer. A rebate offered by one distributor on all purchases of medical-surgical supplies can be matched or bettered by a competitor. Similarly, if a single hospital is offered a percentage volume rebate by one distributor, the hospital can predict the size of the anticipated rebate and estimate the price saving effect of the rebate on its purchases of particular supplies. In this manner, the hospital can estimate the net price of the rebating vendor and compare this net price to the prices of other vendors not offering rebates.

In contrast, the AHSC–VHA Agreement offers a rebate which spans many products and which is dependent upon the hospital group performance. Such an interproduct and interhospital rebate obscures price comparison and impedes competition.

The interproduct aspect of the AHSC rebate creates an interproduct leverage effect in favor of AHSC goods. As noted earlier, a hospital which would naturally prefer and purchase AHSC laboratory supplies before

---

**24.** Even if competitively bid, a hospital group purchasing agreement which clearly defines a group price for a broad expanse of product lines may violate Section 3 of the Clayton Act as unlawful requirements or exclusive dealing arrangement.

the Agreement will also buy AHSC medical-surgical supplies under the Agreement to qualify for a rebate which reduces the purchase price of both products.

Similarly, the interhospital character of the AHSC rebate is unnecessarily anticompetitive. The price of an AHSC medical-surgical supply at the Grand Rapids VHA hospital is directly affected by a decision of the Charleston VHA hospital to purchase the same or another AHSC product. Thus a single VHA hospital cannot calculate the price concession obtained on any AHSC product line because the size of the rebate is dependent upon the volume of purchases from AHSC at other hospitals in the group.

Also, defendant's anticompetitive implementation of the Agreement is not a necessary predicate of hospital cost containment. The disclosure of competitor's pricing at the VHA hospitals to AHSC, the matching of these prices by AHSC, and the peer pressure among the hospitals orchestrated by AHSC are by no means activities which are necessary for successful hospital group purchasing.

In short, defendant's assertion that the AHSC–VHA Purchasing Agreement is a reasonable method of hospital cost containment is factually questionable and legally insufficient to avoid the conclusion that this concerted activity is a conspiracy in restraint of trade. Cost containment can be achieved through hospital group purchasing agreements which are competitively structured. Assuming that the purpose of the AHSC–VHA partnership is hospital cost containment, the terms of the Purchasing Agreement and its implementation are an unreasonably anticompetitive means to achieve this goal.

A final, compelling reason to reject the cost containment justification for the AHSC–VHA partnership is that the partnership, as a matter of principle, seeks to eliminate competitive bidding as a means of trade. Defendant's entire partnership concept is premised on the belief that traditional competition is outmoded. In *National Society of Professional Engineers*, the Supreme Court noted that: "The Rule of Reason does not support a defense based on the

assumption that competition is itself unreasonable." *National Society of Professional Engineers v. United States, supra*, 435 U.S. at 696, 98 S.Ct. at 1367. Accordingly, I cannot accept defendant's assertion that the AHSC–VHA partnership is a hospital cost containment strategy which is made necessary by the failure of competition. To accept defendant's argument is to declare that competition may be suspended in exigent economic circumstances. Such a decision is reserved for Congress, not the courts.

■ Consistent with the above reasoning, I conclude that AHSC, with the VHA and the individual VHA hospitals, has entered into a conspiracy to unreasonably restrain trade in the distribution of medical-surgical supplies to hospitals in the SMSAs of Cincinnati, Columbus, Dayton, Charleston, Grand Rapids, Louisville and Indianapolis.

\* \* \* \* \* \*

## X. EXCLUSIVE DEALING

Section 3 of the Clayton Act provides that:

> "It shall be unlawful for any person engaged in commerce ... to ... make a ... contract for sale of goods [or] supplies ... on the condition ... that the ... purchaser thereof shall not use or deal in the goods ... of a competitor ... where the effect of such ... sale ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

15 U.S.C. § 14.

■ The Clayton Act promotes the competitive distribution of products. The statute poses no restraint on the business conduct of purchasers, although a buyer's concerted refusal to deal may violate Section 1 of the Sherman Act. 3 Von Kalinowski § 12.01[2] at 12–6, 7 (1979).

Section 3 of the Clayton Act condemns anticompetitive exclusive dealing arrangements and requirements contracts. *Standard Oil Company and Standard Stations v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) [hereinafter *Standard Stations* ] and *Tampa Electric Company v.*

*Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). In an exclusive dealing contract, a buyer is precluded from or penalized for purchasing a particular commodity from any one except the seller. *Carter Carburetor Corp. v. FTC*, 112 F.2d 722 (8th Cir. 1940); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). In a requirements contract, the buyer voluntarily agrees with the seller to purchase his requirements of a commodity from that seller. *Tampa Electric, supra.* A requirements contract has the same effect as an exclusive dealing agreement since other competitors are denied access to the buyer in the arrangement.

Neither exclusive dealing arrangements nor requirements contracts are per se illegal. This is because such agreements are not inherently anticompetitive. An exclusive dealing agreement may be justified as a necessary device to aid a newcomer to enter the market or aid a declining business to stay in the market. *B. S. Pearsall Butter Co. v. FTC*, 292 F. 720 (7th Cir. 1923); *GTE Sylvania, Inc. v. Continental T. V., Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Requirements contracts may be justified as a device through which a buyer may obtain a steady source of a product. *Tampa Electric, supra.* This is particularly true if the buyer has entered into the requirements contract after putting the business up for competitive bidding. Consequently, exclusive dealing agreements and requirements contracts are tested under a Rule of Reason analysis.

Assessing the legality of an exclusive dealing arrangement or requirements contract entails a three-step analysis. First, the court must find that an exclusive dealing or requirements arrangement does in fact exist. Second, the court must define the relevant product and geographic markets. Third, the court must analyze the effect of the arrangement to determine whether the arrangement tends to substan-tially lessen competition or create a monopoly in the relevant market.

A requirements contract is usually evidenced by a written instrument although a contract may be implied from the course of conduct between buyer and seller. The seller's assent to an exclusive arrangement is an essential element of a Clayton violation since the Act does not prohibit the buyer from making a unilateral decision to deal with a single seller. *See generally Standard Stations, supra; United States v. Colgate Co.*, 250 U.S. 300, 308, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418 (D.C.Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

The existence of an exclusive dealing arrangement may also be expressed or implied. *Standard Stations, supra; United Shoe Machinery Corp., supra.* Courts have implied an agreement to exclusively deal whenever a seller has used any coercive method that causes buyers to purchase his products exclusively. *Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922); *Oxford Varnish Corp. v. Ault and Wiborg Corp.*, 83 F.2d 764, *reh. den.*, 85 F.2d 390 (6th Cir. 1936); *United States v. Hartford-Empire Co.*, 46 F.Supp. 541 (N.D.Ohio 1941), *aff'd.*, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322; *Tire Sales Corp. v. Cities Service Oil*, 637 F.2d 467, 474 (7th Cir. 1980).

Factors used to imply the existence of an exclusive arrangement fall into two categories. First, an arrangement will be implied when a purchaser is given a special benefit that is denied buyers who do not exclusively deal with the seller. *Standard Fashion, supra; Oxford Varnish, supra.* Second, courts have implied an exclusive arrangement where sellers have imposed penalties on buyers who have failed to deal exclusively with the seller. Thus, in *United Shoe, supra*, the fact that a seller imposed a "penalty royalty" on any buyer not using

the seller's machinery exclusively, created an inference of an exclusive arrangement. Similarly, an exclusive dealing arrangement can be inferred from a seller's refusal to deal with distributors who handle competitor's products. *Alles Corp. v. Senco Products, Inc.*, 329 F.2d 567 (6th Cir. 1964).

■ Exclusive arrangements are implied after the buyer has, in fact, been dealing exclusively with the seller. The central issue when a plaintiff attempts to prove an implied agreement is whether the buyer has the freedom to purchase the product in question from the source of his choosing. *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *Performed Line Products Co. v. Fanner Mfg. Co.*, 328 F.2d 265 (6th Cir. 1964), cert. denied, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964); *Landis Machine Co. v. Chaso Tool Co.*, 141 F.2d 800 (6th Cir. 1944). If the buyer has the freedom to deal with traders of his choice, an implied agreement will not be found. *Mathews Conveyor Co. v. Palmer-Bee Co.*, 135 F.2d 73 (6th Cir. 1943); *Auto Acetylene Light Co. v. Prest-O-Lite Co.*, 276 F. 537 (6th Cir. 1921).

Whether or not a contract must be totally exclusive to be viewed as an exclusive dealing arrangement is unclear. In *United States v. Richfield Oil Corp.*, 99 F.Supp. 280, 292 (S.D.Cal.1951), the district court found it unnecessary to show that the challenged arrangement suppressed all competition between the parties. After *Richfield*, courts have been reluctant to find an exclusive arrangement in the absence of total exclusivity. In *Magnus Petroleum Co. v. Skelly Oil Co.*, 599 F.2d 196, 197 (7th Cir. 1979), the Seventh Circuit determined that a contract requiring a buyer to purchase 60%–80% of his goods from a seller did not remove the buyer from the market. Similarly, in *Sulmeyer v. Coca-Cola Co.*, 515 F.2d 835, 847 (5th Cir. 1975), the Fifth Circuit rejected a quasi-exclusive dealing arrangement theory. Recently, a district court held that a seller's threats of enforcing minimum purchase requirements without actual proof that the buyer was ever forced to deal exclusively was insufficient to support an exclusive dealing claim. *Petroleum For Contractors, Inc. v. Mobil Oil Corp.*, 493 F.Supp. 320 (S.D.N.Y.1980).

■ Once the existence of an express or implied exclusive dealing arrangement is established, the arrangement's effect on competition must be assessed. This may be measured through either of two approaches: a quantitative or a qualitative approach. *Standard Stations, supra; Tampa Electric, supra.*

The quantitative test measures the anticompetitive or monopolistic effect of an exclusive dealing arrangement by reference to a sole criteria: the percentage of the market foreclosed by the arrangement. *Standard Stations, supra.* There a foreclosure of only 6.7% of the market was held sufficient to artificially support defendant's market position. *Id.;* 3 Von Kalinowski, § 1304[1] at 13–49. The quantitative test has been widely criticized for its failure to consider other economic factors which bear on the degree of competition remaining in the relevant market after the execution of an exclusive arrangement. *See Lockhart and Sacks,* "The Relevance of Economic Factors in Determining Whether Exclusive Arrangements Violate Section 3 of the Clayton Act," 65 Harv.L.Rev. 913 (1952); *Schwartz,* "Potential Impairment of Competition; The Impact of *Standard Oil of California v. United States* on the Standard of Legality Under the Clayton Act," 98 U.Pa.L.Rev. 10 (1949).

Nevertheless, the quantitative approach has been applied when the defendant is the dominant firm in the relevant market. *See Mytinger and Casselberry, Inc. v. FTC*, 301 F.2d 534 (D.C.Cir.1962).

The qualitative test, developed, in *Standard Stations,* 337 U.S. at 299 n.5, 69 S.Ct. 1055 n.5 (1949) and *Tampa Electric, supra* assesses the anticompetitive effect by at least seven factors: (1) the extent to which competition is foreclosed in the relevant market; (2) the dominance of the seller in the industry; (3) the relevant strength of

the parties; (4) the ease with which new outlets can be developed; (5) the sales structure of the industry; (6) the extent to which the competition has flourished despite the exclusive arrangement; and (7) the duration of the exclusive arrangement. *Tampa Electric, supra; Carter Carburetor Corp. v. FTC, supra* at 722; *United Shoe Machinery Corp., supra* 258 U.S. at 458, 42 S.Ct. at 365; *Standard Fashion, supra* 258 U.S. at 357, 42 S.Ct. at 362; *Pearsall Butter Co., supra* at 722; *Pick Mfg. Co. v. General Motors Corp.,* 80 F.2d 641, 644 (7th Cir. 1935), *aff'd* 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 (1936); *United States v. American Can Co.,* 87 F.Supp. 18 (N.D.Cal. 1949). Under this approach, a mere showing that the exclusive arrangement involves a substantial number of dollars is not qualitatively sufficient to prove a substantial anticompetitive effect for an exclusive dealing violation. *Tampa Electric, supra* at 334, 81 S.Ct. at 631. Instead, the above factors collectively focus on a single, essential issue: whether competitors have been foreclosed from the market.

The changing structure of the medical-surgical supply distribution industry reveals that small firm competition is endangered by the formation of group exclusive dealing arrangements. Such arrangements are forming between hospital purchasing groups and the industry's few multi-regional suppliers.

Hospital group purchasing is encouraged by government health care reimbursement regulations. *See HCFA Provider Reimbursement Manual,* § 2103. Prime vendor agreements between a single hospital and a designated supplier are also common in the industry. Likewise, with the advent of group purchasing, group prime vendor agreements are being formed. A group prime vendor agreement which rises to the level of a group exclusive dealing arrangement would result in a substantial lessening of competition and a concomitant tendency towards monopolization in local distribution markets.

The hospital supply industry is being restructured by the coalitions of hospitals into large purchasing groups. National hospital proprietary chains such as Humana, and near-national, non-profit hospital associations such as VHA, represent organized blocks of business which are unprecedented in the industry. Proprietary chains and many non-profit purchasing groups prefer a prime vendor capable of rendering a high degree of delivery service to all of the members in the group. The broad geographic scope of these purchasing groups, coupled with the member hospitals' local service demands, precludes all but national or multi-regional suppliers from obtaining this bulk business. AHSC is the only firm with a national distribution capacity. The General Medical Company and, perhaps, Will Ross and IPCO are the only suppliers with multi-regional distribution capacities. Consequently the vast requirements of these group contracts are frequently awarded to the largest supplier without competitive bidding.

■ The antitrust laws have long protected competition in local or regional submarkets from anticompetitive practices pursued in a larger geographic area. *See Schine Chain Theaters, Inc. v. United States,* 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); *United States v. Paramount Pictures, Inc.,* 344 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Consequently, a group purchasing agreement which suppresses competition in any local market where a member of the group is located violates the antitrust laws. To conclude otherwise is to permit group exclusive dealing contracts, which are not competitively bid, to establish local or regional monopolies.

■ Whether a group purchasing agreement has an anticompetitive impact on a local or regional submarket depends on three factors. The first factor is whether the group purchasing agreement embraces part or all of a product submarket. The second factor is whether the group purchasing agreement calls for exclusive or non-ex-

clusive dealing with the contracting vendor. If the agreement is exclusive and relates to an entire product submarket, the final factor is whether the removal of the business of a member hospital from the local submarket tends to destroy competition in that submarket. If a national exclusive group dealing arrangement commits a locally important hospital to buy all its requirements for a given product submarket from one national supplier, competition in a local or regional submarket may be unlawfully suppressed.

The AHSC–VHA Agreement applies to the entire medical-surgical product submarket in addition to many other hospital supply product submarkets. The member VHA hospitals are locally important institutions and the removal of their business from their metropolitan submarket may suppress competition in those submarkets. However, before considering the anticompetitive effect that the Purchasing Agreement might have on any metropolitan submarket, the court must consider a threshold question: whether the Agreement actually requires exclusive dealing.

The terms of the AHSC–VHA Purchasing Agreement do not expressly establish either an exclusive dealing arrangement or requirements contract. The Agreement does not require the VHA hospitals to purchase exclusively from AHSC nor does the Agreement expressly prohibit the hospitals from dealing with any other supplier. Instead, plaintiffs' claim is that the terms and implementation of the Agreement amount to an implied exclusive dealing arrangement.

Plaintiffs make two assertions concerning the existence of an implied exclusive dealing arrangement: first, that the defendant and the VHA intended the Agreement to operate as an exclusive arrangement; second, that the Agreement, as implemented, has the effect of an exclusive dealing arrangement.

The evidence establishes that both AHSC and the VHA intended to build an exclusive commercial relationship between the supplier and each of the member hospitals. AHSD considered itself the "prime vendor" of medical-surgical supplies to the VHA hospitals. (PX 70) AHSD officials stated that the VHA hospitals made a commitment to develop AHSC as the "sole source" of their requirements. (PX 3) The VHA Board of Directors concurred in this assessment and noted that the agreement "implied an exclusive arrangement" with AHSC. (PX 259)

It is also clear that the AHSC and VHA personnel attempted to establish a pattern of exclusive dealing at each VHA hospital. Defendant and the VHA agreed that the member hospitals would open their record books and disclose to AHSC the prices at which other vendors currently sold various supplies to the hospitals. (PX 3, 4) AHSC agreed to generally match the prices of the incumbent vendors. (PX 14) VHA Executive Director, Robert Kitzman agreed to preclude other vendors from bidding on this business. (PX 38, 39, 40, 158) This price matching strategy was qualified by a "walk away" provision whereby AHSC would not be obligated to match the price of any unprofitable product the hospital could obtain from another vendor. (PX 45) Thus, the price matching program was designed to confer on defendant a right of first refusal to furnish supplies to the VHA hospitals. These policies evidence defendant's clear invitation for the VHA hospitals to exclusively deal.

Although defendant's policies demonstrate an intent and an attempt to establish an exclusive dealing arrangement, the evidence does not support the conclusion that an exclusive dealing relationship was in fact established at any VHA hospital.

Plaintiffs assert that the VHA hospitals are buying sufficiently large quantities of supplies from AHSC for the court to infer

the existence of an exclusive dealing arrangement. In support of this contention, plaintiffs offer the following statistical analysis:

TABLE 8

| Hospital | Annualized Dollar/ Bed Purchases from AHSD as of 3/31/80 (PX 166) | Percentage of the total Purchases based on AHSD's own potential figure of $2,700/bed (PX 260) |
|---|---|---|
| Henry Ford Hospital | $2,784 | 100% |
| Charleston Area Medical Center | 2,340 | 86% |
| Riverside Methodist Hospital | 1,969 | 73% |
| Community Hospital of Indianapolis | 1,903 | 70% |
| Miami Valley Hospital | 1,541 | 57% |
| Christ Hospital | 1,471 | 54% |
| Norton-Children's Hospitals | 1,106 | 44% |
| Butterworth Hospital | 238 | 9% * |

* Butterworth's low percentage may result from the fact that allegedly it is holding back pending the resolution of this lawsuit (PX 49), a fact denied by Butterworth officials.

These analysis assumes that each VHA hospital has a total potential purchase level of medical-surgical supplies of $2,700 per bed. It purports to measure the estimated 1980 purchases of each of the eight relevant VHA hospitals as a percentage of that hospital's total purchase potential. The court is satisfied, however, that plaintiffs' figures in Table 8 are unreliable.

The analysis relies on an unrealistically low hospital per-bed purchase level for medical-surgical supplies. It assumes the total hospital purchase level for medical-surgical supplies is $2,700 per bed. This statistic purports to be defendant's estimate of AHSC's sales potential at each of the VHA hospitals. (PX 260) In fact, this VHA purchase potential is based on a hospi-

tal purchase potential developed by AHSC in 1977 which was intended to measure the purchase potential of a 200-bed hospital. (T 2453–2454) This dated statistic, which relates to hospitals far smaller than the VHA hospitals, is unreliable and understates the per-bed purchase potential of the VHA hospitals. (*Id.*) More reliable are the Armbruster potentials which the court has previously adopted as expressing the average annual per-bed potentials for medical-surgical supplies by hospitals within specific size categories. The following table is a recalculation of plaintiff's analysis but which measures the AHSC sales percentage in relation to the 1980 Armbruster purchase potentials.

TABLE 9

| Hospital Bed Size (PX 1, PX 322) | Annualize Dollar/ Bed Purchases from AHSD as of 3/31/80 (PX 166) | Armbruster Potential for Hospital | AHSC Sales Percent of Armbruster Potential |
|---|---|---|---|
| Henry Ford (1052) Detroit, Michigan | $2,784 | $3,644 | 76% |
| Charleston Area Medical Center (903) Charleston, W.Va. | 2,340 | 3,644 | 64% |

| Hospital Bed Size (PX 1, PX 322) | Annualize Dollar/ Bed Purchases from AHSD as of 3/31/80 (PX 166) | Armbruster Potential for Hospital | AHSC Sales Percent of Armbruster Potential |
|---|---|---|---|
| Riverside Methodist Hospital (806) Columbus, Ohio | $ 1,969 | $ 3,644 | 54% |
| Community Hospital of Indianapolis (750) Indianapolis, Indiana | 1,903 | 3,644 | 52% |
| Christ Hospital (617) Cincinnati, Ohio | 1,741 | 3,644 | 48% |
| Miami Valley Hospital (669) Dayton, Ohio | 1,541 | 3,644 | 42% |
| Norton-Children's Hospitals (492) Louisville, Kentucky | 1,106 | 2,742 [25] | 33% |
| Butterworth Hospital (535) Grand Rapids, Michigan | 238 | 3,644 | 7% |

Even using the Armbruster potential, this table tends to overstate defendant's sales percentages at these hospitals. The overstatement occurs because the Armbruster potential represents the medical-surgical supply purchase potential of an average hospital in each size class. The VHA hospitals are not average medical-surgical supply consumers. Since the VHA hospitals sustain large outpatient programs and teaching curricula, they consume a larger than average volume of medical-surgical supplies. Consequently, the table understates the VHA hospital's per-bed purchase potential and overstates the AHSC's sales share of that potential. Nevertheless, the above figures are useful as a maximum AHSC sales percentage in each of the VHA hospitals.

In my judgment, these AHSC sales percentages are not large enough to imply the existence of an exclusive dealing arrangement. At the VHA hospitals in Louisville, Grand Rapids, Cincinnati, and Dayton, defendant does not presently have more than half of the medical-surgical supply business in these hospitals. At the Indianapolis and Columbus VHA hospitals, defendant has only slightly more than half of the hospital's potential medical-surgical business. At the Charleston hospital, defendant has approximately 65% of the relevant business and only at the Detroit VHA hospital has the defendant obtained three-quarters of the hospital's medical-surgical business. While the latter statistics approach the level necessary to imply the existence of an exclusive dealing arrangement, they fall decidedly short of actual exclusive dealing. With 35% and 25% of the medical-surgical business remaining in the hands of vendors other than AHSC, these hospitals have not yet been removed from their respective metropolitan markets. *See Magnus Petroleum Company, supra*; and *Petroleum For Contractors v. Mobil Oil, supra.*

■ Having concluded that the AHSC–VHA Purchasing Agreement has not yet risen to a level of a group exclusive dealing arrangement, it is not necessary to consider whether the existence of such an arrangement impairs competition in the relevant metropolitan submarkets.

25. Norton-Children's Hospitals have 492 beds and, therefore fall within the Armbruster size category of hospitals with a capacity of 300 to 499 beds. The 1980 Armbruster potential for an institution of this size is $3,308. If Norton-Children's Hospitals had eight more beds, they would cross over into the next and largest IMS hospital size category of hospitals having 500 or more beds. In this larger size category, Norton-Children's would have a purchase potential of $3,644. If AHSD's actual per-bed purchases at Norton-Children's are assessed against this higher Armbruster potential, defendant's sales amount to 30.35% of the total medical-surgical business at Norton-Children's.

## XI. BOYCOTT

Group boycotts or concerted refusals to deal are prohibited by Section 1 of the Sherman Act. The Supreme Court in *United States v. General Motors*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) has defined a group boycott as (1) joint collaborative action which is designed to (2) exclude a business from access to the market.

■ Unquestionably, any business may unilaterally decide to deal or refuse to deal with whomever it wishes. *United States v. General Motors, supra; Cernuto, Inc. v. United Cabinet Corporation*, 595 F.2d 164 (3d Cir. 1979). However where two or more businesses, or persons so agree, it becomes unlawful. *United States v. General Motors, supra.* An unlawful boycott may involve groups of buyers, sellers, or both entities. *See,* 2 *Von Kalinowski, supra* § 6D.02 at 6D-2 n. 3.

■ Traditionally group boycotts have been regarded as inherently anticompetitive and, therefore, a per se violation of Section 1 of the Sherman Act. *See, Eastern States Retail Lumber Dealer's Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). This per se standard remains applicable to horizontal boycotts which are "combinations among traders at one level of distribution, whose purpose [is] to exclude direct competitors from the market." *McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 186 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *accord, see Eastern States Lumber Dealers Ass'n v. United States, supra.* Historically, the per se standard has also been applied to "vertical" boycotts or "combinations among traders at different marketing levels [which are] designed to exclude from the market, direct competitors of some members of the combination." *McQuade, supra* at 186; *accord, Klor's, Inc., supra.* The continued application of the per se standard to vertical group boycotts is somewhat unclear in light of the Supreme Court's decision in *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

In *Sylvania*, the Court replaced the per se standard with a rule of reason analysis as the proper standard to test the legality of vertical distribution restraints. *Accord, see Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). In light of *Sylvania*, it appears that the application of the per se standard to a boycott charge depends on whether the boycott is "predominently horizontal." As the Court of Appeals for the Sixth Circuit recently noted in *Com-Tel, Inc. v. DuKane Corp., et al.*, 669 F.2d 404 (6th Cir. 1982):

> "Although a group boycott usually has both vertical and horizontal characteristics, 'it is the horizontal element that justifies applying a rule of per se illegality.' *Note, Vertical Agreements to Terminate Competing Distributors: Ork Corp. v. Whirlpool Corp.*, 92 Harv.L.Rev. 1160, 1163 (1979)."

At 409, n. 6.

Plaintiffs generally allege that AHSC and the VHA have conspired and caused the VHA member hospitals to boycott medical-surgical supply distributors which compete with AHSD. Since the boycott is allegedly between the individual VHA hospitals, the nature of the claimed restraint is clearly horizontal and the per se standard is applicable.

Defendant asserts that plaintiffs have failed to establish the existence of a boycott. In particular the defense raises four arguments of note.

Defendant first alleges that before a boycott can be found evidence must establish that the collaborators banded together to gain market power at the expense of other competitors. The VHA hospitals, defendant urges, have not banded together to gain such market power.

Collaboration to gain market power, however, is not required to establish a group boycott. In *General Motors*, the Supreme Court rejected the idea that proof of any economic motive was necessary to a boycott claim.

> "... Where businessmen concert their action in order to deprive others of access

to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct."

*Supra* at 146, 86 S.Ct. at 1331.

Similarly, the effect of the boycott need not be that the boycotters obtain market power. Such a requirement is inconsistent with the per se standard of liability found appropriate in *Klor's, supra.* The emphasis in *Klor's* was not on the market power allegedly gained by the boycotting manufacturers, distributors and retailer; but rather the adverse effect of the wrongful conduct on the victim. The boycott took from *Klor's* its freedom to buy appliances in an open competitive market. Correlatively it deprived manufacturers of their freedom to deal with *Klor's.* The agreement in *Klor's* constituted a boycott because it interfered with the natural flow of commerce. The acquisition of market power, as such, as not a determining factor in condemning the understanding as a boycott. Consequently, plaintiffs need not prove that defendant, the VHA or the VHA hospitals sought to acquire market power through the alleged boycott.

Defendant next argues that since the VHA hospitals do not compete in, let alone control, any single market, the "group" cannot eliminate any competitor from "access to the market" which is essential to a boycott offense. Defendant correctly states that the essence of a boycott is group action which removes a competitor from access to the market. It does not, however, follow from this that each of the confederates of a boycott must compete within a single market. Again, the *Klor's* decision indicates that injury to the boycott victim is the focus of the offense and not injury to the general market. Since proof of a competitive injury to the marketplace is unnecessary for a boycott claim, it makes no sense to require that all members of the boycott be competitors in the same market as their victim. It is sufficient if the members of the boycott have the collective capacity to deny their victim access to the market. Collectively, the VHA hospitals have the capacity to deny AHSC's competitors access to important segments of their metropolitan submarkets. Consequently, the fact that the VHA hospitals are not competitors within any single market does not prevent them from engaging in a group boycott.

Defendant's third assertion is that the decision of members of a purchasing group, whether arrived at individually or collectively, to select one supplier over others to get a better "deal" does not amount to a boycott under Section 1. I agree. Competitive group purchasing is a good example. Vendors are solicited and given an opportunity to bid on the outstanding business and one is ultimately selected. Clearly the loser is a disappointed competitor, not the object of an illegal boycott. Such a circumstance occurred in *Instant Delivery Corp. v. City Stores Co.*, 284 F.Supp. 941 (E.D.Pa.1968). In that case, four department stores awarded their delivery business to a competitor of Instant Delivery Corp. The business was awarded only after Instant was invited to compete. The district court found that Instant did, in fact, compete vigorously for the business.

> "Its [Instant's] presentation was considered along with that of Tose [the winner bidder] and the selection remained in doubt until the very end. The decision that each of the stores made was to select Tose, not to exclude Instant."

*Supra* at 947.

This competitive opportunity is the crucial fact which distinguishes *Instant* from the present case. Here plaintiffs were not given an opportunity to compete with AHSC prior to the execution of the Agreement. After execution of the Agreement, an effort was made, as heretofore pointed out, to preclude all competitive bidding at the hospitals. Consequently, the defendant cannot characterize the actions of the VHA and the VHA hospitals as merely the selection of one vendor over its disappointed competitors.

Finally, defendant offers a factual defense to plaintiffs' boycott theory. This defense has two parts. First, defendant argues that neither the VHA nor any VHA member hospital has taken any action to encourage other VHA hospitals to purchase

more supplies from AHSC. Second, defendant claims that the fact that the VHA hospitals are still purchasing substantial amounts of supplies from plaintiffs and other distributors objectively refutes the existence of a group boycott.

Defendant's first fact contention is directly contrary to the preponderance of the evidence. The record clearly establishes that the VHA exerted considerable pressure on the hospitals to increase purchases from AHSC under the Agreement. (PX 3, 10, 34, 38, 40, 142, 158) Similarly, the VHA hospitals have exerted peer pressure among themselves to increase their collective AHSC purchases. (PX 128, 380a)

■ Defendant's second factual contention requires an inquiry into the nature of a boycott. A group boycott is a form of contract, combination or conspiracy which "actually or effectively eliminates any competitor from access to the market." *Cullum Electric and Mechanical, Inc. v. Mechanical Contractors Association of South Carolina*, 436 F.Supp. 418, 430, *aff'd* 569 F.Supp. 821 (4th Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978); *accord, United States v. General Motors, supra* at 145, 86

S.Ct. at 1330; Barber, *Refusals to Deal under the Federal Antitrust Laws*, 103 U.Pa.L.Rev. 847 (1955). The element of group agreement which is implicit in any antitrust combination or conspiracy may be established by either an express agreement or the court may infer such an agreement based on the conduct of the parties.

■ The terms of the AHSC–VHA Purchasing Agreement do not expressly commit the VHA hospitals to refuse to deal with any vendor other than the defendant. As was true with plaintiffs' exclusive dealing claim, the court must look to the implementation of the Purchasing Agreement to infer the existence of any agreement to boycott AHSC's competitors. Defendant correctly asserts that even after the AHSC–VHA Purchasing Agreement, the VHA hospitals still purchase supplies from vendors other than the defendant. This is demonstrated by the following table, which measures the AHSD portion of the VHA medical-surgical business as of March 31, 1980. The statistical evidence in this table has already been considered in relation to plaintiffs' exclusive dealing claim. This evidence is also relevant to plaintiffs' boycott claim.

TABLE 9

| Hospital Bed Size (PX 1, PX 322) | Annualize Dollar/ Bed Purchases from AHSD as of 3/31/80 (PX 166) | Armbruster Potential for Hospital | AHSC Sales Percent of Armbruster Potential |
|---|---|---|---|
| Henry Ford (1052) | $2,784 | $3,644 | 76% |
| Charleston Area Medical Center (903) | 2,340 | 3,644 | 64% |
| Riverside Methodist Hospital (806) | 1,969 | 3,644 | 54% |
| Community Hospital of Indianapolis (750) | 1,903 | 3,644 | 52% |
| Christ Hospital (617) | 1,741 | 3,644 | 48% |
| Miami Valley Hospital (669) | 1,541 | 3,644 | 42% |
| Norton-Children's Hospitals (492) | 1,106 | 2,742 [25] | 33% |
| Butterworth Hospital (535) | 238 | 3,644 | 7% |

I am satisfied from the evidence that the concerted action of the VHA hospitals does not rise to the level of a group boycott. The fact that as of March 31, 1980, significant medical-surgical business was still awarded to plaintiffs as well as other vendors warrants the conclusion that the VHA hospitals have not entered into an agree-

ment with defendant to boycott plaintiffs. Accordingly, the evidence is insufficient to conclude that AHSC has conspired to induce a group boycott of its competitors in violation of Section 1 of the Sherman Act.

\* \* \* \* \* \*

## XII. DAMAGES AND REMEDY

Section 4 of the Clayton Act provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained...."

15 U.S.C. § 15.

In considering the damage aspect of this case, the court will focus on three issues: first, whether plaintiffs have sustained damage caused by defendant's violation of the antitrust laws; second, a determination of those damages; third and finally, the fashioning of appropriate injunctive relief to prevent further antitrust violation.

### A. *Proof of Damage.*

■ To recover under Section 4 of the Clayton Act, plaintiffs must, by a preponderance of the evidence, satisfy two criteria: (1) that their "business or property" was injured; and (2) that the injury sustained was "by reason of" the defendant's violation of the antitrust laws. 15 Von Kalinowski, *supra* § 115.01(1) at 115–6.

■ Plaintiffs must prove that defendant's activity in violation of the antitrust laws resulted in actual injury to their business or property. The court has concluded that defendant has violated Section 2 of the Sherman Act through its attempt to monopolize the distribution of medical-surgical supplies in the metropolitan areas of Cincinnati, Columbus, Dayton, Charleston and Indianapolis. Similarly, the court has concluded that defendant has violated Section 1 of the Sherman Act by conspiring to unreasonably restrain trade in the above metropolitan areas and in the Grand Rapids and Louisville areas. Only in Detroit has defendant committed no antitrust violation.

Plaintiffs' actual damage from these violations is demonstrated by a comparison of plaintiffs' sales before and after the date of the illegal agreement and a similar study of AHSC sales for these same periods. Such a comparative sales analysis is consistent with *Elyria-Lorain Broadcasting Company v. Lorain Journal Co.*, 358 F.2d 790 (6th Cir. 1966). There the Court of Appeals overturned a district judge's determination that the plaintiff radio station had failed to prove damage where a defendant newspaper refused to carry advertising for merchants who also advertised on the plaintiffs' radio programs. The Sixth Circuit found that antitrust damage had been adequately proved since:

"Numerous merchants testified that they had cancelled their advertising contracts with plaintiffs because of defendant's activities; ... [and] a comparison of plaintiffs advertising revenues during and after the restrictive practices showed a marked increase in revenues after the restrictive practices were enjoined."

The documentary evidence establishes that AHSD's sales at each VHA hospitals increased substantially after the execution of the Purchasing Agreement. (PX 231A) At Charleston Area Medical Center (CAMC), the increase was in excess of 3000%; at Riverside Methodist Hospital, it was 126%; at Christ Hospital, it was 327%; at Norton-Children's Hospitals, it was 49%; at Miami Valley Hospital, it was 200%; at Community Hospital, it was 421%; and at Butterworth Hospital, it was 23%. (PX 166 at 222)

Correlatively, during the same period, Skyland experienced a 54% drop in sales at CAMC. (PX 275) Crocker-Fels experienced a 40% decline in sales at CAMC; a 50% decline at Norton-Children's Hospitals; a 25% drop at Riverside Hospital; a 75% drop at Miami Valley Hospital; a 62% drop at Christ Hospital; and a 100% drop at Community Hospital of Indianapolis. (T 484, 383) Plaintiff Ransdell has experienced a similar sharp sales decline at Norton-Children's Hospitals (T 283–284, 122) and is faced with the prospect of losing a second major customer, Jewish Hospital, which has been approved for VHA member-

ship. (T 171, 251, 4892–4893) This evidence is generally confirmed by Dr. Martin's report, which demonstrates a general decline in the plaintiffs' sales in the geographic markets in which VHA hospitals are located. (PX 244)

Plaintiffs' damage is further verified by the deposition testimony of several VHA purchasing personnel who stated that they had transferred business from plaintiffs' firms to AHSC because of the Purchasing Agreement. (e.g., Lowe Dep. 6/5/80 at 25–27, 82–83, 85; Jeffers Dep. 89–90; Roth Dep. 30–32; Butschi Dep. 4/29/80 at 28–29, 37, 287–288; PX 133; Brown Dep. 5/28/80 at 122–123, 148–149)

It is true that plaintiffs' overall sales have actually increased over the 1979 levels. However, this continued business success is not necessarily inconsistent with an antitrust violation. Plaintiffs might have reasonably expected a larger sales increase in an expanding hospital supply market had defendant not impaired competition through the Purchasing Agreement. In *Feminist Womens' Health Center v. Mohammad*, 586 F.2d 530 (5th Cir. 1978), the court rejected the argument that a decrease in sales of an antitrust plaintiff is necessary to establish the fact of damage.

> "The doctors argue that the Center cannot hope to prove damages because the clinic's business has actually flourished since the commencement of the alleged conspiracy. ... Although the income of the clinic may have increased during and after the conspiracy ... that fact would no more preclude proof of damage than a decrease in income, without more, would establish the fact of damage. We have no assurance that the growth of the clinic's business was not retarded by the alleged actions of the defendants."

*Id.* at 547.

Consequently, plaintiffs' increased sales may be proof that plaintiffs were successful competitors and that in the absence of AHSC's anticompetitive acts would have garnered a larger share of the sales to VHA hospitals. *See also, Gaines v. Carrollton Tobacco Board of Trade, Inc.*, 496 F.2d 284 (6th Cir. 1974), where plaintiff's more suc-

cessful experience at a location free of unlawful restrictions was found to be evidence that its poor showing at a location hampered by anticompetitive restrictions was caused by those restrictions and that antitrust violations injured the plaintiff's business.

As a second part of proving the fact of actual antitrust damage, plaintiffs must show that the claimed injury was caused by defendant's antitrust violation. A careful review of the record convinces the court that plaintiffs have established the necessary causal connection between the anticompetitive Purchasing Agreement and the business shifts to AHSC from its competitors at the VHA hospitals. The following evidence drawn from the VHA hospitals in the seven markets which sustained antitrust violations supports the existence of this causal connection.

*Charleston Area Medical Center, Charleston, West Virginia.*

At Charleston Area Medical Center, large volumes of medical-surgical supply business formerly held by Skyland were converted to AHSC. (PX 30, 253a) Both James Lowe, the Director of Materials Management, and Robert Deitz, Director of Purchasing at CAMC, stated that the rebate provisions of the AHSC–VHA Agreement were influential in forming purchasing decisions at the hospital. (Lowe Dep. 6/5/80 at 23–24; T 4315–4317, 4043–4044, 4241–4247) Mr. Lowe further testified that conversion to AHSC was done without giving defendant's competitors the opportunity to submit bids on this business. (Lowe Dep. 6/5/80 at 84–85) The Purchasing Agreement was one of the reasons why AHSC had the unique opportunity to bid on and acquire this business. (*Id.*)

This conversion from Skyland to AHSC was not caused by the hospital's dissatisfaction with its former supplier. Robert Deitz testified that "as far as I was concerned, I had no complaints about Skyland's overall general service to the Medical Center." (T 7686) In contrast, the conversion of CAMC business to AHSC occurred in spite of several backorder problems in the delivery of

AHSD products. (PX 174) Similarly, the shift in business to AHSC cannot be attributed to CAMC's desire to obtain "cost savings" flowing from the alleged "services" provided by AHSC. In this regard, CAMC officials testified that they used very little of the material management "advice" which they received from AHSC. (Deitz Dep. 6/4/80 at 45–47, 113; Lowe Dep. 6/5/80 at 36–37) In short, the evidence clearly shows that the unlawful Purchasing Agreement was a material cause in the increase in sales of AHSC and the correlative decline in sales of Skyland at the hospital.

*Riverside Methodist Hospital, Columbus, Ohio.*

Riverside Methodist Hospital's Director of Purchasing described his hospital's commitment to the AHSC–VHA Purchasing Agreement in the following manner:

"As a member of the Voluntary Hospitals of America, Riverside Methodist has a responsibility to participate in the program of the Voluntary Hospitals of America.

As a consequence of that, Riverside's obligation is to do all in its power as a member to contribute toward the aggregate incentives that were established in the agreement. . . .

And with that . . . we will not purchase anything under the agreement and pay a higher price for it . . . our basic responsibility is first to the hospital and second to VHA."

(Jeffers Dep. 11/27/79 at 90)

Similarly, the Assistant Director of Material Management of the hospital testified that under the AHSC match-it program, Riverside has converted large amounts of business to AHSC. (McDonald Dep. 11/27/79 at 98) The Purchasing Manager also testified that AHSC's competitors have lost business to defendant as a consequence of the hospital's participation in the Purchasing Agreement. (*Id.* at 65)

*Christ Hospital, Cincinnati, Ohio.*

The Director of Purchasing for Christ Hospital testified that he believed that the AHSC–VHA Purchasing Agreement was a threat to the custom of competitive bidding traditionally used at his hospital. (Roth Dep. 5/2/80 at 72; T 9420) The Chief Administrator of Christ Hospital, Alexander Harmon, noted that AHSC had a history of high pricing which was not usually in the hospital's bidding range. After the execution of the Purchasing Agreement, Mr. Harmon suggested that the hospital disclose competitive prices to AHSC to implement the Agreement. (Roth Dep. 5/2/80 at 72) This price disclosure policy was subsequently terminated, but Mr. Harmon instructed his hospital purchasing staff to function with a bias toward AHSC. (PX 322)

Frank Roth, Director of Purchasing at Christ Hospital, testified that the AHSC–VHA contract influenced the hospital's decision to shift business from plaintiff Crocker-Fels to AHSD. (Roth Dep. 5/2/80 at 32–33) Realizing the magnitude of this shift of business, Mr. Roth called the president of Crocker-Fels, Rufus Smith, to advise him he should reduce his inventory because, within a short period of time, Christ Hospital would be doing much less business with his firm. (T 431–432, Roth Dep. 5/2/80 at 25–26, 67–68, 75) After 16 months under the Purchasing Agreement, Christ Hospital reduced its purchases from Crocker-Fels from $800,000 per year to $300,000 per year, a drop of 62%. (T 383)

*Community Hospital of Indianapolis, Indiana.*

After introducing the Purchasing Agreement at Community Hospital of Indianapolis, Robert Simmons of AHSC wrote:

"Community Hospital has been a very strong supporter of the VHA and they have started a *major conversion program of competitors products to ours.*" (Emphasis added)

(PX 195, accord see PX 145, 265)

The hospital's conversion program is confirmed by the notes of Simmons taken during a VHA Board of Directors meeting which state that several hundred product items were converted to AHSC under the Agreement. (PX 145; Simmons Dep. 7/2/80 at 493–495)

*Norton Children's Hospitals, Louisville, Kentucky.*

Wade Mountz, Chief Executive Officer at Norton Children's Hospitals, and William Brown, that hospital's Purchasing Director, both testified that the AHSC–VHA Purchasing Agreement had been a factor in purchasing decisions at their hospital. (T 8776–8777; Brown Dep. 5/28/80 at 122, 148–149) This is confirmed by an AHSC weekly penetration report:

> "[An AHSD representative] spent 1½ days in Norton-Childrens [sic] this week getting *all* of their med/surg pricing. They really seemed excited about VHA/AHS relations. The pricing will really help the program get rolling and should lead to some immediate large product categories of business coming our way. Competitors are *very* nervous!" (Emphasis in the original)

(PX 23)

In total, Norton-Children's Hospitals has reduced its purchases from Ransdell by 25% (T 283) and from Crocker-Fels by 50%. (T 485)

Another indication that the Purchasing Agreement was responsible for the conversions to AHSC is the fact that the conversions took place in the face of alleged poor service by AHSC's divisions. (T 8809–8810, 9798; Brown Dep. 5/28/80 at 76–80) William Brown, the Purchasing Director at the hospital, complained that AHSD's local sales representative "should be better trained." (*Id.*) No similar complaints were lodged against Crocker-Fels. (*Id.* at 99, 204)

*Miami Valley Hospital, Dayton, Ohio.*

The Purchasing Manager of Miami Valley Hospital testified that the Purchasing Agreement was a factor in that hospital's increased purchases from AHSC. (Butschi Dep. 4/29/80 at 28–29, 37) Likewise, the Materials Manager of the hospital acknowledged that the Purchasing Agreement had played a role in the conversion of products to AHSD. (T 1017, 10706)

After July 1, 1979, Miami Valley Hospital stopped buying a number of medical-surgical supply products from independent dealers and started buying them exclusively from AHSD without giving the existing dealers an opportunity to rebid. (Butschi Dep. 4/29/80 at 157–159, 164–165) This shift in business to AHSC occurred notwithstanding AHSC's poor service. (PX 189, 193) AHSC documents predicted that Miami Valley Hospital "will be a million dollar account in short order." (PX 171) At the same time, Crocker-Fels' sales to Miami Valley Hospital decreased by more than 75% since the signing of the AHSC–VHA contract. (T 485)

*Butterworth Hospital, Grand Rapids, Michigan.*

Although Butterworth Hospital has not actively participated in the Purchasing Agreement, its purchases from AHSD have doubled on a per-bed basis since the execution of the AHSC–VHA contract. (T 13069) Defendant has surmised this limited participation was due to this lawsuit. An AHS V. Mueller memo states:

> "This account has uncertainties with relationship to the pending suit against the Corporation. They are located in Grand Rapids where one of the distributors which is suing AHSC is located. They are holding back taking any actions with V. Mueller and are awaiting to see what actions unfold before they do anything."

(PX 49)

At the trial, Butterworth officials denied the existence of an official policy whereby it would "hold back" purchasing supplies from AHSC pending the outcome of the litigation. Nevertheless, the Purchasing Agreement is contrary to Butterworth's traditional competitive purchasing practices and was resisted at least at a lower level within the hospital as being non-competitive. (PX 37)

Having concluded that plaintiffs have proved by a preponderance of the evidence that they sustained damage as a result of the Purchasing Agreement and its unlawful implementation, the remaining issue is ascertaining the amount of those damages.

B. *Amount of Damages.*

At the outset it should be noted that courts have generally been more liber-

al as to proof of the quantum of damages in antitrust actions than in other areas of the law. *National Wrestling Alliance v. Myers*, 325 F.2d 768 (8th Cir. 1963). A damage award may not be based upon speculation or guesswork. However, "[a]n estimated damage award is permissible, provided the evidence on which it is based is quantitatively sufficient. The estimate may be derived from proof that is probable and inferential in nature, as well as from more direct and positive evidence." 15 Von Kalinowski, *supra*, § 115.02(2) at 115–11. A reasonable damage estimate is particularly appropriate where an antitrust defendant's wrongdoing has made it impossible to produce a more precise damage assessment. As the Supreme Court has observed:

> "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 262, 66 S.Ct. 574, 578, 90 L.Ed. 652 (1946). Similarly, the fact that other factors could have contributed to the business losses sustained by an antitrust plaintiff is not fatal to a damage claim.

In *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 794 (6th Cir. 1970), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971), the Sixth Circuit said:

> "Appellants' principal grounds for objection to the jury verdict is that internal and external economic conditions and decisions of the management resulted in South-East's losses, and not the conduct of the alleged conspiracy. But the question of whether certain of South-East's losses were attributable to the conspiracy or other economic factors was for the jury's consideration and determination . . . as is the question of the credibility of the witnesses used in showing damages . . . It is concluded that there was sufficient credible evidence to support the jury's verdict as to the fact of damages and the amount of damages was computed as precisely as capable under the circumstances."

*South-East Coal Co. v. Consolidation Coal Co., supra* at 794. *See also, Riverside Coal Co. v. United Mine Workers of America*, 410 F.2d 267 (6th Cir.), *cert. denied*, 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969).

To establish the amount of their damages, plaintiffs relied on a statistical report and testimony of their expert, Dr. Edward J. Heiden. Dr. Heiden's study purports to measure plaintiffs' damage for three time periods. The first damage period runs from the signing of the Purchasing Agreement on July 1, 1979, until August, 1980. Plaintiffs' actual damages, as measured by lost profits, are calculated using actual sales statistics. The second damage period runs from September, 1980, until the end of the Purchasing Agreement in December, 1982. In this second period, plaintiffs' lost profit damages are calculated using statistical projections of expected sales. The third damage period covers the 36 months after the expiration of the Purchasing Agreement, until December 31, 1985. Plaintiffs contend that this third damage period is necessary because after the Agreement expires they will continue to suffer a slowly diminishing loss of future profits. Plaintiffs believe they will sustain this profit loss because the contract has "imbedded" AHSC in the VHA hospitals and defendant will continue to benefit from this inside position even after the contract has expired. Like the second damage period, this third damage period is based on a statistical projection of prospective sales.

As previously indicated, damages in an antitrust case are frequently difficult to define with precision. In this case, plaintiffs are entitled to lost profit damages from July 1, 1979, until April 22, 1982. The latter date represents the date of this opinion and accompanying order. However, as hereinafter described, the court is granting to plaintiffs injunctive relief, which the court assumes will eliminate the need for any prospective damage remedy. Also, for reasons hereinafter explained, the court regards the Heiden damage analysis as a reasonable, reliable estimate of plaintiffs' actual damage. Consistent with the court's general conclusion regarding the appropriate measure of damages, plaintiffs are entitled to all damages in Dr. Heiden's first

damage period and that portion of Heiden's second damage period which reflects injury sustained before April 22, 1982. Both the damage and injunctive remedies shall be tailored to redress plaintiffs' antitrust injuries in all of the relevant metropolitan submarkets except Detroit. Plaintiffs have sustained no damage in this submarket.

Defendant vigorously contends that the court should disregard the Heiden report, claiming that Dr. Heiden is insufficiently qualified for the task of assessing the damages in this case. The court finds Dr. Heiden more than competent to assess plaintiffs' damages. Moreover, Dr. Heiden's methodology is consistent with traditional antitrust damage analyses.

Dr. Heiden's testimony covered a period of approximately two days and filled 334 pages in the transcript. He was subjected to searching cross-examination by able defense counsel.

Although this is his first experience in putting together a damage assessment in a civil antitrust case, Dr. Heiden is eminently qualified for the task. He is currently the chief economist for a consulting firm in Washington, D. C. He has been employed as an economic consultant for a number of government agencies, including the U. S. Consumer Products Safety Commission and the Federal Trade Commission. Prior to that, he obtained his PhD in economics from Washington University. In addition, he has authored a number of articles and studies in the field of economics. At one time, he was hired as a consultant for ITT and apparently worked on that matter with defendant's present counsel. Although lacking specific experience with health care economic problems, Dr. Heiden stated:

> "I have used the general methodology and types of data that are used in damage assessments, such as this, really throughout my professional career in terms of analyzing the impact of regulations and antitrust conduct on firms and the behavior of industries...."

(T 5903)

Dr. Heiden calculated plaintiffs' actual damages for the first damage period in the following manner. First, Dr. Heiden focused on the six months which immediately preceded signing of the AHSC–VHA Agreement and called this the "base" period. During this base period, Dr. Heiden measured the actual medical-surgical sales made by each plaintiff and AHSD at each of the seven relevant VHA hospitals. This sales data for both plaintiffs and defendant was projected forward from July 1, 1979, the contract signing date, until August, 1980. The AHSD sales projection was adjusted to account for inflation, general growth in the medical-surgical supply industry and defendant's pre-contract expansion plans in the markets in which the VHA hospitals are located. (T 5950–5953) These sales projections from the base period data represent the sales which plaintiffs and defendant AHSD could reasonably expect at each VHA hospital in the absence of the Agreement.

Dr. Heiden then computed the actual sales of each plaintiff and AHSD at each VHA hospital under the Agreement for his first damage period. Actual sales statistics were available only until August, 1980.

Next, Dr. Heiden compared each plaintiffs' expected sales without the Agreement to its actual sales under the Agreement and plaintiffs' losses were computed. Then, AHSD sales with and without the Agreement were compared and defendant's gains were computed. Finally, plaintiffs' lost sales were "netted" against defendant's increased sales. Plaintiffs' sales were considered lost by reason of defendant's violation only if a plaintiff's decreased sales were matched against AHSD's increased sales at the particular hospital involved. After each plaintiff's lost sales were so calculated, Dr. Heiden applied a conservative profit margin, based on each plaintiff's business experience, to calculate lost profits. (T 5922–5924, 5981–5982)

Lost profits for the second and third damage periods were calculated in a similar manner. A similar comparison of plaintiffs' and defendant's projected sales with and without the Agreement was made. Plaintiffs' sales decreases were "netted" against defendant's sales increases to arrive at each

plaintiff's net lost sales. Then a conservative profit margin was applied to the net lost sales figures to arrive at the lost profits. Appendix 1 of this opinion shows net lost sales and lost profits sustained by each plaintiff at each VHA hospital as calculated under the Heiden methodology. (Source PX 255, Table 3.)

■ Dr. Heiden's methodology appears to be reasonably accurate when compared to traditional antitrust damage analyses. Generally, lost profits are a recognized element of antitrust damages. *See, Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Bigelow v. RKO Pictures, Inc., supra; South-East Coal Co. v. Consolidation Coal Co., supra.*

Dr. Heiden's base line sales projections provide a reasonable estimate of the relative shares of AHSC and plaintiffs in the sale of medical-surgical supplies to VHA hospitals. The adjustments made in these projections insure that they accurately represent the share of sales plaintiffs could have expected to maintain in those hospitals, absent defendant's antitrust violation. Projecting the share of sales to VHA hospitals that plaintiffs would have enjoyed but for defendant's unlawful activities is a common method of estimating damage. *See, Zenith Radio Corp. v. Hazeltine Research, Inc., supra.*

In *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., supra,* the Sixth Circuit reversed a district court judgment prohibiting plaintiffs from estimating their damages based upon a comparison between plaintiff's advertising revenues in an unrestricted market and its lesser revenues in a restricted market. The Sixth Circuit concluded that such a lost revenue estimate would be fair, and even suggested that injury suffered during the damage period could be calculated by comparing sales during that period with sales during a later, unrestricted time period. Accord *see, Heatransfer Corp. v. Volkswagenwerk, A. G.,* 553 F.2d 964 (5th Cir. 1977).

Dr. Heiden's estimate of plaintiffs' loss of its expected share of sales is less speculative than that approved in *Elyria-Lorain.* Un-

like the later case, Dr. Heiden's analysis rests on actual experience before the illegal restraint in the affected VHA hospitals, and not on estimates derived from plaintiffs' performance in another geographic area.

■ Once lost sales are projected, courts agree that lost profits may be calculated by multiplying a plaintiff's net profit per sales unit times the volume of lost sales. *See, e.g., Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874 (1st Cir. 1966); *North Texas Producers Association v. Young,* 308 F.2d 235 (5th Cir. 1962), *cert. denied,* 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963). *See generally,* Annot., 16 A.L.R. Fed. 14, 51 (1973). Dr. Heiden's use of this method, based on a conservative net profit figure derived from plaintiffs' experience, is reasonable. *See also, Reed Brothers, Inc. v. Monsanto Co.,* 525 F.2d 486, 499 (8th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976).

Defendant argues strenuously that Dr. Heiden ignored other factors which could influence AHSD's and plaintiffs' sales to VHA hospitals. This, of course, is an argument that can be made in almost any calculation of lost profits. One can never be absolutely sure what might have happened had the AHSC–VHA contract not been signed. Yet the evidence conclusively establishes that, prior to the contract, all of the plaintiffs were growing, viable concerns in a highly-competitive market. Nevertheless, for the first 14 months after the contract, when actual figures could be examined, plaintiffs' sales at the VHA hospitals were drastically reduced. The speed and degree with which the hospitals converted to American were obviously not identical at each hospital. Therefore, it is not surprising that some plaintiffs suffered greater damage than others. The fact that the damages so suffered were not the same for each plaintiff is not proof, as defendant argues, that the damages were not caused by the Purchasing Agreement.

Defendant also claims the Heiden methodology is fatally defective because his damage estimate fails to focus on specific medical-surgical products. The medical-

surgical supply distribution industry involves literally thousands of different items sold to the various hospitals. As Dr. Heiden observed, product-by-product analysis would be "very difficult" and "impractical." (T 6042, 6043) It is axiomatic that in any single case experts may differ in their economic approaches to a damage analysis. The use of a comparison of sales figures as undertaken by Dr. Heiden in this case is a reasonably accurate method.

Dr. Heiden's complete three-period damage analysis assesses plaintiffs' lost profits at $388,188.00 spanning a five-and-one-half year period since the signing of the AHSC–VHA Agreement. However, plaintiffs are not entitled to this full sum.

Dr. Heiden's analysis is implicitly based on the assumption that plaintiffs' prayer for an injunction will be denied. No adjustment is made in the Heiden calculations which takes into account defendant's full compliance with the injunction of this court. Presumably defendant will comply. Assuming defendant's full compliance, the court is unable to find with any degree of certainty that plaintiffs will continue to sustain further damage. In any event, even if plaintiffs continue to sustain some damage in the face of the injunction, the Heiden calculations are too speculative and do not, in my judgment, reasonably reflect such damage.

Accordingly, plaintiffs are entitled to damages for lost profits sustained from the signing of the Purchasing Agreement until April 22, 1982. This damage remedy shall include all of Dr. Heiden's first damage period and part of the second damage period. These damages are reflected in the following table. In accordance with Section 4 of the Clayton Act, these damages shall be trebled.

\*　　\*　　\*　　\*　　\*　　\*

TABLE 10

| VHA Hospital | Competitor | Damages 7/1/79 – 8/31/80 | Damages 9/1/80 – 4/22/82 * |
|---|---|---|---|
| CAMC – Charleston, W.VA. | Skyland | $27,528 | $75,056 |
| | Crocker-Fels | 257 | 646 |
| Christ Hospital – Cincinnati, Ohio | Crocker-Fels | 6,345 | 13,028 |
| Riverside Hospital – Columbus, Ohio | Crocker-Fels | 322 | 406 |
| Miami Valley Hosp. – Dayton, Ohio | Crocker-Fels | 928 | 2,070 |
| Butterworth Hosp. – Grand Rapids, MI | White & White ** | –0– | –0– |
| Community Hosp. of Indianapolis – Indianapolis, IN | Crocker-Fels | 506 | 909 |

\* Since the court is enjoining further antitrust activity, plaintiffs are not entitled to the full amount of damages in the Heiden second damage period, which consists of 28 months. Plaintiffs are entitled to damages sustained in the first 19.75 months of that period. Accordingly, the court has prorated the damages sustained within the allocable portion of the second damage period by multiplying the Heiden second damage period figures by a fraction of 19.75 divided by 28.

\*\* See pages 171–172. Although White and White has sustained no monetary damage, the violation of the antitrust laws by defendant constitutes a threatened loss or injury entitling White and White, along with the other plaintiffs, to injunctive relief. 15 U.S.C.A. § 26. See below.

| VHA Hospital | Competitor | Damages 7/1/79 – 8/31/80 | Damages 9/1/80 – 4/22/82 * |
|---|---|---|---|
| Norton-Children's Hospitals – | Ransdell | $ 2,379 | $ 6,061 |
| Louisville, KY | Crocker-Fels | 2,046 | 5,059 |
| Subtotal all plaintiffs | | $40,311 | $103,235 |

TOTAL DAMAGES ALL PLAINTIFFS: $143,546.00
TREBLED DAMAGE: $430,638.00

### C. Injunctive Relief.

Section 16 of the Clayton Act authorizes injunctive relief for threatened loss or damage by reason of a violation of the federal antitrust laws. The issuance of a permanent injunction lies within a federal district court's "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132, 89 S.Ct. 1562, 1581, 23 L.Ed.2d 129 (1969).

In executing and implementing the AHSC–VHA Purchasing Agreement, defendant has violated Sections 1 and 2 of the Sherman Act. Since the nature of defendant's antitrust violations is continuous and the life of the Purchasing Agreement has not expired, the court finds that future, similar antitrust violations by the defendant in each of the seven metropolitan submarkets are inevitable and certain. Injunctive relief is, therefore, appropriate. 15 U.S.C.A. § 26.

Defendant shall be enjoined from any conduct in furtherance of the AHSC–VHA Purchasing Agreement dated July 5, 1979, relative to the distribution of medical-surgical supplies to VHA hospitals in Cincinnati, Columbus, Dayton, Charleston, Louisville, Indianapolis and Grand Rapids. Specifically, the following commercial conduct of the defendant shall be included and proscribed by the injunction of this court.

Defendant shall be enjoined forthwith from offering or paying any price cap or volume incentive discount pursuant to the AHSC–VHA Purchasing Agreement in connection with the sale of medical-surgical supplies in the seven relevant metropolitan submarkets. Defendant shall also be enjoined from inducing the VHA hospitals to disclose to it the prices of any incumbent competitor for medical-surgical supplies and appropriating for itself this business at a matched price in any of the seven relevant metropolitan areas. Finally, defendant shall be enjoined from acting or conspiring with VHA hospitals to preclude competitive bidding for the distribution of medical-surgical supplies at any VHA hospital in the above seven relevant metropolitan areas.

One aspect of the injunctive relief to be granted by this court requires special mention. The court has previously determined that the acquisition by AHSC of salesman Paul Bush was an anticompetitive act designed to cripple defendant's principal competitor in the Charleston submarket. After carefully considering the means available to the court to remedy this particular antitrust injury, the court concludes that injunctive relief is inappropriate.

Injunctive relief to redress antitrust injuries must be fashioned in accordance with equitable principles. It is beyond the court's equitable powers to affirmatively decree that Mr. Bush must resume his former employment with Skyland. Similarly, while the court may enjoin Mr. Bush's continued employment with the defendant, equitable considerations militate against this remedy. To enjoin Mr. Bush from continued employment with AHSC could work an unwarranted personal hardship on him. Finally, the court is confident that its injunction, as previously defined, will be sufficient to reinvigorate competition in the Charleston submarket. Accordingly, the court, in its discretion, denies any injunctive

relief with respect to the employment of Paul Bush.

* * * * * *

## XIII. ATTORNEY FEES AND COSTS

The awarding of attorney fees and costs shall be determined in response to a later appropriately-filed motion, supporting documents and briefs.

## XIV. CONCLUSION

For the foregoing reasons, judgment is entered for plaintiffs on Count I and Count VI of the amended complaint; plaintiffs are awarded damages of One Hundred Forty-three Thousand Five Hundred Forty-six Dollars ($143,546.00), and trebled pursuant to Section 4 of the Clayton Act, for a total of Four Hundred Thirty Thousand Six Hundred Thirty-eight Dollars ($430,638.00); Count IV is dismissed; pursuant to Section 16 of the Clayton Act, injunctive relief in favor of the plaintiffs is ordered in accordance with this opinion and as set forth in the attached order; and finally, determination of attorney fees and costs, pursuant to Section 4 of the Clayton Act, is held in abeyance for later determination.

## JUDGMENT

This cause having been heard by the court and the court having filed this date its opinion containing findings of fact and conclusions of law; and the court having concluded that plaintiffs are entitled to judgment for the relief prayed for in the amended complaint, to the extent that it is hereinafter granted,

IT IS ORDERED, ADJUDGED AND DECREED, in accordance with Section 16 of the Clayton Act, that defendant, its divisions, officers, agents, representatives and employees be and are hereby permanently enjoined from any conduct in furtherance of the AHSC–VHA Purchasing Agreement dated July 5, 1979, concerning the sale and distribution of medical-surgical supplies to VHA hospitals in Cincinnati, Ohio; Columbus, Ohio; Dayton, Ohio; Charleston, West Virginia; Louisville, Kentucky; Indianapolis, Indiana; and Grand Rapids, Michigan. The aforesaid are permanently enjoined and restrained from in any manner:

(1) offering or paying any price cap or volume incentive discount pursuant to the July 5, 1979, AHSC–VHA Purchasing Agreement in connection with the sale of medical-surgical supplies in the seven aforementioned metropolitan submarkets;

(2) inducing the VHA hospitals to disclose to AHSC competitor prices for medical-surgical supplies or otherwise appropriating for itself this business at a matched price in any of the above seven metropolitan areas;

(3) inducing VHA hospitals to suppress or in any way discourage competitive bidding for the distribution of medical-surgical supplies at any VHA hospital in the above seven metropolitan areas.

Nothing herein ordered shall be construed in any way to prevent, discourage or impede defendant from traditional competition at VHA hospitals with plaintiffs or other medical-surgical suppliers and/or manufacturers.

IT IS ORDERED AND ADJUDGED that Count IV of plaintiffs' complaint, as amended, is dismissed.

The court having found that the unlawful acts of the defendant were a direct and proximate cause of damages sustained by plaintiffs, therefore,

IT IS ORDERED AND ADJUDGED that plaintiffs recover of the defendant the following sums, with interest thereon as provided by law, and their costs of this action:

| | |
|---|---|
| Bluefield Supply Co., Skyland Hospital Supply Division | $102,584.00 |
| The Crocker-Fels Company | $ 32,522.00 |
| Ransdell Surgical, Inc. | $ 8,440.00 |
| Total damages all plaintiffs: | $143,546.00 |
| Trebled per Section 4, Clayton Act | $430,638.00 |

APPENDIX 1

LOST DOLLAR SALES AND PROFITS BY COMPETITOR FOR VHA HOSPITALS IN THREE DAMAGE PERIODS

| VHA HOSPITAL | COMPETITOR | TYPE OF LOSS | DAMAGES July 1, 1979 – August 31, 1980 | DAMAGES September 1, 1980 – December 31, 1982 | DAMAGES January 1, 1983 – December 31, 1985 |
|---|---|---|---|---|---|
| CAMC – Charleston, W VA | Skyland | Sales | 1,019,565 | 3,941,060 | 5,418,838 |
| | | Profit | 27,528 | 106,408 | 146,309 |
| | Crocker-Fels | Sales | 12,871 | 45,799 | 63,200 |
| | | Profit | 257 | 916 | 1,264 |

LOST DOLLAR SALES AND PROFITS BY COMPETITOR FOR VHA HOSPITALS IN THREE DAMAGE PERIODS

| VHA HOSPITAL | COMPETITOR | TYPE OF LOSS | DAMAGES July 1, 1979 – August 31, 1980 | DAMAGES September 1, 1980 – December 31, 1982 | DAMAGES January 1, 1983 – December 31, 1985 |
|---|---|---|---|---|---|
| Christ Hospital Cincinnati, OH | Crocker-Fels | Sales | 317,261 | 923,569 | 1,271,386 |
| | | Profit | 6,345 | 18,471 | 25,427 |
| Riverside Hospital Columbus, OH | Crocker-Fels | Sales | 16,078 | 28,781 | 41,924 |
| | | Profit | 322 | 576 | 838 |
| Miami Valley Hospital Dayton, OH | Crocker-Fels | Sales | 46,391 | 146,728 | 200,768 |
| | | Profit | 928 | 2,935 | 4,015 |
| Henry Ford Hospital Detroit, MI | White & White | Sales | – – – | – – – | – – – |
| | | Profit | – – – | – – – | – – – |
| Butterworth Hospital Grand Rapids, MI | White & White | Sales | 632 | – – – | – – – |
| | | Profit | 21 | – – – | – – – |
| Community Hosp. of Indianapolis Indianapolis, IN | Crocker-Fels | Sales | 25,310 | 64,406 | 87,901 |
| | | Profit | 506 | 1,288 | 1,758 |
| Norton-Children's Hospital | Ransdell | Sales | 82,026 | 296,355 | 412,532 |
| | | Profit | 2,379 | 8,593 | 11,964 |
| Louisville, KY | Crocker-Fels | Sales | 102,290 | 358,476 | 492,698 |
| | | Profit | 2,046 | 7,170 | 9,854 |